UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GENUS LIFESCIENCES INC.,

Plaintiff,

v.

LANNETT COMPANY, INC., et al.,

Defendants.

Case No. 18-cv-07603-WHO

ORDER GRANTING LANNETT'S MOTION TO DISMISS IN PART AND DENYING IN PART; GRANTING FIRST DATABANK'S MOTION TO DISMISS; DENYING MOTION FOR RECONSIDERATION

Re: Dkt. Nos. 55, 64, 66

Plaintiff Genus Lifesciences Inc. ("Genus") complains that its competitors in the market for cocaine hydrochloride nasal spray, defendants Lannett Company Inc. ("Lannett") and Cody Laboratories, Inc. ("Cody"), Lannett's wholly owned subsidiary, falsely advertise, market and promote their product (which is not approved by the United States Food and Drug Administration) and unfairly compete with it in ways that violate the law. Genus also sues First Databank, Inc. ("First Databank"), a pharmaceutical pricing list company. On defendants' prior motions to dismiss, I found that some of Genus's claims against Lannett and Cody were plausibly stated but that none of its claims against First Databank were. Order Granting Lannett Company, Inc.'s and Cody Laboratories, Inc.'s Motion to Dismiss in Part and Denying in Part; Granting First Databank, Inc.'s Motion to Dismiss ("Order") [Dkt. No. 53]. I dismissed each claim with leave to amend, except for Genus's contributory false advertising claim against First Databank, which I dismissed with prejudice.

Genus has now filed an amended complaint. First Amended Complaint ("FAC") [Dkt. No. 54]. It has also filed a motion for reconsideration related to my dismissal with prejudice of its contributory false advertising claim against First Databank. [Dkt. No. 55]. Lannett and Cody,

jointly, and First Databank move to dismiss the FAC. [Dkt. Nos. 64, 66]. For the reasons stated below, Lannett and Cody's motion to dismiss is granted in part and denied in part, First Databank's motion to dismiss is granted, and Genus's motion to reconsider is denied.

## BACKGROUND

**Factual Background**

My previous Order contains a detailed factual background; I incorporate it by reference.[1] Order at 2-8. Genus manufactures an FDA approved spray under the brand name GOPRELTO® ("Goprelto") and Lannett and Cody manufacture an unapproved spray under the brand name C-Topical® ("C-Topical"). Genus newly alleges in the FAC that it has conducted a survey of Lannett's customers, revealing that 73.4% of them falsely believe that C-Topical is FDA approved. FAC at ¶ 10. The survey also shows that 70.4% of Lannett's customers falsely believe that Lannett only sells FDA approved products. *Id.* Genus uses this survey evidence to bolster its claims that C-Topical's packaging and labelling, as well as Lannett's websites, are unlawfully misleading. *Id.* at ¶¶ 106-128. In addition, Genus alleges new survey data related to whether C-Topical's unapproved status is material to its customers. *Id.* at ¶¶ 153-154.

In the FAC, Genus asserts: (i) new false advertising allegations based on several of Lannett's advertisements which describe C-Topical as a "pre-1998" drug (*Id.* at ¶¶ 47, 52, 67-82; Exhibits 34-37 attached to FAC [Dkt. No. 54-2]; (ii) new allegations that Lannett's product catalog identifies C-Topical as generic (*Id.* at ¶ 105); (iii) new allegations related to other listing companies (*Id.* at ¶¶ 133-135); (iv) additional allegations related to First Databank's practices and communications with Genus (*Id.* at ¶¶ 137-149, 169-205, 218-220); and (v) additional allegations in support of its Sherman Act claims against Lannett (*Id.* at ¶¶ 227-238).

**Procedural Background**

In the Order, I granted Lannett and Cody's motion to dismiss in part and denied it in part.

---

[1] Of note, on May 7, 2017, Genus quotes Lannett as stating: "Upon the recent request of the FDA to cease manufacturing and distributing our unapproved C-Topical product as a result of an approved product on the market, the Company has agreed to cease manufacturing its unapproved C-Topical 4% on June 15, 2019 and cease distributing the product on August 15, 2019." *Id.* at ¶ 51. Lannett's counsel confirmed that at the hearing on August 21, 2019.

On Genus's Lanham Act claims against Lannett and Cody, I ruled: (i) Genus may plead a false advertising claim against Lannett based on the implication that C-Topical is approved using survey data that 91% of pharmacists believe that all products pharmacists dispense are FDA approved; (ii) statements in SEC filings and investor calls that C-Topical is "grandfathered" or sold under a "preliminary new drug application" cannot support a Lanham Act claim without specific allegations that they were made for the purpose of influencing customers of cocaine hydrochloride solutions to buy C-Topical, or were disseminated sufficiently to the relevant purchasing public (pharmacists, hospitals, and doctors) to constitute "advertising" or "promotion" within the pharmaceutical industry; (iii) C-Topical's indication for oral, laryngeal, or nasal topical administration is false because the FDA defines a "topical" route of administration as to a particular spot on the outer surface of the body and the mucus membranes of the oral, laryngeal, and nasal cavities are not on the outside of the body; (iv) Lannett's failure to affirmatively identify C-Topical as unapproved to third party intermediaries and customers was sufficient to state a claim as to customers based on the survey data, but not as to third party intermediaries without further supporting allegations; (v) the meta description on C-Topical's website that it was generic could support a Lanham Act claim because the landing page would not disabuse a consumer of the notion that C-Topical is generic; (vi) general statements on Lannett's website were not false but could be misleading in context combined with allegations that they conveyed the implied message that C-Topical was grandfathered or sold with FDA approval and deceived a significant portion of recipients; (vii) general statements on Cody's website related to compliance with FDA requirements could support a Lanham Act claim because Cody's website contained an affirmatively false statement that its active pharmaceutical ingredients were FDA approved; and (viii) the appearance and content of C-Topical's labeling and packaging could not support a Lanham Act claim because they did not constitute an overt false statement and Genus failed to allege that the advertising actually conveyed the implied message that C-Topical was FDA approved and deceived a significant portion of recipients. Order at 9-20.

Turning to Genus's Sherman Act claims against Lannett, I found that that Genus failed to state a monopolization claim against Lannett based on false advertising for two reasons. *Id.* at 22-

3

23. First, Genus did not allege over what time period Lannett's meta description was online, how long the challenged statements were on Cody's website, or how long Lannett described C-Topical as having a "topical" route of administration. *Id.* Genus also failed to allege why these statements were not readily susceptible to neutralization by rivals. *Id.* Next, Genus's monopolization claim based on Lannett's listing practices failed because Genus did not allege that it had been substantially foreclosed from the entire cocaine hydrochloride market. *Id.* at 23-24. Finally, Genus's state law claims against Lannett under California's false advertising and unfair competition laws survived because they were premised on the same allegations of false advertising as Genus's Lanham Act claims. *Id.* at 25.

I granted First Databank's motion to dismiss on several grounds. Genus's false advertising claim failed because Genus was unable to allege that First Databank was anything more than a reference database. *Id.* at 27-30. First Databank's listing of C-Topical did not constitute commercial speech since it did not propose a commercial transaction between First Databank and consumers of cocaine hydrochloride. *Id.* Genus failed to allege that Lannett and First Databank had a quid-pro-quo relationship based on C-Topical's sales. *Id.* Its contributory false advertising claim against First Databank failed under the tests in *Duty Free Ams., Inc. v. Estée Lauder Cos.*, 797 F.3d 1248, 1275 (11th Cir. 2015) and *ADT Sec. Servs., Inc. v. Sec. One Int'l, Inc.*, No. 11-cv-05149-YGR, 2012 WL 4068632, at *1 (N.D. Cal. Sept. 14, 2012). For the *Duty-Free* test, Genus did not allege that First Databank knowingly induced or caused Lannett's conduct or materially participated in it. *Id.* at 30-33. Under the *ADT Services* test, Genus did not allege that First Databank either induced the primary Lanham Act violation by Lannett, or that First Databank continued to supply an infringing product to Lannett. The claims I dismissed against Lannett, Cody and First Databank were with leave to amend, except for Genus's contributory false advertising claim against First Databank, which was dismissed with prejudice. *Id.* at 33.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its

face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). If the court dismisses the complaint, it "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).

## DISCUSSION

## I. LANNETT AND CODY'S MOTION TO DISMISS

### A. The Lanham Act Claims

#### 1. Lanham Act Claims and FDA Approval

The Lanham Act creates a private right of action for competitors to bring claims for false or misleading advertising, even if the challenged products are regulated by the FDCA. *POM Wonderful LLC v. Coca-Cola Co.*, 134 S. Ct. 2228, 2233 (2014). "Courts can evaluate Lanham Act claims that do not require specialized knowledge or interpretation of the FDCA's requirements." *Belcher Pharm., LLC v. Hospira, Inc.*, No. 17-cv2353, 2018 WL 4643292, at *4 (M.D. Fla. Apr. 9, 2018). "For example, courts can review a claim that a competitor falsely represented its product as FDA approved." *Id.* (citing *Innovative Health Sols., Inc. v. DyAnsys, Inc.*, Case No. 14-cv-05207-SI, 2015 WL 2398931, at *8 (N.D. Cal. May 19, 2015)). "And claims that involve whether a product's advertising misleads consumers also fall within a court's jurisdiction." *Id.* (citing *Church & Dwight Co. Inc. v. SPD Swiss Precision Diagnostics*, 104 F.

Supp. 3d 348, 362 (S.D.N.Y. 2015).

To state a false advertising claim under the Lanham Act, a plaintiff must allege: "(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by lessening of the goodwill associated with its products." *Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, 758 F.3d 1069, 1071-72 (9th Cir. 2014) (citing *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997)). Plaintiffs must allege all five elements of the test in order to state a false advertising claim. *Id.* "When the alleged representation is not an overt false statement, but merely misleading in context, the evidentiary showing required to sustain a Lanham claim is higher" and "proof that the advertising actually conveyed the implied message and thereby deceived a significant portion of the recipients becomes critical." *JHP Pharm., LLC v. Hospira, Inc.*, 52 F. Supp. 3d 992, 1002-03 (C.D. Cal. 2014) (citing *William H. Morris Co. v. Grp. W, Inc.*, 66 F.3d 255, 258 (9th Cir. 1995)).

Courts have found that when a Lanham Act claim is based on the mere implication that a drug was approved by the FDA, a plaintiff must also plead other facts to show that customers were actually confused. *Par Sterile Prod., LLC v. Fresenius Kabi USA LLC*, No. 14-cv3349, 2015 WL 1263041, at *4 (N.D. Ill. Mar. 17, 2015). In *Par*, the court found the following additional allegations to state a Lanham Act claim: (i) that buyers believe all prescribed drugs identified on the Price Lists are FDA approved and (ii) that in some surveys 91% of pharmacists are actually confused about whether all drugs that appear on industry price lists are approved. *Id.* at *4.

## 2. Statements Made in SEC Filings and Investor Calls

In the Order, I held that statements made by Lannett in its SEC filings or by its directors during investment calls stating that C-Topical was "grandfathered" or sold under a "preliminary new drug application" were not actionable because they were not accompanied by specific allegations that they were made for the purpose of influencing the customers of cocaine

hydrochloride solutions to buy C-Topical, or were disseminated sufficiently to the relevant purchasing public (pharmacists, hospitals, and doctors) to constitute "advertising" or "promotion" within the pharmaceutical industry. Order at 12-14 (citing *Rice v. Fox Broadcasting Co.*, 330 F.3d at 1170, 1181 (9th Cir. 2003)). Lannett moves again to dismiss Genus's attempted revival of its claims based on SEC filings and statements made on investor calls. Defendant Lannett Co. Inc. & Cody Laboratories, Inc.'s Notice of Motion, Motion to Dismiss the First Amended Complaint ("Lan. MTD") at 7-8 [Dkt. No. 64]. It argues that Genus's conclusory allegations that these communications constitute "commercial statements" or were "advertised to customers" do not change the non-commercial nature of these statements. *Id.* (citing FAC at ¶¶ 55, 64).

Genus contends that its claim is not based on the statements in SEC filings or investor calls alone. Instead, it attempts to bring those claims in combination with the advertisements describing C-Topical as a "pre-1938" product (the "pre-1938 ads") and that together, this renders the statements contained in the SEC filings and investor calls actionable. Plaintiff Genus Lifesciences, Inc.'s Brief in Opposition to Lannett Company, Inc.'s and Cody Laboratories, Inc.'s Motion to Dismiss First Amended Complaint ("Lan. Oppo.") at 6-9 [Dkt. No. 68]. According to Genus, "this is all one claim" because it must be read in the context of the overall complaint. *Id.* at 6.

The problem with Genus's argument is that Lanham Act claims must be evaluated on a statement-by-statement basis. *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247-48 (11th Cir. 2002). In *Johnson & Johnson*, the Third Circuit reviewed a district court decision that reviewed several advertisements together, rather than on an ad-by-ad basis. *Id.* The court ruled that although "a court must analyze the message conveyed in full context," courts "may not assume context" and the district court erroneously assumed that consumers would be exposed to every advertisement in the campaign. *Id.* (internal citations and quotation marks omitted).

Here, Genus improperly asks me to assume context. There is no indication that consumers would have observed the SEC filings and statements in the investor calls along with the pre-1938

ads.  It would be improper to assume that they did without specific supporting factual assertions.[2]

As I held in the Order, Genus has failed to state a false advertising claim based on Lannett's statements in SEC filings or investor calls because it fails to bring specific allegations that they were made for the purpose of influencing customers or were disseminated sufficiently to the relevant purchasing public.  It does not follow that just because consumers might have seen the pre-1938 ads, they necessarily would also have seen the SEC filings or listened to the investor calls.  The pre-1938 ads will be considered separately from the SEC filings and investor calls.  Lannett's motion to dismiss Genus's Lanham Act claims based on SEC filings and investor calls is granted.

### 3.    The Pre-1938 Ads

As discussed above, Genus  attached four new C-Topical advertisements by Lannett to the FAC.  FAC at ¶¶ 68-76; Exhibits 34-37.  All four describe C-Topical as a pre-1938 drug (Exhibits 34-37) and three also state that "A New Drug Application (NDA), with clinical study data has been submitted to the FDA" (Exhibits 35-37). These advertisements appeared on www.lannettdirect.com (Exhibit 34) and on www.entjournal.com (Exhibits 35-37).

Lannett argues that these advertisements are not actionable because Genus has not plausibly alleged that customers were misled by the statements or that "pre-1938" status was material to customers.  Lan. MTD at 12-13.  It contends that Genus makes an unsupported inferential leap to claim that purchasers equate "pre-1938" with "grandfathered," or "FDA authorization."  *Id.*  To plead materiality, Lannett claims that Genus must plausibly allege that the statement "pre-1938" is likely to influence purchasing decisions and its allegations that FDA approval status is material do not cover these statements.  *Id.*  It points out that the ad on www.lannettdirect.com also states that "Cocaine HCL is a pre-1938 drug that has not been approved by the FDA" and the ENT Journal advertisements state that Cocaine HCL "has not been proven safe and effective by the FDA."  *Id.*  It does not address the statements related to

---

[2] Genus's authority on this point is not relevant.  Lan. Oppo. at 6 (citing *Brown v. Collections Bureau of Am., Ltd*, 183 F. Supp. 3d 1004, 1006 (N.D. Cal. 2016) (Seeborg, J.) (case involves no Lanham Act false advertising claims with multiple advertisements); *Evans v. Gilmore*, No. 15-cv-01772-MEJ, 2015 WL 4463747, at *9 (N.D. Cal. July 21, 2015) (same).

United States District Court
Northern District of California

1    submission of an NDA and clinical study data to the FDA.

2          In opposition to Lannett's argument that customers would not equate "pre-1938" with

3    "grandfathered," Genus asserts that:  (i) C-Topical's customers would know that 1938 is the year

4    Congress passed the landmark Federal Food, Drug, and Cosmetic Act; (ii) Lannett equates the two

5    and repeatedly used the phrase "1938 'grandfather clause'" in its citizen petition to the FDA; (iii)

6    the FDA used the same language to deny Lannett's petition; (iv) if Lannett's customers would not

7    understand what pre-1938 means, Lannett would not use the phrase; and (v) Genus specifically

8    alleged that "pre-1938"means the drug is "grandfathered" and FDA authorized.  Lan. Oppo. at 7

9    n.8.  These arguments apply to the claim related to submission of an NDA and clinical data as

10   well.  *Id.* at 9.

11         I agree that Genus has sufficiently alleged that people in the market for a prescription drug

12   such as C-Topical would know what "pre-1938" means in this context or what the implication of

13   submitting clinical data pursuant to an NDA would be.  It has sufficiently alleged that the only

14   reason Lannett would advertise C-Topical as "pre-1938," or that they had submitted an NDA,

15   would be to convince consumers that C-Topical is an unapproved "grandfathered" drug product or

16   otherwise authorized by FDA.[3]

17         Genus counters that Lannett's materiality argument erroneously conflates FDA approval

18   with FDA authorization.  *Id.*  It states that a "pre-1938" drug, or one that has a submitted NDA, is

19   FDA authorized, not FDA approved.  *Id.* at 7-9.  Thus, Genus claims, even where Lannett admits

20   it has no FDA approval for C-Topical, it still falsely suggests that C-Topical is otherwise

21   authorized.  *Id.*  And Genus asserts that it has adequately pleaded that customers would care

22   whether C-Topical was sold with FDA authorization because it has alleged that the FDA approval

23   status of a prescription drug is material to customers since approved drugs provide customers

24   assurance concerning the quality of the product not afforded to unapproved prescription drugs.  *Id.*

25

26   _____

27   [3] Genus also argues that both the statements that "C-Topical is a pre-1938 drug" and "Cocaine
     HCL has not been proven safe and effective by FDA" are literally false and are therefore
     presumed deceptive.  *Id.* 7-8.  Genus contends that the approval of its Goprelto product shows that

28   Cocaine HCL has been proven safe and effective by the FDA.  *Id.*  Lannett does not respond to
     this argument.  The claims based on literal falsity survive.

It cites to its survey evidence showing that the majority of Lannett's customers would not buy C-Topical if they knew it was unapproved. *Id.* Therefore, according to Genus, because customers care whether a drug is FDA-approved, they implicitly care whether the FDA authorizes a manufacturer to sell a drug. *Id.*

I agree with Genus's argument up until the final leap of logic. Genus has adequately alleged that customers care about FDA approval. But I am also persuaded by Lannett's argument on the difference between approval and authorization. The complaint does not allege that customers care about FDA authorization and Genus's argument that they must implicitly care about it is a bridge too far. Genus has not actually pleaded that FDA authorization, versus approval, is material to customers of cocaine hydrochloride. As a result, it has not stated a claim based on the pre-1938 ads. Its claims based on these ads are dismissed with leave to amend.

### 4. C-Topical's Labeling and Packaging

In the Order, I held that Genus had failed to state a claim based on the appearance and content of C-Topical's labeling and packaging and the allegedly misleading similarities between it and the labeling and packaging of an FDA approved drug. Order at 19-20. I held that because the alleged representation was not an overt false statement, but was merely misleading in context, Genus would have to allege that it actually conveyed the implied message that C-Topical was FDA approved and deceived a significant portion of recipients. *Id.* In response to that guidance, Genus conducted a survey of Lannett's customers; allegedly 73.4% of them falsely believed that C-Topical was FDA approved after reviewing its packaging. AC at ¶¶ 112, 114.

In its motion to dismiss, Lannett claims that this additional factual allegation is still insufficient because Genus does not allege that any of the information on the label or package is false. Lan. MTD at 8-10. According to Lannett, while the Lanham Act forbids misleading as well as false claims, "misleading" does not include "factual propositions that are susceptible to misunderstanding." *Id.* It asks me to disregard Genus's survey allegations because a survey cannot be used to ascribe a "misleading" meaning to an otherwise accurate statement. *Id.* It claims that it is required by federal law to include the various statements on the packaging and label and that under Genus's theory, Lannett could only avoid liability by eliminating essential

information.  *Id.*  Finally, it attacks Genus's survey, claiming that Genus failed to disclose which customers were surveyed.  *Id.*

Lannett's attack on the merits of the survey evidence fails at the motion to dismiss stage. Lan. Oppo. at 12.  While it may later attack the survey's methodology and findings successfully, it may not do so now.  Its attempt to reframe Genus's claim as contesting specific true statements on C-Topicals labeling and packaging also misrepresents Genus's claim; Genus instead attacks the overall combination of C-Topical's packaging as misleading consumers to believe that it is an FDA approved product.  *Id.*

Further, Lannett's authority that Genus's survey cannot be used to ascribe a "misleading" meaning to an otherwise true statement is distinguishable, and not just because that is not what Genus is attempting to do.  In *Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 886-87 (7th Cir.), opinion amended on denial of reh'g, 209 F.3d 1032 (7th Cir. 2000), the statement alleged to be misleading was the description of a particular infant formula as being the "1st Choice of Doctors."  *Id.* at 883.  The parties disputed whether this implied to consumers that a majority of physicians strongly preferred the product for strictly professional reasons when some surveys only showed plurality support.  *Id.* at 884.  The Seventh Circuit found that the district court improperly used the plaintiffs survey to define the meaning of the phrase "1st Choice of Doctors."  *Id.* at 887. Genus is not using survey data to parse a particular phrase and establish that it is misleading, and *Mead* is unhelpful.

*Allergan USA Inc. v. Imprimis Pharm.*, Inc., No. 17-cv-1551, 2018 WL 5919210, at *6 (C.D. Cal. Apr. 30, 2018) is not persuasive either.  There, the challenged claim was whether it was misleading to describe a product that was FDA-approved as such when the defendant had not perfectly complied with federal laws.  That is not the situation here.  Genus is not attempting to challenge particular statements on the C-Topical's labelling or packaging.

Finally, I am unpersuaded by Lannett's argument that it is protected from Genus's claims because it is required to include certain information on the package or label.  This supposed dilemma could be remedied by including a statement that C-Topical is not FDA-approved without running afoul of FDA labelling requirements.

1  Lannett's motion to dismiss Genus's Lanham Act claims based on C-Topical's labelling

2  and packaging is denied.

3  **5.      General Statements on Lannett's Website**

4  In the Order, I held that general statements on Lannett's website that it complied with FDA

5  regulatory requirements were not associated with, or made in reference to, C-Topical, and were

6  not false.  Order at 17-18.  But I held that they could be misleading in context if combined with

7  allegations that they actually conveyed the implied message that C-Topical was grandfathered or

8  sold with FDA approval and deceived a significant portion of recipients.  *Id.*  Genus has amended

9  its complaint with survey evidence to show that after reviewing Lannett's homepage for its

10  www.lannett.com website, 70.4% of Lannett's customers falsely believed that Lannett sells only

11  drugs that are FDA approved.  AC at ¶¶ 124-125.

12  Lannett counters in two ways.  Lan. MTD at 11-12.  First, it attacks Genus's survey,

13  arguing that the results say nothing about whether Lannett's statements actually conveyed the

14  implied message that C-Topical was sold with FDA approval.  *Id.*  It contends that Genus's survey

15  does not allege that participants were asked if the general statements on Lannett's website led

16  them to believe that C-Topical was approved by the FDA, particularly given that the C-Topical

17  page links to information stating that it is unapproved.  *Id.*  Second, it argues that its compliance

18  with FDA regulatory requirements is squarely within the primary jurisdiction of the FDA and may

19  not form the basis of a Lanham Act claim.  Lan. MTD at 11-12.

20  Genus points out that its survey provided numerous examples of customers identifying

21  Lannett's website as the cause of their false belief that Lannett only sells FDA-approved drug

22  products.  Lan. Oppo. at 13.  The FAC lists a number of responses to the question "What makes

23  you say Lannett sells only drugs that are FDA approved?" such as "Website mentions generic

24  medications, giving impression that they are selling already FDA approved pharmaceuticals" and

25  "based on the first page, it is a generic drug manufacturer.  Generic drugs still require FDA

26  approval."  FAC at ¶ 124.  I agree with Genus that this survey evidence is sufficient and again

27  reject Lannett's attempts to dispute Genus's methodology at the pleading stage.  Regarding

28  Lannett's second argument, as I held in the Order, "Courts can evaluate Lanham Act claims that

do not require specialized knowledge or interpretation of the FDCA's requirements." Order at 9 (citing *Hospira*, 2018 WL 4643292, at *4). This includes a "claim that a competitor falsely represented its product as FDA approved." *Id.* (citing *Innovative Health*, 2015 WL 2398931, at *8).

Lannett's motion to dismiss claims based on statements on its website is denied.

### 6.     Claims Related to the Route of Administration

In the Order, I held that pursuant to the FDA's Data Standards Manual for Route of Administration, C-Topical's label contained an affirmative misrepresentation. Order at 14-15. The FDA's manual states that a "topical" route is "[a]dministration to a particular spot on the outer surface of the body[,]" while C-Topical's label states that it is "indicated for the introduction of local (topical) anesthesia of accessible mucous membranes of the oral, laryngeal and nasal cavities." *Id.* I reasoned that because the inside of the nose, mouth, and larynx are not "particular spots on the outer surface of the body[,]" C-Topical's route of administration could not accurately be described as "topical" under the FDA's definitions. *Id.*

Despite this ruling, Lannett moves again to dismiss claims based on C-Topical's route of administration, arguing that Genus also describes Goprelto as "For Topical Use Only" at the FDA's direction, and therefore cannot plausibly allege that C-Topical's route of administration is false. Lan. MTD at 13-15. Instead, Lannett claims, Genus complains that C-Topical's description of uses for C-Topical is different than the FDA-approved label for Goprelto, which only lists a nasal route of administration. *Id.* And, according to Lannett, Genus does not allege any facts suggesting that Lannett's description of its product being for "oral, nasal, and laryngeal" use is false. *Id.*

Lannett's new argument is foreclosed under the consolidation rule pursuant to Federal Rule of Civil Procedure 12(g). As the court in *In re Anthem, Inc. Data Breach Litig.*, No. 15-MD-02617-LHK, 2016 WL 3029783, at *44 (N.D. Cal. May 27, 2016) observed:

> Federal Rule of Civil Procedure 12(g)(2) states that "[e]xcept as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." Federal Rule of Civil Procedure 12(h)(2), in turn,

> provides that arguments which pertain to a plaintiff's "[f]ailure to state a claim upon which relief can be granted . . . may be raised: (A) in any pleading allowed or ordered under Rule 7(a); (B) by a motion under Rule 12(c); or (C) at trial." To summarize, under Rule 12(g)(2) and Rule 12(h)(2), a party that seeks to assert a defense that was available but omitted from an earlier Rule 12 motion can only do so in a pleading, a Rule 12(c) motion, or at trial.

While Lannett states that its argument is based on "newly provided exhibits," that assertion is not well taken. The label and packaging for Goprelto was included in its initial complaint. Complaint at ¶¶ 31, 32 [Dkt. No. 1]. Lannett could have raised this argument in its initial motion to dismiss and failed to. On this ground alone, Lannett's motion to dismiss based on C-Topical's route of administration arguments is denied.[4]

Lannett's argument is also wrong on the merits. There is a distinction between the FDA's technical meaning of "topical" for routes of administration with the ordinary meaning of the word "topical." Lan. Oppo. at 15-18. Even if Goprelto is labeled "for topical use only," that does not mean that its route of administration is also topical. Genus's use of "topical" is consistent given that its product is a nasal solution, for "topical" use, and has a "nasal" route of administration. Lannett, in contrast, describes C-Topical as a topical solution, for topical use, and with a "topical" route of administration. For the reasons stated in the Order, this is false.

### 7. Statements to Third Parties

I previously held that Genus failed to allege that Lannett violated the Lanham Act by not identifying C-Topical as unapproved to third party intermediaries because it did not include any supporting allegations that third parties were misled into believing that C-Topical was approved. Order at 15-16. I held that McKesson's description of C-Topical did not state that it was unapproved and thus did not weigh in favor of, nor against, a finding that Lannett had misled McKesson. *Id.* I also found that since the price lists have C-Topical's unapproved status "buried," that would support a finding that Lannett had correctly informed the price lists that C-Topical was an unapproved drug. *Id.* But I found that Lannett's description of C-Topical as "topical" to pricing lists was a false statement. *Id.*

---

[4] Lannett claims that it may raise its argument based on newly provided exhibits attached to the FAC. Lan. MTD at 13-14. But Goprelto's label has always stated that it is "for topical use only."

14

Lannett argues that Genus has not remedied the identified defects and that exhibits attached to the amended complaint demonstrate that Lannett told pricing list companies that C-Topical is unapproved. Lan. MTD at 15-17. Lannett points to two exhibits. *Id.* The first is Exhibit 45, which Genus identifies as a document from First Databank. [Dkt. No. 54-2]. Under the field titled "FDA NSDE Marketing Category[,]" it describes C-Topical as "UNAPPROVED DRUG OTHER." *Id.* at 3. The second is Exhibit 46, which Genus identifies as a document from the Medi-Span price list. [Dkt. No. 54-2]. Under the field titled "Drug Application Information ("FDA")" it also describes C-Topical as "UNAPPROVED DRUG OTHER." *Id.* at 2.

In response, Genus argues that it has added allegations that support its claims that Lannett has McKesson advertise C-Topical as "generic." Lan. Oppo. at 18-19 (citing FAC at ¶ 130; Exhibit 46 at 2). Genus notes that despite identifying that C-Topical is unapproved, both First Databank and Medi-Span still promote it as generic. *Id.* (citing to Exhibits 45, 46).

It is not clear if exhibits 45 and 46 promote C-Topical as generic. Without a better explanation from Genus, I find that the exhibits do not support an inference that Lannett has misrepresented its product to these pricing lists as generic. Genus's claim that Lannett has misrepresented the route of administration to third parties survives but its claim that Lannett has misrepresented C-Topical as generic is dismissed with leave to amend.

### 8. Statements in Lannett's Catalog

Genus raises a new Lanham Act claim based on Lannett's product catalogs from 2016, 2014, and 2010, each of which characterizes C-Topical as "generic." FAC at ¶ 105; Exhibits 38, 39, 40. Lannett moves to dismiss because Genus has not pleaded any facts to suggest that these product catalogs were available to customers after Genus entered the market. Lan. MTD at 17-18. Lannett contends that in order to have standing, Genus must allege that the statements contained in these catalogs proximately caused "an injury to a commercial interest in sales or business reputation[.]" *Id.* (citing *Lexmark Int'l v. Static Control Components, Inc.*, 572 U.S. 118, 140 (2014)). According to Lannett, Genus must plead facts suggesting that "statements made prior to its entry into the market continued to have a market effect, such that it suffered competitive injury as a result of those statements once it entered." *Id.* (citing *Dyson, Inc. v. Garry Vacuum, LLC*, No.

1   10-01626, 2011 WL 13268002, at *5-6 (C.D. Cal. Jan. 4, 2011); *Sigma Dynamics, Inc. v. E.*

2   *Piphany, Inc.*, No. 04-cv-0569-MJJ, 2004 WL 2648370, at *4 (N.D. Cal. June 25, 2004).

3       Genus responds that Lannett has not averred that it removed the statements from any 2017,

4   2018, or 2019 catalogs or stopped using its 2016 catalog after Goprelto was approved by the FDA

5   in 2017. Lan. Oppo. at 9-10. It notes that it was able to find Lannett's 2016 catalog as late as

6   April 2019 and that Lannett has not produced more recent marketing materials. *Id.* It also argues

7   that Lannett misreads its complaint; it is alleging that Lannett not only misled, but currently

8   misleads, customers with its catalogs. *Id.* (citing FAC at ¶ 105 ("Lannett intentionally misleads

9   customers by characterizing C-Topical as a "generic" in its product catalog.")). It states that this is

10  part of Lannett's broader false advertising that C-Topical is generic across its meta-description,

11  product page, product catalogs, and other statements. *Id.* It seeks to combine its allegations with

12  its survey data. *Id.* It also argues that Lannett relied on outdated authority and that *Dyson* and

13  *Sigma* have been superseded by *Lexmark,* which holds that pleading proximate cause requires

14  "economic or reputational injury flowing directly from the deception wrought by the defendant's

15  advertising" and that the deception causes consumers to withhold business from the plaintiff. *Id.*

16  at 10-11 (citing 572 U.S. at 129-134). It states that it has done so by alleging that "[a]s a direct

17  result" of Lannett's various "false and misleading descriptions of fact, false and misleading

18  representations, and false and deceptive advertising," "Genus has suffered, currently suffers, and

19  will continue to suffer" injury. *Id.* (citing FAC at ¶¶ 244, 252).

20      Genus has failed to plead facts suggesting that these product catalogs are currently used by

21  Lannett in advertising or promotion or made available to purchasers in any way. *Id.* That Genus

22  was able to locate these older catalogs does not suggest otherwise. Its attempt to force Lannett to

23  affirm that it no longer described C-Topical as generic in later catalogs is inappropriate at the

24  pleading stage. *Id.*

25      Further, I agree with Lannett that *Dyson* and *Sigma* are still good law and consistent with

26  *Lexmark*. *Id.* at 11-12. *Lexmark* requires plaintiffs to allege "economic or reputational injury

27  flowing directly from the deception wrought by the defendant's advertising; and that that occurs

28  when deception of consumers causes them to withhold trade from the plaintiff." 572 U.S. at 133.

16

Genus would need to show how its injury flowed directly from these catalogs prior to it entering the market. There is no reason to think this is impossible, but the FAC's use of the present tense does not meet Rule 9(b)'s specificity requirements. *See* FAC at ¶ 105 ("Lannett intentionally misleads customers by characterizing C-Topical as a "generic" in its product catalog."). Genus's argument that this is part of Lannett's broader false advertising is also insufficient.

Lannett's motion to dismiss Genus's false advertising claim based on Lannett's 2016, 2014, and 2010 catalogs is granted. If discovery reveals similar statements in catalogs used by Lannett after Genus entered the market, Genus may amend its complaint.

### 9. Contributory False Advertising Claim Against Cody

In the Order, I found that Genus's contributory false advertising claim against Cody was adequately stated. Order at 19 ("Genus has sufficiently stated a claim for false advertising and contributory false advertising based on the statements contained on Cody's website."). Despite this, Lannett and Cody again argue that this claim fails "not only because Genus fails to plausibly allege violations of the Lanham Act, but also because Genus pleads no [facts] suggesting that Cody contributed, caused, or participated in any allegedly misleading statement." Lan. MTD at 7 n.8. I will not revisit my earlier ruling.

### B. The Sherman Act Claims

In the Order, I dismissed Genus's Sherman Act claims for failing to show that Lannett used its monopoly power to "to foreclose competition, to gain a competitive advantage, or to destroy a competitor." Order at 20-25 (citing *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 482-83 (1992) (citation omitted)). Genus did not overcome the presumption that Lannett's advertising had a *de minimis* effect on competition. *Id.* at 22-23.

In its initial complaint, Genus did not adequately allege that Lannett's statements were not readily susceptible to neutralization or offset by rivals. *Id.* at 23. Besides its attempts to get First Databank to change C-Topical's CFI number, Genus did not show why other efforts to promote Goprelto failed or would not be successful. *Id.* It did not plausibly allege why it was incapable of pushing back on Lannett's listing practices through other means. *Id.* Less significantly, Genus's monopolization claim based on false advertising also failed to allege how long Lannett's meta

17

description and the challenged statements on Cody's website had been online or how long Lannett had described C-Topical as having a "topical" route of administration. *Id.* at 23. And its monopolization claim for listing practices failed because it did not establish that it had been substantially foreclosed from the entire cocaine hydrochloride market. *Id.* at 23-25. Genus merely described its efforts related to a single promotional channel, First Databank, and did not show that existing or potential alternative channels of promotion were also foreclosed. *Id.*

In the FAC, Genus again brings its monopolization claims based on four things it claims Lannett does: (i) falsely characterizing C-Topical as having a "topical" route of administration in order to prevent customers from buying, or even becoming aware of Goprelto; (ii) preventing C-Topical from receiving the same product code as Goprelto by prohibiting First Databank from describing the solution as "nasal"; (iii) restricting access to true and complete information about available products in order to exclude competition by deceiving and misleading healthcare professionals into believing that no competing cocaine hydrochloride solution product exists; and (iv) tricking doctors, patients, and other consumers into believing that C-Topical is FDA approved so they will not feel inclined to search for an FDA-approved alternative. FAC at ¶ 311.

### 1. Monopolization Claim Based on False Advertising

Lannett argues that Genus still fails to overcome the presumption that Lannett's advertising had a *de minimis* effect on competition. Lan. MTD at 19-22. To plausibly allege that Lannett's advertising constituted exclusionary conduct and overcome a presumption that the effect on competition was *de minimis*, a plaintiff must allege cumulative facts that would prove the statements were: (1) clearly false, (2) clearly material, (3) clearly likely to induce reasonable reliance, (4) made to buyers without knowledge of the subject matter, (5) continued for prolonged periods, and (6) not readily susceptible to neutralization or other offset by rivals. *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publications, Inc.*, 108 F.3d 1147, 1152 (9th Cir. 1997) (citation omitted). [5] *Id.* According to Lannett, Genus still does not plead facts to explain why an advertising campaign promoting Goprelto as the only FDA approved

---

[5] Lannett also makes arguments about the first four factors. *Id.* at 21. I have already rejected these arguments in my prior Order and do not need to revisit them. Order at 22-23.

18

cocaine hydrochloride product would not be successful, or why any efforts to tell customers that C-Topical is unapproved or that its route of administration is misleading would fail. *Id.* It characterizes Genus's claims of exclusionary conduct as amounting to a complaint that customers are not becoming aware of Goprelto. *Id.* (citing FAC at ¶ 311).

In opposition, Genus contends that Lannett's conduct could not have been neutralized by traditional advertising because its false and misleading statements were being presented to the market through third-party price lists that appear to provide objective and unbiased information. *Id.* It also argues that it does not need to show that Lannett's statements were not readily susceptible to neutralization or other offset because courts do not apply the test in *Harcourt* when a defendant employs a third party to give false and misleading information the appearance of objectivity and lack of bias. *Id.*

The cases cited by Genus to argue that the test in *Harcourt* should not apply are not helpful. For example, in *TYR Sport, Inc. v. Warnaco Swimwear, Inc.*, 679 F. Supp. 2d 1120, 1127 (C.D. Cal. 2009) plaintiff TYR and defendant Speedo were both designers and manufacturers of high-end swim wear for competitive swimmers. USA Swimming, the national governing body of the sport, hired co-defendant Mark Schubert to be the head coach of the national and Olympic teams. *Id.* Schubert was and remained a paid spokesperson for Speedo. *Id.* TYR alleged that a combination of Speedo and USA Swimming made USA Swimming a de facto sales agent for Speedo. *Id.* In exchange for payments from Speedo, USA Swimming allegedly agreed to act as a promoter for Speedo and to make false statements that Speedo's products were "superior" and that its rivals' products were "inferior." *Id.* Schubert misled national team members by claiming that the Speedo suit provided "a 2% advantage" over the equipment made by Speedo's rivals. *Id.* USA Swimming agreed to alter images of sponsored athletes to remove logos of Speedo's competitors. *Id.* USA Swimming did not allow Speedo's competitors to advertise in its official publication, sponsor USA Swimming-sanctioned meets, or to post signs at meets. *Id.* There were also allegations that Schubert went beyond criticism and threatened athletes who chose to wear TYR's products by stating that they might not make it to the Olympics and that he might use his authority as head coach to mandate the use of Speedo's equipment. *Id.* at 1131. Some athletes

1    followed through on Schubert's recommendation that they breach their contracts with other

2    equipment providers to avoid "staying home" during the Olympics.  *Id.*

3          It is unsurprising that the court in *TYR* found that the *Harcourt* test did not apply.

4    *Harcourt's de minimis* presumption was based on "buyer distrust of a seller's disparaging

5    comments about a rival seller [that] should caution us against attaching much weight to isolated

6    examples of disparagement."  *Id.* at 1132 (citing *Harcourt*, 108 F.3d at 1152).  It did not apply

7    because the use of Schubert to make the disparaging statements gave the appearance of objectivity

8    and lack of bias.  *Id.*  Even if his connection to Speedo was generally known, his coaching position

9    may have given him added credibility that he otherwise would not have had solely as a Speedo

10   spokesperson.  *Id.*

11         The facts in this case are quite different.  Unlike Schubert, the price lists did not make

12   disparaging or false comments about Goprelto that would be difficult to rebut.  If anything, Genus

13   alleges that the pricing lists accurately describe Goprelto and inaccurately describe C-Topical.

14   This is not the same as rebutting disparaging comments made by an ostensibly neutral third-party

15   authority.[6]

16         *Killian Pest Control, Inc. v. HomeTeam Pest Defense, Inc.*, No. 14-cv-05239-VC 2015 WL

17   13385918, at *4 (N.D. Cal. Dec. 21, 2015) is also of no help.  That case involved rival pest control

18   companies where one misled homeowners into thinking that service by the other would damage

19   their home pest control systems and it physically placed locks on the systems to prevent access.

20   *Id.*  Nothing like that happened here.

21         Lastly, Genus cites *Fed. Trade Comm'n v. Qualcomm Inc.*, No. 17-cv-00220-LHK, 2019

22   WL 2206013 (N.D. Cal. May 21, 2019) and *Premier Elec. Constr. Co. v. Nat'l Elec. Contractors*

---

[6] Genus also cites *Prime Healthcare Servs., Inc. v. Serv. Emps. Int'l Union*, No. 11-cv-02652, 2012 WL 3778348, at *10 (S.D. Cal. Aug. 30, 2012) for the same proposition and it is inapplicable for the same reason.  There, Prime Healthcare alleged that a competing healthcare provider and labor union conspired to eliminate Prime Healthcare's market presence.  *Id.* at *2. The union defendant published disparaging statements about Prime Healthcare's quality of care and the healthcare provider defendant routinely cited these disparaging statements "as 'independent' evidence" of Prime Healthcare's poor quality of care.  *Id.* at *10.  That is not the scenario described in this case.

*Ass'n*, 814 F.2d 358 (7th Cir. 1987) for the proposition that even if it could neutralize Lannett's false advertising on the pricing lists by expending sufficient time and money on marketing to educate customers, this would impose a disproportionate burden on it due to Lannett's use of objective third parties. Lan. Oppo. at 22 n.21. But again, the conduct in these cases is too dissimilar to support Genus's argument that it need not allege that Lannett's conduct is not readily susceptible to neutralization or offset. *Qualcomm* involved wholly dissimilar allegations related to a complex licensing scheme; the court did not even consider the *Harcourt* test. *Premier* involved the effect of non-union electrical workers underbidding union electrical workers because they did not have to pay dues. Again, the court did not consider the *Harcourt* test.

Genus has not shown that Lannett's advertising had more than a *de minimis* effect on competition. It fails to explain why an advertising campaign to promote Goprelto as the only FDA approved cocaine hydrochloride solution would not be effective. Its arguments are undercut by its own survey data, which state: (i) "62.8% of Lannett's customers acknowledged that if he or she was told that the cocaine hydrochloride solution product sold by Lannett was not FDA approved, that information would influence his or her decision about whether to purchase or dispense" C-Topical; and (ii) "60.6% of Lannett's customers would be less likely to purchase, use, or dispense [C-Topical] if he or she had information that [C-Topical] was not FDA approved." FAC at ¶¶ 153, 154.

Additionally, Genus now alleges that Lannett has been making false and misleading representations that C-Topical has a topical route of administration since at least 2013. Lan Oppo. at 21 (citing FAC at ¶ 167). In support of this proposition, Genus cites only to Lannett's SEC filings.[7] FAC at ¶ 167. It has not shown that these filings were made for the purpose of influencing the customers of cocaine hydrochloride solution to buy C-Topical, or were disseminated sufficiently to the relevant purchasing public. They cannot be used to satisfy the

---

[7] "On information and belief, Lannett has described C-Topical as having a 'topical' route of administration since 2013. For example, in Lannett's 2013 10-K filing to the U.S. Securities and Exchange Commission, the company described C-Topical as 'an analgesic topical solution.' Lannett used identical language in its 2014, 2015, 2016, and 2017 10-K filings. In 2018, Lannett filed a 10-K document where it describes a competitor receiving approval to sell a 'Cocaine Hydrochloride topical product' that could interfere with Lannett's ability to sell C-Topical."

fifth prong of the *Harcourt* test.

**C. Monopolization Claim Based on Listing Practices**

Lannett claims that Genus's monopolization claim based on its listing practices fails again for four reasons. Lan. MTD at 22-24. First, Genus has not alleged that Lannett denied it access to First Databank or Medi-Span. Instead, according to Lannett, Genus claims that it is able to correctly list its products on the pricing lists used by the three largest wholesalers and that essentially the entire market can access information about Goprelto by either searching for "cocaine hydrochloride" (which would show both products) or Goprelto (which would show only Genus's product). *Id.* Lannett contends that Genus's complaint rests on the narrow allegation that if a customer re-orders C-Topical or searches directly for it, they will not also be notified of Goprelto. *Id.* Second, Genus's allegations relate only to a single promotional channel, namely price lists, and that there are no allegations that Lannett has prevented it from using other promotional channels. *Id.* Third, Genus's claim amounts to a complaint that it cannot free-ride off Lannett's customers who specifically seek out C-Topical. *Id.* Fourth, Genus's concern about customers being able to access "complete" and "accurate" information on price lists is false because it has petitioned First Databank to remove C-Topical from its price list entirely.

Genus responds that it has sufficiently alleged that Lannett's conduct affects all of the distribution channels through which cocaine hydrochloride is sold and therefore it has been excluded from the entire market. Lan. Oppo. at 23-25. It argues that because virtually all cocaine hydrochloride solution is purchased through the three largest drug wholesalers (AmerisourceBergen, Cardinal Health, and McKesson) and that all three wholesalers rely on First Databank and Medi-Span's price lists, Lannett's falsely identified route of administration impacts all distribution channels. *Id.* It contends that this does not affect the purchase decisions of only the "narrow subset of customers" described by Lannett because virtually all customers that look at either product must conclude that they do not share the same route of administration and would question whether they are equivalent and substitutable for the same procedure. *Id.* It asserts that this interferes with the primary purpose of the price lists, namely to collect accurate information regarding drug characteristics and pricing from a litany of sources so that doctors can easily

compare products on a single platform. *Id.*

Genus also argues that even though its product is still listed on the price lists, substantial foreclosure does not require total foreclosure, and courts routinely find that foreclosure has occurred even when a competitor has access to the market. *Id.* According to Genus, Lannett's decision to use misleading codes on First Databank and MediSpan's price lists disproportionately harm potential competitors because it prevents customers from understanding that new cocaine hydrochloride solution products entering the market can be substituted for C-Topical. *Id.* It states that this burden is disproportional because it is not one that Lannett was forced to overcome and is insurmountable. *Id.* Genus cites to an email from Cardinal stating that because of the different routes of administration on the labels for Goprelto and C-Topical, customers purchasing C-Topical would not see Goprelto as a "cardkey equivalent." *Id.* (citing Exhibit 51).

Genus's monopolization claim based on listing practices fails for largely the same reasons as its claim based on Lannett's advertising. It can still be found on the price lists that it alleges are the source of its problems. Its survey data show that if 60% of Lannett's customers knew C-Topical lacked FDA approval they would not purchase it. FAC at ¶¶ 153, 154. It has not alleged that it has been prevented from educating Lannett's customers about the approval status of C-Topical. Cocaine hydrochloride customers who are not simply reordering C-Topical would still be able to find Goprelto as well. Genus's citation to *Qualcomm* is not persuasive for the reasons described above. Its citation to *Church & Dwight Co., Inc. v. Mayer Labs., Inc.*, No. 10-cv-4429-EMC, 2011 WL 1225912, at *6 (N.D. Cal. Apr. 1, 2011) is similarly unhelpful. There, the alleged scheme involved rebates on condoms from the defendant manufacturer that incentivized drug stores to use a certain percentage of their display area on only the defendant's condoms, preventing competitors from displaying their products. *Id.* at *2. Here, C-Topical's listing on the price databases does not foreclose a large percentage of display space as it did with physical stores in *Church*. Both C-Topical and Goprelto are displayed on an online price database; unlike shelf space, an online price database is not a zero-sum display. *Church* is unhelpful to Genus. I dismiss Genus's Sherman Act claims with prejudice.

### D. The State Law Claims

Lannett again moves to dismiss Genus's California False Advertising and Unfair Competition Law claims because they are premised on the same allegations as the Lanham Act Claims. Lan. MTD at 24-25. The Order already rejected this argument. Genus has sufficiently pleaded violations of the Lanham Act. Order at 25. Lannett's argument fails again for the same reason and its motion to dismiss state law claims is denied.

## II. FIRST DATABANK'S MOTION TO DISMISS

In the Order, I held that Genus's Lanham Act claims against First Databank failed because a Lanham Act claim must be based on commercial speech and First Databank was not engaging in commercial speech when it listed C-Topical (or Goprelto) on its pricing list. Order at 25-30. I reasoned that First Databank does not propose a commercial transaction between it and customers of cocaine hydrochloride and Genus failed to allege that the information contained in its pricing list was for the purpose of inducing Genus or Lannett's customers to enter into a commercial transaction with First Databank. *Id.* at 27. I observed that Genus does not contend that First Databank will be more successful or have a monetary interest in whether customers of cocaine hydrochloride choose to buy C-Topical rather than Goprelto. *Id.* There were no allegations of a quid-pro-quo relationship between Lannett and First Databank, where First Databank would receive a kickback from sales of C-Topical that it would not receive from sales of Goprelto. *Id.* at 27-28. Indeed, the allegations in the complaint suggested that First Databank's interest was in having a comprehensive list of pharmaceutical products, not that any particular pharmaceutical product should be more successful than another. *Id.* at 28.

Lannett has amended its complaint to provide more detail on how First Databank operates and the role of price lists in the pharmaceutical industry. FAC at ¶¶ 169-198. None of these allegations supports a finding that First Databank has any monetary interest in whether customers of cocaine hydrochloride choose to buy C-Topical rather than Goprelto. Accordingly, First Databank moves to dismiss.[8] Defendant First Databank, Inc.'s Motion to Dismiss First Amended

---

[8] First Databank also makes a number of other arguments that I need not reach because the commercial speech issue is dispositive. *Id.* at 7-9.

24

Complaint ("FD MTD") [Dkt. No. 66].

Genus contends that First Databank falsely advertises that its database is "reliable" and "accurate." Plaintiff Genus Lifesciences, Inc.'s Opposition to First Databank, Inc.'s Motion to Dismiss First Amended Complaint ("FD Oppo.") [Dkt. No. 73] at 7-11. Count V states that:

> First Databank is falsely and misleadingly advertising Lannett's and Cody's CTopical in First Databank's database as a "topical" route of administration. First Databank falsely and misleadingly assigns a CFI code to reflect the route of administration and falsely and misleadingly assigns GOPRELTO® a different CFI code.

FAC at ¶ 284. This claim is unrelated to First Databank's alleged representations that its database is "reliable" and "accurate."

This argument fails on the merits as well. As First Databank contends, Genus cannot show a causal link between these general statements and its alleged injuries sufficient to confer standing under the Lanham Act. FD Reply at 2. To the extent that First Databank customers rely upon it in making decisions, they are relying on the database itself, not generic statements about the pricing list as a whole. These general statements do not relate to C-Topical or Goprelto and cannot form the basis of Genus's false advertising claims.

In addition, courts have generally found that false advertising claims cannot be premised on these sorts of general statements of accuracy or reliability. Courts may determine as a matter of law whether a statement is puffery. *Cook, Perkiss & Liehe, Inc. v. N. California Collection Serv. Inc.*, 911 F.2d 242, 245 (9th Cir. 1990) ("District courts often resolve whether a statement is puffery when considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) and we can think of no sound reason why they should not do so."). Courts analyzing whether a statement constitutes puffery examine whether it contains general assertions that say nothing about the specific characteristics or components of a product or whether it includes specific factual assertions. "The common theme that seems to run through cases considering puffery in a variety of contexts is that consumer reliance will be induced by specific rather than general assertions. Advertising which merely states in general terms that one product is superior is not actionable. However, misdescriptions of specific or absolute characteristics of a product are actionable." *Id.* at 246 (citing *Smith-Victor Corp. v. Sylvania Elec. Products, Inc.*, 242 F. Supp.

302, 308-09 (N.D. Ill. 1965) (advertiser's statement that its lamps were "far brighter than any lamp ever before offered for home movies" was ruled puffery. However, when the advertiser quantified numerically the alleged superior brightness with statements such as "35,000 candle power and 10–hour life," the court found a potential Lanham Act claim)).

The statements identified by Genus have been held to be non-specific puffery in other cases. *See In re Seagate Tech. LLC Litig.*, 233 F. Supp. 3d 776, 793 (N.D. Cal. 2017) ("Use of terms like "quality," "reliability," and "performance" generally constitutes puffery."). For the same reasons, First Databank's general statements of accuracy and reliability are not actionable.

Genus's second argument concerning First Databank's allegedly false statements about C-Topical's route of administration was considered in detail in the Order. I will not revisit it here. Order at 25-30. Genus's false advertising claim against First Databank is dismissed with prejudice.

### III.    MOTION TO RECONSIDER ON CONTRIBUTORY FALSE ADVERTISING

In the Order, I dismissed Genus's contributory false advertising claim against First Databank with prejudice. Order at 30-33. I observed that it was unclear in this Circuit if contributory false advertising could apply to non-commercial speech in any context because the Lanham Act applies only to commercial speech. *Id.* at 30 (internal citations omitted). Even if it does, Genus's claim fails under either the Eleventh Circuit's contributory false advertising rule as articulated in *Duty Free Ams., Inc. v. Estée Lauder Cos.*, 797 F.3d 1248, 1275 (11th Cir. 2015)[9] or the test in *ADT Sec. Servs., Inc. v. Sec. One Int'l, Inc.*, No. 11-cv-05149-YGR, 2012 WL 4068632, at *1 (N.D. Cal. Sept. 14, 2012). *Id.* at 31-33.

The claim failed the test in *Duty Free* because Genus did not allege that First Databank directly controlled Lannett's false advertising, was a dispositive factor in enabling Lannett's false advertising, explicitly or implicitly encouraged Lannett's false advertising, or refused to halt Lannett's false advertising in bad faith. *Id.* at 32. I held that the allegations in the complaint did not suggest that First Databank's conduct induced Lannett to represent its route of administration

United States District Court
Northern District of California

---

[9] To date, no other court in the Ninth Circuit has applied the *Duty Free* test.

as "topical." *Id.* I then found that First Databank failed the test articulated in *ADT* because Genus did not allege that First Databank intentionally induced the primary Lanham Act violation by Lannett or that First Databank continued to supply an infringing product to Lannett. *Id.* at 32-33. I observed that:

> Although the tests in *Duty Free* and *ADT. Sec. Servs.* are different, the same theory animates both: the party accused of contributorily infringing essentially drives the infringing party's conduct. Here, Genus's theory is the opposite. It cannot state a claim for contributory false advertising under its preferred test or under First Databank's preferred test.

Order at 33.

Genus now moves for leave to file a motion for reconsideration, entry of partial judgment, or to allow it to certify the issue for appeal to the Ninth Circuit. [Dkt. No. 55]. Genus argues that the Ninth Circuit recently reaffirmed the broad legal standard for contributory liability as requiring only "material contribution." *Id.* (citing *VHT, Inc. v. Zillow Group, Inc.*, 918 F.3d 723 (9th Cir. 2019)). According to Genus, this standard is in line with the "material participation" standard in *Duty Free* and that it was error to require allegations that First Databank "caused" or "drove" Lannett's direct false advertising. *Id.*

In its proposed motion, Genus elaborates that in *VHT*, the Ninth Circuit broadly articulated the standard for contributory liability in a copyright infringement case as follows: "Contributory liability requires that a party (1) has knowledge of another's infringement and (2) either (a) materially contributes to or (b) induces that infringement." Plaintiff Genus Lifesciences, Inc.'s [Proposed] Motion for Reconsideration Pursuant to Civil Local Rule 7-9 or, Alternatively, Certification for Appeal Pursuant to FRCP 54(b) and/or 28 U.S.C. § 1292(b) (Recon. Mot.) at 4 (citing *VHT*, 918 F.3d at 745 (internal quotation marks omitted)) [Dkt. No. 56-1]. Genus states that this decision was published after Genus filed its previous opposition to First Databank's first motion to dismiss. *Id.* Were I to import the standard from *VHT*, Genus argues, its contributory false advertising claim against First Databank would survive because "First Databank has control over its database, it is one of the main channels through which Lannett propagated its false claims, and First Databank controls the dissemination of Lannett's false statements throughout its

database." *Id.* at 4-5.

After Genus filed its motion to reconsider, I issued an order for response. [Dkt. No. 72]. First Databank opposed because although *VHT* was not decided until after Genus filed its opposition, the opinion was issued weeks before oral argument and Genus did not raise the decision then. *Id.* at 1. More significantly, *VHT* is a copyright case, not a Lanham Act case, and the discussion on "material contribution" is specific to the context of copyright infringement. *Id.* First Databank states that it is unclear how the standard in *VHT* could be applied to a false advertising claim without collapsing the secondary claim into the primary false advertising claim. *Id.* It argues that Genus's theory would "create potential Lanham Act liability for all publishers of non-commercial information based on allegations that the information they publish contributes to separate allegedly false advertising by third parties." *Id.*

*VHT* involved a professional real estate photography studio that brought a copyright infringement action against the owner of a real estate marketplace website. 918 F.3d at 730. The plaintiff alleged that the owner's use of photos on its website exceeded scope of studio's licenses to brokers, agents, and listing services who provided photos to website. *Id.* The court held that in the copyright context, online material contribution to infringement by a "computer system operator" was proper "if it has actual knowledge that specific infringing material is available using its system, and can take simple measures to prevent further damage to copyrighted works, yet continues to provide access to infringing works." *Id.* at 745 (internal citations omitted).

I agree with First Databank that it is not clear that importing the material contribution standard from the online copyright context to Lanham Act false advertising claims makes sense. To do so would open up a vast and currently non-existent scope of liability for all publishers of non-commercial information. Copyright has its own body of law that is separate and apart from the Lanham Act; I decline to conflate the two. Genus's motion for reconsideration is denied.[10] For the avoidance of doubt, Genus's "placeholder" contributory false advertising claim is

---

[10] Genus also provides argument related to whether First Databank can be contributorily liable for Lannett's false advertising without engaging in commercial speech itself. Recon Mot. at 6-7. Because the material contribution issue is dispositive, I need not reach this argument.

dismissed with prejudice.

I also decline to enter partial judgment or to certify the issue for appeal. I agree with First Databank that Genus's contributory false advertising claim overlaps with Genus's false advertising claims against Lannett and Cody. Certification for appeal will delay the case and drive up the costs of the parties in violation of the principles of Federal Rule of Civil Procedure 1.

## CONCLUSION

For the reasons stated above, Lannett and Cody's motion to dismiss is granted in part and denied in part. Genus may amend its Lanham Act claims against Lannett and Cody. Its Sherman Act claims are dismissed with prejudice. First Databank's motion to dismiss is also granted with prejudice. Genus's motion for reconsideration is denied.

**IT IS SO ORDERED.**

Dated: September 3, 2019

William H. Orrick
United States District Judge