Michael J. Freno (*pro hac vice*)
michael.freno@klgates.com
Jeffrey C. Johnson (*pro hac vice*)
jeffrey.johnson@klgates.com
Harold Storey (SBN 268603)
harold.storey@klgates.com
Elizabeth Weiskopf (*pro hac vice*)
elizabeth.weiskopf@klgates.com
**K&L GATES LLP**
925 Fourth Avenue, Suite 2900
Seattle, WA 98104
Telephone: + 1 206 623 7580
Facsimile: + 1 206 623 7022

Jason N. Haycock (SBN 278983)
jason.haycock@klgates.com
**K&L GATES LLP**
Four Embarcadero Center, Suite 1200
San Francisco, CA 94111
Telephone: +1 415 882 8200
Facsimile: +1 415 882 8220

Allen Bachman (*pro hac vice*)
allen.bachman@klgates.com
**K&L GATES LLP**
1601 K Street NW
Washington D.C., 20006-1600
Telephone: + 1 202 778 9000
Facsimile: + 1 202 778 9100

*Attorneys for Plaintiff Genus Lifesciences, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| GENUS LIFESCIENCES INC.,<br><br>          Plaintiff,<br><br>vs.<br><br>LANNETT COMPANY, INC., CODY LABORATORIES, INC.<br><br>          Defendants. | Case No.: 3:18-cv-07603-WHO<br><br>**SECOND AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>**FILED UNDER SEAL** |

Genus Lifesciences Inc. ("Genus" or "Plaintiff"), for its Second Amended Complaint herein, alleges as follows:

## **INTRODUCTION**

1.      Genus brings this lawsuit under section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)), the California Business and Professions Code, §§ 17200 *et seq.,* 17500 *et seq.*, and the common law. Genus's claims against Lannett Company, Inc. ("Lannett") and Cody Laboratories, Inc. ("Cody") (collectively, "Defendants" or "Lannett") arise from Defendants falsely advertising, marketing, and

promoting a prescription cocaine hydrochloride solution 4% drug product, sold under the brand name C-Topical® ("C-Topical"), that is not approved by the U.S. Food and Drug Administration ("FDA").[1]

2. As of the filing of this Second Amended Complaint, Genus holds the only FDA approved New Drug Application ("NDA") for cocaine hydrochloride solution in the United States. On December 14, 2017, FDA granted approval of NDA 209963 permitting Genus to market GOPRELTO® (cocaine hydrochloride nasal solution 4%) for "the induction of local anesthesia of the mucous membranes when performing diagnostic procedures and surgeries on or through the nasal cavities in adults." (Exhibit 1 at 1.) GOPRELTO® is the first cocaine product ever approved by FDA. Genus makes, sells, or offers to sell, its FDA approved cocaine hydrochloride solution 4% as both branded GOPRELTO® and an authorized generic of GOPRELTO® (collectively, "GOPRELTO®").

3. GOPRELTO® is used by physicians on adult patients for the induction of local anesthesia of the mucous membranes during diagnostic procedures and surgeries on, or through, the nasal cavities. In particular, GOPRELTO® is used by otolaryngologists, commonly known as ENTs (ear, nose and throat specialists), and plastic surgeons while performing intranasal medical procedures.

4. Lannett has no FDA approval to market a cocaine product to wholesalers, hospitals, pharmacists, doctors, patients, or anyone else (collectively, "customers") in the United States, including California.

5. In order to market a drug under the Federal Food, Drug, and Cosmetic Act ("FDCA") a company generally must obtain FDA approval by filing an NDA or an Abbreviated New Drug Application ("ANDA"). 21 U.S.C. § 355(a). Lannett's C-Topical is not FDA approved pursuant to an NDA. 21 U.S.C. § 355(b). Lannett's C-Topical is also not FDA approved pursuant to an ANDA. 21 U.S.C. § 355(j). And although there are theoretical exemptions from the FDCA's NDA and ANDA approval requirements, Lannett's C-Topical has not qualified for any exemptions that would allow Lannett to lawfully market C-Topical in the United States. As a result, FDA required Lannett to stop distributing C-Topical as of August 15, 2019.

---

[1] Genus's Complaint and First Amended Complaint alleged Sherman Act violations against Lannett and Cody, and alleged false advertising and contributory false advertising by First Databank, Inc. ("First Databank"). Genus incorporates those claims by reference to preserve Genus's right to appeal the Court's decision dismissing those claims.

6. Nonetheless, since at least as early as 2008, Lannett and Cody have manufactured, marketed, and sold C-Topical to customers in the United States, including in California and this judicial district, without any FDA approval or approval from any relevant California act or agency.

7. Whether drugs are FDA approved is material to consumers. FDA approval tells customers that a drug is legally marketed and provides customers with an assurance as to the quality of the product. Because the marketing of unapproved drugs is not FDA regulated, such marketing may present a serious safety issue to customers. (Exhibit 2 at 1 ("Unapproved drugs are *not* generic medications, and neither their safety nor their efficacy can be assured"); Exhibit 3 at 1–2; Exhibit 4 at 2–3.) In a past survey of pharmacists, 100% of pharmacists stated that if they had a choice, the pharmacist would choose to purchase a prescription drug for their pharmacy that was approved by the FDA, rather than a prescription drug that was not approved by the FDA. (Exhibit 5 at Exhibit 13 ¶ 8.)

8. Despite having no FDA approval to legally market C-Topical, Lannett and Cody intentionally mislead, and have misled, customers into believing that C-Topical is FDA approved and legally marketed by, among other things: (i) advertising and packaging C-Topical to look like an FDA approved drug product; (ii) advertising C-Topical as a "Generic Pharmaceutical;" (iii) advertising C-Topical as a legally marketed "grandfathered" product; and (ii) advertising C-Topical as legally marketed under a NDA submitted to FDA for a related cocaine product.

9. Customers are actually deceived by Lannett's false and misleading commercial statements concerning C-Topical. Based on a recent survey of Lannett's customers, 73.4% of Lannett's customers falsely believe that C-Topical is FDA approved, and 70.4% of Lannett's customers falsely believe that Lannett only sells FDA approved products.

10. Lannett also intentionally misleads, and have intentionally misled, customers by indicating that C-Topical is a superior product to Genus's GOPRELTO® by having broader indications of use. Lannett's false and misleading advertisements are causing, and have caused, irreparable damage to Genus's business and sale of its competing approved GOPRELTO® product, including in the State of California and this judicial district, and will continue to cause such harm until it is enjoined. This lawsuit arises from Lannett's false and misleading marketing of C-Topical throughout the United States, including California.

11.     Genus seeks, among other things, to enjoin Lannett's ongoing violations of the Lanham Act, the California Business and Professions Code, and the common law; and to stop Lannett from falsely advertising, marketing and promoting its unapproved C-Topical.  Genus also seeks damages resulting from Lannett's unlawful conduct as set forth in the Prayer for Relief.

## THE PARTIES

12.     Genus is a Pennsylvania corporation organized under the laws of the State of Pennsylvania, with a principal place of business at 514 North 12th Street, Allentown, Pennsylvania 18102.

13.     On information and belief, Lannett is a corporation organized under the laws of the State of Delaware, with a principal place of business at 9000 State Road, Philadelphia, Pennsylvania 19136.

14.     On information and belief, Cody is a corporation organized under the laws of the State of Wyoming, with a principal place of business at 601 Yellowstone Avenue, Cody, Wyoming 82414, and Cody is the wholly owned subsidiary of Lannett.  On information and belief, Cody manufactured the finished dosage form of C-Topical at its facility in Cody, Wyoming.  Cody also packaged C-Topical.  Lannett includes its name on the packaging and drug as the "labeler."

## JURISDICTION AND VENUE

15.     This action arises under the Lanham Act, 15 U.S.C. § 1125(a), under the statutory law of the State of California, and under the common law.  This Court has subject matter jurisdiction for each of the claims herein:

(a)     False or misleading representations of fact and unfair competition violate section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and this Court has original jurisdiction over such claims by virtue of 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338;

(b)     Unfair competition violates the California Business and Professions Code, § 17200 *et seq*., and this Court has supplemental jurisdiction over those claims by virtue of 28 U.S.C. § 1367(a);

4

SECOND AMENDED COMPLAINT

(c)     False advertising violates the California Business and Professions Code, § 17500 *et seq.*, and this Court has supplemental jurisdiction over those claims by virtue of 28 U.S.C. § 1367(a); and

(d)     Unfair competition violates California common law, and this Court has supplemental jurisdiction over those claims by virtue of 28 U.S.C. § 1367(a).

16.     On information and belief, this Court has personal jurisdiction over Lannett because Lannett has purposefully availed itself of the California market and has purposefully directed its business activities into this state, including the Northern District of California ("District").

17.     On information and belief, Lannett has extensive contacts with California and this District, and Lannett has purposefully directed the unapproved C-Topical to be advertised, promoted, and sold in this District.  Lannett has deliberately taken advantage of the California market to profit from its false advertising of the unapproved C-Topical.

18.     On information and belief, Lannett has intentionally targeted one of the largest U.S. markets for pharmaceuticals—California.  On information and belief, Lannett employed a sales force to promote and sell the unapproved C-Topical to ENTs and plastic surgeons for oral, nasal, and laryngeal surgeries in California, specifically this District, from about 2014 to 2018.  (*See, e.g.*, Exhibit 6 at 52.)  On information and belief, Lannett's sales force communicated with physicians, hospitals, and surgery centers to ensure the facilities had adequate supply of the unapproved C-Topical.  On information and belief, such customers purchasing Lannett's unapproved C-Topical located in the State of California, including this District, have actually been misled by the packaging and false advertising related to the unapproved C-Topical.

19.     On information and belief, Lannett has previously hired, and currently hires, consultants residing in California to advise on business operations.

20.     On information and belief, Lannett has previously submitted to the jurisdiction of California, as Lannett has previously been sued in California without objecting on the basis of lack of personal jurisdiction.  *See, e.g.*, *Robert Horowitz et al. v. Caraco Pharm. Labs., Ltd. et al.*, No. 2:10-cv-00298-GHK-JEM (C.D. Cal. 2010).

21.     Lannett regularly conducts business in the State of California and throughout the United States.  Lannett markets and sells products to nationwide retail drugstore chains, including those with locations in this District, as well as through nationwide wholesalers and distributors, and others who target this District.  Lannett has purposefully and voluntarily placed the unapproved C-Topical into the stream of commerce with the knowing expectation that it will be purchased by consumers in this District, and with the result that it has in fact been purchased by consumers in this District.

22.     On information and belief, Cody manufactured and packaged unapproved C-Topical sold by Lannett, and placed that product into the stream of interstate commerce with the knowledge that Lannett will sell it in the state of California.  On information and belief, Cody distributed, or caused to be distributed, the unapproved C-Topical to wholesalers and distributors around the nation, including California and this District.

23.     On information and belief, Lannett and Cody have intended to profit, and do profit, from the sale of unapproved C-Topical in California.

24.     On information and belief, Cody and Lannett purposefully and consistently sold and distributed unapproved C-Topical into California, competing with Genus in the California market, and causing harm to Genus every time a customer in this District chooses the unapproved C-Topical product over FDA approved GOPRELTO®.  Genus has suffered competitive harm in the California marketplace through the diversion of sales by Cody and Lannett's false advertising.

25.     The harm Genus has suffered, including lost sales of its FDA approved GOPRELTO® in the state of California, due to Lannett's and Cody's false and misleading advertising and other acts of unfair competition in this state, arises directly out of Lannett's and Cody's California contacts, and would not have arisen but for Lannett's and Cody's California activities.

26.     Venue is proper in this District under 28 U.S.C. § 1391(b)–(c).

## BACKGROUND

27.     Lannett has marketed its C-Topical product in the United States illegally and without FDA approval or authorization since at least 2008.

28.     FDA requires every new prescription drug product to obtain FDA approval through a formal drug application before the applicant can market the drug.  That is the law under the Federal Food Drug and Cosmetic Act.  21 U.S.C. § 355(a) ("No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application filed pursuant to subsection (b) or (j) is effective with respect to such drug.").

29.     Some old drugs, typically those manufactured before 1962, could theoretically be "grandfathered" under specific provisions of the FDCA because they are not "new" drugs.  The FDCA's "grandfather" provisions are not applicable to Lannett's C-Topical product.

30.     Congress enacted the Federal Food & Drugs Act in June 1906 (the "1906 Act"), which made it unlawful to "manufacture . . . any article of food or drug which is adulterated or misbranded . . . ." 21 U.S.C. § 1 (1906) (repealed in 1938 by 21 U.S.C. § 329(a).)  The 1906 Act did not require drugs to be approved by an administrative agency like FDA—which did not exist at the time.

31.     In 1938, Congress passed the landmark Federal Food, Drug, and Cosmetic Act (the "1938 FDCA"), which repealed the 1906 Act, and for the first time required all "new drugs" to be approved for safety.  A drug already on the market before the June 25, 1938 enactment date, however, is exempt from the "new drug" status pursuant to a grandfather clause so long as it is sold with, *inter alia*, the same chemical composition and indications.  21 U.S.C. §§ 201(p), 321(p)(1) (1938).

32.     In 1962, Congress amended the 1938 FDCA to require "new drugs" to be demonstrably effective for a specified use as well as being safe.  Drug Amendments of 1962, Pub. L. No. 87-781, § 102, 76 Stat. 780, 781–82 (1962).  The amendments included another grandfather clause, exempting older drugs from the new effectiveness requirement if, among other requirements, their composition and labelling had not changed since the October 10, 1962 enactment date.  *Id*. § 107(c)(4).

33.     In 1984, after about 40 infants died after taking unapproved Vitamin E intravenous injections (E-Ferol), the FDA created a program called the "Prescription Drug Wrap-Up" to identify the universe of unapproved drugs in the United States.  (Exhibit 7 at 6; Exhibit 3 at 10.)  FDA identified

approximately 5,150 unapproved, marketed products.  (Exhibit 7 at 6 n.14.)  According to FDA, each of these drugs is illegally marketed unless the manufacturer establishes that the drug is grandfathered.  (*Id*. at 6.)

34.    In 2006 and 2011, FDA published "guidances"—nonbinding recommendations—to encourage makers of unapproved drugs to seek formal NDA approval for their products.  (Exhibits 3 & 4.)  FDA's stated goals of the 2006 guidance were to "(1) clarify to FDA personnel and the regulated industry how we intend to exercise our enforcement discretion regarding unapproved drugs and (2) emphasize that illegally marketed drugs must obtain FDA approval."  (Exhibit 3 at 2.)

35.    In its 2006 FDA guidance, FDA encouraged pharmaceutical manufacturers to seek formal NDA approval for otherwise previously unapproved marketed prescription drugs, which Genus did by seeking FDA approval for GOPRELTO®.  FDA stated: "Sometimes, a company may obtain approval of an NDA for a product that other companies are marketing without approval.  We want to encourage this type of voluntary compliance with the new drug requirements because it benefits the public health by increasing the assurance that marketed drug products are safe and effective — it also reduces the resources that FDA must expend on enforcement."  (*Id.* at 5 (footnote omitted).)

36.    The difference between approved and unapproved drugs is enormous: Whereas approved drugs are heavily regulated by FDA, unapproved drugs are not actively regulated at all.  For approved drugs, like Genus's GOPRELTO®, FDA preapproves drug and promotional labels and regulates advertisements.  *See* 21 U.S.C. §§ 201(n), 321(m), and 352(n); 21 C.F.R. §§ 202.1(e)(1), (3), (l)(2), 201.100(d)(1)–(3).  For unapproved marketed prescription drugs, FDA does not review them for safety or efficacy, and FDA does not review the drug labels, package inserts, or advertisements.  FDA's action on unapproved marketed prescription drugs is binary: FDA either takes enforcement action to remove the unapproved drug from the market, or it does not take immediate enforcement action.

**Lannett's Entry into the Market in 2008**

37.    Before Lannett launched its unapproved C-Topical product in 2008, other companies sold unapproved versions of cocaine hydrochloride 4% solution in the United States for a number of years.  For example, Roxanne Laboratories, Inc. (which was later purchased by Hikma Labs, Inc.) sold

8

large volumes of unapproved cocaine hydrochloride 4% solution in the United States in the past, and it was the only company selling cocaine hydrochloride in 2006.  After the FDA announced its Prescription Drug Wrap-Up Program in its 2006 FDA guidance, Roxanne began to wind down its sales of unapproved cocaine hydrochloride.

38.     With Roxane leaving the market, Lannett entered the market with its illegally marketed unapproved cocaine hydrochloride 4% solution.  After FDA expressly "emphasize[d] that illegally marketed drugs must obtain FDA approval" in 2006 (Exhibit 3 at 2), Lannett commercially launched its unapproved illegally marketed C-Topical in 2008.  (*See, e.g*., Exhibit 8 at 2; Exhibit 9.)[2]

39.     After Lannett launched its product, the volume of cocaine hydrochloride 4% solution it sold decreased each year due to Lannett's efforts to increase the price of the drug.  Between 2010 and 2013, Lannett increased the price of C-Topical greater than ▓▓▓ (Exhibit 10 at LANNETT-CTOP-054883.)  For example, whereas 334,792 bottles of cocaine hydrochloride 4% solution were sold in 2007 (and before Lannett entered the market), after Lannett's price increases, Lannett sold less than half the number of bottles in 2017.  (Exhibit 11 (IMS data indicating 152,291 4 mL bottles of 4% C Topical were sold between January 2017 and December 2017); Exhibit 12 (IMS data indicating that 334,792 bottles of cocaine hydrochloride 4% solution were sold in 2007).)

40.     When Lannett launched its cocaine hydrochloride product in 2008, Lannett advertised the product to look like an FDA approved product.  (*See, e.g.*, Exhibit 13.)

41.     To mislead customers into believing Lannett's cocaine hydrochloride product was FDA approved, Lannett began marketing its product as an innovator product under the brand name C-Topical.  Marketing an unapproved illegally marketed prescription drug product under a brand name misled customers and suggested that C-Topical is FDA approved and that Lannett was the innovator of a new FDA approved drug product.

42.     Lannett engaged in other false advertising following its launch.  For example, it packaged its product to have the appearance and content of an FDA approved drug with the hallmarks of an FDA approved drug product, misleading customers into believing that its product was FDA

---

[2] Roxanne continued selling its cocaine hydrochloride in 2009, but stopped that year, and announced that it was no longer selling cocaine hydrochloride.

SECOND AMENDED COMPLAINT

approved. (Exhibits 13; 14.) On information and belief Lannett took steps to market and sell C-topical through channels that mislead customers into believing that C-Topical is FDA approved.  In an effort to increase sales, Lannett used a sales team to promote C-Topical.  Lannett placed advertisements in journals and left printed publications behind during sales visits.

43.     Lannett's only competition for cocaine from 2009 through 2017 included compounding pharmacists, who could legally manufacture individual bottles of a cocaine hydrochloride 4% solution for customers.  Lannett posited a strategy to take market share from compounding pharmacists, stating:

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████        (Exhibit 15 at LANNETT-CTOP-088710.)   Although compounding pharmacists were legally marketing and selling an alternative cocaine hydrochloride solution product, whereas Lannett was illegally marketing an unapproved product, Lannett attacked the compounding pharmacists ██████████████████████████████ ████████████

44.     For example, to convince a customer to try C-Topical, ████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ████████  (Exhibit 16.)  Lannett falsely told customers through a ██████████████ ███████████████████████████████████████████████ ████████████████████████  (Exhibit 17.)   Lannett also falsely told customers ████ ███████████████████████████████████████████████ ████████████████████████████████  (*Id*.)   Each statement is literally false because C-Topical was an unapproved drug product ████████████████████ ████████████████████████████   This was another effort by Lannett to falsely persuade customers that C-Topical was FDA approved.

45.     █████████████████████████████████████████ ███████████████████████████████████████████████

SECOND AMENDED COMPLAINT

1  ████████████████████████████████████████████████████

2  ████████████████████████████████████████████████████

3  ████████████████████████████████████████████████████

4  ████████ (Exhibit 18 at KOSAR-000138) (emphasis added).  Other internal documents show

5  that Lannett's sales persons were to emphasize that: ████████████████████████████

6  ████████████████████████████████████████████████████

7  ███████████████████████████ (Exhibit 19.)   One Lannett sales specialist

8  counseled a new sales person to address customer concerns over ██████████████████

9  ████████████████████████████████████ (Exhibit 20 ██████████████

10 ████████████████████████████████████████████████████

11 █████████████████████████████████████

12    46.    Lannett had other methods of implying FDA approval.  Lannett would tell customers

13 that C-Topical is █████████████   which implies FDA approval.  (Exhibit 21 ████████████

14 ████████████████████████████████████████████████████

15 This statement was repeated over and over to customers, and falsely implies that FDA has determined

16 that C-Topical was ████████████████, although FDA had never made that determination.

17    47.    On other occasions, Lannett falsely marketed and advertised its drug as a "generic"

18 FDA-approved drug product.  For example, Lannett marketed C-Topical as a "generic" drug product

19 through its product catalogs.  Lannett also described C-Topical as a "generic" pharmaceutical in the

20 meta-description of a C-Topical product webpage, so that customers searching for C-Topical would

21 go to Lannett's product page believing it was an FDA approved "generic" drug.  Lannett also falsely

22 told wholesalers that its C-Topical was approved under an ANDA.  By marketing C-Topical as a

23 "generic," Lannett misled customers into believing that C-Topical was FDA approved because a

24 "generic" pharmaceutical product is one presumed to be approved through the ANDA pathway.

25    48.    Lannett also falsely advertised its drug as a "topical solution . . . indicated for the

26 introduction of local (topical) anesthesia of accessible mucous membranes of the oral, laryngeal and

27 nasal cavities."  (Exhibit 8 at 1.)  Lannett's advertisement of the use of C-Topical orally or laryngeally

28 falsely implies that a cocaine hydrochloride solution product has been approved by FDA for those

uses.  FDA has never approved any cocaine hydrochloride product for oral anesthesia.  FDA has never approved any cocaine hydrochloride product for laryngeal anesthesia.  Furthermore, Lannett's marketing its C-Topical for oral or laryngeal use falsely implies that FDA has approved a cocaine hydrochloride product for oral or laryngeal use, and Lannett directed its sales representatives to market C-Topical for oral, nasal, and laryngeal surgeries to hospitals, surgery centers, and health care providers in California, including in this District.

49.    As a result of Lannett's false advertising of its C-Topical as FDA approved, most customers of C-Topical mistakenly believe C-Topical is FDA approved.

### FDA Confirmed that C-Topical Is Neither Legally Marketed
### Nor a "pre-1938 Grandfather" Drug in November 2015

50.    According to the FDA, unapproved drugs, like C-Topical, are presumptively illegal unless the manufacturer establishes the drug is grandfathered.  (Exhibit 3 at 10 ("A drug that was subject to the Prescription Drug Wrap-Up **is marketed illegally, unless the manufacturer of such a drug can establish that its drug is grandfathered** or otherwise not a *new drug*." (italics emphasis in original; bold emphasis added)); *see also* 21 C.F.R. § 314.200(e)(5); *United States v. An Article of Drug (Bentex Ulcerine)*, 469 F.2d 875, 878 (5th Cir. 1972); *United States v. Articles of Drug Consisting of the Following: 5,906 Boxes*, 745 F.2d 105, 113 (1st Cir. 1984).  As an unapproved drug, Lannett's C-Topical is illegal unless Lannett proves otherwise.

51.    After the FDA issued its 2011 guidance on unapproved drugs which emphasized that "illegally marketed drugs must obtain FDA approval" (Exhibit 4 at 3), Lannett petitioned FDA and asked FDA to acknowledge that Lannett could legally market C-Topical as a "grandfathered" drug. (Exhibit 22.)  On February 24, 2012, Lannett submitted a Citizen Petition to FDA asking FDA to confirm the "grandfather" status of cocaine hydrochloride, pursuant to the 1938 "grandfather clause" of the FDCA, and to "acknowledge that Lannett's . . . Cocaine HCl Product[] may be legally marketed based on [its] 'grandfather' status." (*Id*. at 1.)

52.    On November 12, 2015, FDA denied Lannett's Citizen's Petition, finding Lannett did not present sufficient information to justify the legality or "grandfather" status of its C-Topical. (Exhibit 23 at 16.)  FDA stated: "The evidence you [Lannett] have provided through the Citizen

Petition process is inadequate to support a conclusion either that cocaine HCl products in general, or Lannett's cocaine HCl, 40 mg/mL, or cocaine HCl, 100 mg/mL, topical solutions in particular, meet the requirements of the 1938 grandfather clause.  Accordingly, your requests that the Agency affirm the 'grandfather' status of cocaine HCl products in general, and Lannett's Cocaine HCl Products in particular, are denied."  (*Id.*)

53.    FDA also stated in its November 2015 decision: "In addition, we deny your [Lannett's] request that we acknowledge these products may be legally marketed based on their 'grandfather' status and that, therefore, the new drug requirements, including premarket approval and prescription drug user fees, are not applicable.  Therefore, your request that FDA acknowledge that the new drug requirements, including premarket approval and user fees, are not applicable to Lannett's Cocaine HCl Products is also denied."  (*Id.* at 17.)  Lannett did not challenge the FDA's decision.

54.    Because Lannett could not prove that its C-Topical is not a new drug, Lannett's marketing of C-Topical is illegal and subject to FDA enforcement action to stop the sale of an illegal drug.   FDA took enforcement action against Lannett's sale of C-Topical, and Lannett ceased distributing its unapproved C-Topical on August 15, 2019.  FDA told Lannett to cease manufacturing its unapproved C-Topical product before May 7, 2019.  (Exhibit 24 at 37.)

**Lannett Continued Marketing Its C-Topical as Branded, Generic, and**
**"Grandfathered" After the FDA's 2015 Decision Denying Lannett's Request**
**that Its C-Topical was a pre-1938 Grandfathered Drug**

55.    After the FDA's November 2015 decision denying C-Topical "pre-1938 grandfather" status, and confirming the illegal nature of C-Topical, Lannett's head of marketing said he had ███████████████████████████████████████████████████████████████████████ ██████████████████████ (Exhibit 25.)  Lannett was advised that ████████████████ ████████████████████████ (*Id.*)  Even in 2017, Lannett's then CEO lamented that ███ █████████████████████████████████████████████████████ (Exhibit 26.)  Lannett acknowledged █████████████████████████████████████████████████████████ ██████████████████████████████████████████ (Exhibit 27.)   Another person associated with Lannett stated: ███████████████████████████████████████

13

1   ██████████████████████████████   (Exhibit 28.)   Lannett's Regulatory Affairs

2   Manager expressed a similar sentiment: ████████████████████████████████

3   ████████████████████████████████████████████████████████████████████

4   (*Id.*; *see also* Exhibit 29.)

5         56.     These statements demonstrate Lannett's knowledge that its advertising is false and

6   misleading, and that Lannett harbored an intent to mislead customers as to the "pre-1938 grandfather"

7   status and legality of Lannett's marketing C-Topical after FDA's November 2015 decision.

8         57.     Despite the fact that Lannett knew that its marketing of C-Topical was misleading,

9   Lannett continued its marketing campaign for C-Topical, including *inter alia* using the same

10  C-Topical packaging, the same misleading statements on various websites, and the same product

11  catalogs.

12        58.     After the FDA's November 2015 decision, Lannett created a new misleading statement

13  to include on certain of its C-Topical advertisements.  Although this new statement admitted for the

14  first time that C-Topical was not approved, the advertisement falsely stated that C-Topical was a "pre-

15  1938" grandfathered product and suggested that C-Topical was exempt from the requirements to

16  obtain FDA approval, and therefore, legally marketed.  As one example of this, Lannett included the

17  following statement ("the pre-1938 note") in a journal advertisement:

> **Note:** Cocaine HCl is a pre-1938 drug and has not been proven safe and
> effective by the FDA. Only the FDA can determine whether a drug is safe
> and effective for its intended use.

21  (Exhibit 30.)  This note is literally false and misleading because it states in a C-Topical advertisement

22  that "[c]ocaine HCl is a pre-1938 drug," which necessarily and falsely implies to customers that

23  Lannett is legally marketing its drug as "grandfathered"—the exact opposite of what the FDA told

24  Lannett in the FDA's November 2015 decision on the Citizen Petition.  This note is also misleading

25  because it states "[c]ocaine HCl . . . has not been proven safe and effective by the FDA," even though

26  Genus's GOPRELTO® had been proven safe and effective by the FDA as of December 14, 2017, a

27  time period when this advertisement was still in circulation among customers.  This note falsely tells

28

Genus's potential customers that no cocaine hydrochloride drug is FDA approved, including Genus's product.

59.     Starting in 2016, various versions of Lannett's pre-1938 note began to appear in certain marketing materials and advertisements used by Lannett to market C-Topical, including a digital sales aid, journal ads, leave-behinds (Exhibits 31; 32), websites (Exhibit 33), price lists, and case reports (Exhibits 34–36.)

60.     Despite the fact that it was untrue and rejected by the FDA, Lannett's characterization of C-Topical as a pre-1938 grandfathered product became Lannett's official position, and it propagated through financial disclosures as well as advertisements.  Lannett repeatedly referred to its product as its "Grandfathered C-Topical product," (Exhibit 37 at 31), as "grandfathered" (Exhibit 38 at 10; Exhibit 39 at 8), and as "its unapproved Grandfathered C-Topical product." (Exhibit 40 at 31; Exhibit 41 at 33.)

61.     Even after the FDA's decision holding that Lannett's C-Topical was not grandfathered and illegally marketed based on the information provided by Lannett for the FDA, Lannett continued employing a large sales force whose sole job was to promote sales of C-Topical.  One of these former sales representatives admitted ████████████████████████████████████ ████████████████████ (Exhibit 42 ██████████ at 59:10–17.))  Lannett knew its marketing of C-Topical was wrong.  In fact, years later, Lannett ████████████████████████ ██████████████████ Lannett's Chief Executive Officer acknowledged to the Board of Lannett that ████████████████████████████████████████████████████████ ██████████████████ (Exhibit 43.)   Lannett knew it could not legally promote an unapproved product, but did it anyway.

62.     Members of Lannett's sales team included ██████████████████ ████████████████████████████████████████████████ ████████████████████████████████ (Exhibit 42 at 9:4–17; 73:17–79:18.) ████████████████████████████████ ████████████████████████████████████████ (*See, e.g.*, *id.* at 37:5–21; 39:20–40:25; 52:12–53:7.)

1

2     (*Id.* at 52:12–53:7.)

3

4     (Exhibit 44 at 2

5     ; Exhibit 45 at 3

6

7

8     63.

9

10     (*see, e.g.*, Exhibit 32; Exhibit 42 at 83:17–88:4.)  A "leave behind" is a brochure

11 advertising C-Topical to be left with the customer.  All aspects of the visual aid falsely indicates that

12 Lannett is legally marketing C-Topical.  (Exhibit 46.)

13     64.

14

15     (Exhibit 42 at 11:2–4).

16     (*Id.* at 16:18–20.)

17     (*Id.* at

18 11:21–23).

19

20     (*Id.* at 22:17–22; 227:2–9.)

21     65.  Upon information and belief, Lannett's false and misleading advertising continued

22 through August 15, 2019, when Lannett was forced to cease distribution of C-Topical.

23          **Lannett Marketed C-Topical for False and Unsupported Uses to Mislead**

24          <u>**Customers into Believing C Topical Is Superior to Other Anesthetics**</u>

25     66.  In addition to falsely marketing C-Topical as FDA-approved or as legally marketed by

26 Lannett, Lannett also misrepresented C-Topical's characteristics and uses.  For example, Lannett

27 falsely marketed C-Topical as having a "topical" route of administration, which it does not.

28



16

67.     Lannett also advertised C-Topical for "off-label" uses to suggest the superiority of C-Topical compared to other competing anesthetics.  Drug products which are FDA approved (like GOPRELTO®) cannot be legally marketed for off-label uses.  Off-label marketing occurs when a pharmaceutical company advertises uses of a drug for which FDA never granted explicit approval, and companies who promote drug products for off-label uses may be subject to prosecution.

68.     The label for C-Topical describes its indications and uses to include "local (topical) anesthesia of accessible mucous membranes of the oral, laryngeal and nasal cavities."  (Exhibit 8.) Technically, because C-Topical is not an FDA approved drug, all of Lannett's advertised uses for C-Topical constitute uses for which FDA never granted explicit approval to Lannett.  If C-Topical was FDA approved, however, Lannett would be restricted to marketing it for local anesthesia in the oral, laryngeal and nasal cavities.  Lannett, however, marketed C-Topical for a number of off-label uses to mislead customers into believing C-Topical was superior to alternative anesthetics.

69.     For example, Lannett marketed C-Topical

(Exhibit 47

A former Lannett sales representative,            , explained that

(Exhibit 42 at 28:3–5.)

(*Id.* at 40:3– 42:8.)

(*Id.* at 10:4–25.)

70.

(*Id.* at 43:14–44:10; 70:8–22.)

(*Id.* at 43:14–44:10.)

17

SECOND AMENDED COMPLAINT

1 ██████████████████████████████████████████████████████████

2 ██████████████████████████████████████ (Exhibit 48.) ███

3 ████████████████████████████████████████████████████

4 71. ████████████████████████████████████████████████

5 ████████████████████████████ (Exhibits 46; 49; 50.) ██████████████

6 ██████████████████████████████████████████████████████████

7 ██████████████████████████████████████████████████████████

8 ████████████████████ (Exhibit 51; Exhibit 52 ██████████████████████

9 ██████████████████████████████████████████████████████████

10 ██████████████████████████████████████████████████████████

11 ███████████████████████████████████ (Exhibit 42 at 44:25–45:25; 47:19–48:15;

12 50:10–25.)

13      72.   Lannett's advertising of C-Topical went beyond its own unapproved drug label which

14 Lannett misled customers into believing that C-Topical was a superior product to other anesthetics,

15 including Genus's FDA approved GOPRELTO®.

16     **Lannett's False and Misleading Advertising Has a Persistent Effect**

17      73.   Because Lannett had no competitors beginning in 2010, which continued until Genus's

18 FDA's approval of GOPRELTO® in December 2017, for many years, Lannett's false advertising went

19 unchecked by commercial competitors. Lannett had no commercial competitor with an incentive to

20 complain about Lannett's false advertising of its C-Topical product. The particular facts in this case

21 are unlike many other false advertising cases. In many cases, two competitors are already on the

22 market when one of the competitors begins to falsely promote its product, or disparage the

23 competitor's product. In this case, Lannett had a monopoly for C-Topical for nearly a decade, during

24 which time, Lannett repeatedly misled customers about the FDA-approval status and legality of its

25 C-Topical.

26      74.   Lannett's past false advertising had a long-lasting effect, resulting in persistent

27 deception by customers. One obvious example of the impact of Lannett's past advertising having a

28 long-term impact is Lannett's misrepresentation of C-Topical to wholesalers and Price List companies

in 2014, 2015, and 2016, which resulted in false information permeating wholesaler and Price List databases past 2016. Those false statements continued into the future without additional advertising by Lannett, and still caused harm in 2017, 2018, and 2019. Once the wholesaler or Price List was misled as to FDA approval status, the legality of C-Topical, and its route of administration and uses, that misrepresentation became institutional and flowed through the pharmaceutical supply chain.

75.     By the time Genus entered the market, Lannett had already caused a significant amount of customers to falsely believe C-Topical was FDA approved and a legally marketed product.

76.     In general, the effects of any particular advertisement do not disappear the moment the advertisement is out of circulation to customers. (Exhibit 53 ¶ 13.) Advertising can have a long-term memory effect on customers. (*Id.*) It is not uncommon for customers to remember memorable advertisements from their childhood, for example. (*Id.*) In this particular case involving C-Topical, Lannett's past advertising of C-Topical as FDA approved and legally marketed has a persistent effect on the marketplace and customers. (*Id.* ¶ 15)

77.     Beginning as early as 2010, Lannett began advertising C-Topical and repeatedly disseminating the false message that C-Topical was FDA approved and legally marketed through, for example, its product packaging, to influence customer decisions to purchase and use C-Topical. This repeated and cumulative advertising strengthened the effect and longevity of the advertising. (*Id.* ¶ 16 & Exh. E at 226).) In this case, Lannett's repeated false advertising over time strengthened the effect of its false advertising and added to its persistent effect in the minds of customers. (*Id.* ¶ 16.)

78.     In the case of C-Topical, there are other reasons why Lannett's past false advertisements still impact the market today. In particular, current purchasers of C-Topical in 2019 are directly influenced by Lannett's past false advertisements because the false advertisement of C-Topical as FDA approved or legally marketed induced customers to try C-Topical in the first place. (*Id.* ¶ 19.) Academic literature shows that advertising can strongly induce a customer to try a product, whereas for repeat purchasers, "the consumption experience" is another important factor for subsequent purchase decisions. (*Id.* ¶ 20 & Exh. F at184–185 ("Horsky and Simon (1983) in their study of durables found that advertising informs the innovators of the existence of the new product and from then on the imitation effect-the transmittal of experience from adopters to potential adopters-

19

1    takes over.  It seems that an analogous situation is being uncovered here for repeat purchase brands

2    advertising induces trial and after that the consumption experience takes over.")); (*Id.*, Exh. G at 40.

3    ("…usage appears to dominate advertising as an information source for purchase decisions in the

4    future.").)

5          79.    Because both the legality of Lannett's marketing C-Topical and the FDA-approval

6    status of C-Topical are highly material to a customer's decision whether to purchase C-Topical, by

7    misleading customers in the past that C-Topical was FDA-approved or legally marketed and getting

8    customers to try C-Topical, Lannett directly harmed Genus's ability to sell its FDA-approved product

9    to customers today.  But for Lannett's past misleading advertisements, customers would not have tried

10   C-Topical in the first instance.  (*Id.* ¶  19.)

11         80.    Once a customer had purchased C-Topical, that customer can become a "repeat

12   customer" based on his or her consumption experience with the product.  (*Id.*)  An important driver of

13   whether a customer will purchase a product again is the customer's satisfaction with the product.

14   Therefore, if an incumbent company like Lannett includes false claims in an advertisement, those

15   claims may convince consumers to try its product, resulting in those consumers becoming repeat

16   customers if the customer is also satisfied with the incumbent's product.  (*Id.* ¶ 20.)

17         81.    Lannett's market research suggests that customers ███████████████████

18   ████████████████████████████████████████████████████████████████████████

19   ███████████████████████████████████████████████████████  (*Id.* ¶ 21.)

20   These are positive attributes of the cocaine hydrochloride 4% solution compared to alternatives, but

21   not positive attributes of Lannett's particular brand of cocaine product.  ███████████████

22   ███████████████████████████  Based on positive consumption experience, many cocaine

23   hydrochloride 4% solution customers became repeat customers.  (*Id.*)

24         82.    In 2017, 2018, and 2019, many C-Topical customers were repeat customers.  Indirect

25   customers like hospital outpatient pharmacy departments (HOPDs), surgical clinics (ASCs) and

26   independent physician offices, who buy product from wholesalers, like AmerisourceBergen

27   Corporation ("ABC"), Cardinal Health, Inc. ("Cardinal"), McKesson Corporation ("McKesson")

28   (collectively, "the Big Three"), have each indicated that they routinely purchase their prescription drug

needs from one or two of their preferred wholesalers, typically the Big Three.  These customers have indicated that most of the prescription drugs they need and buy are products that they have purchased before and repeatedly over the course of extended periods of time (often, years), as their surgical needs require.  Many customers simply use the "re-order" function on the wholesaler ordering portal to purchase additional product quantities of an prescription because of the ease of access to see the specific product they bought in the past, and ease of online function (i.e. to simply do a repeat order of exact same product as they bought in the past), as opposed to doing a new search, and having to check the applicability of a new product to the product specifications requested by a director, which could be the purchasing manager, or the physician himself/herself.

83.   In this case, because the FDA approval status of C-Topical and the legality of marketing it are highly material considerations for customers, a misleading advertisement from Lannett in 2014, 2015, and 2016, had a persistent impact on customer purchasing behavior because it induced customers to try C-Topical in the first instance.  (Exhibit 53, ¶ 23.)  After trying the product, many customers became repeat customers.  (*Id*.)

### Genus's FDA Approval of GOPRELTO®

84.   To gain FDA approval of its GOPRELTO® product, Genus performed five clinical trials, comprising 742 human subjects: one Phase 3 pivotal clinical safety and efficacy trial, one pharmacokinetic study, one study on renally impaired patients, one study on hepatically impaired patients, and one thorough cardiac safety study looking for specific heart arrhythmias.  Additionally Genus performed ten non-clinical trials to further examine the safety of GOPRELTO® and its intended use.  On information and belief, no other company to date has invested the time, resources, costs, and efforts to successfully obtain FDA approval for a cocaine hydrochloride product.

85.   Based on all of Genus's work, FDA approved GOPRELTO® on December 14, 2017, "for the induction of local anesthesia of the mucous membranes when performing diagnostic procedures and surgeries on or through the nasal cavities in adults." (Exhibit 1 at 1.)  FDA determined that GOPRELTO®'s route of administration is "nasal."

86.   GOPRELTO® is provided in single-use bottles with the following FDA approved label on each bottle.



(Exhibit 54 at 1, 17.)

87.     Genus's single-use bottles are packaged inside an FDA regulated and approved carton:

(*Id.* at 18.)

88.     Inside the carton is a package insert containing FDA approved language for the administration of GOPRELTO®.  (*Id.*)  All aspects of Genus's drug label, packaging, and package

22

insert are regulated and approved by FDA.  As of the filing of this Second Amended Complaint, Genus holds the only FDA approval for a cocaine product.  (Exhibit 55.)

89.    When Genus obtained approval of GOPRELTO® on December 14, 2017, the damage caused by Lannett's nearly decade long false advertising campaign created a significant market barrier to Genus's ability to sell GOPRELTO®.  Nearly a decade of unchecked false advertising caused the vast majority of Genus's potential customers to already falsely believe C-Topical was FDA approved and legally marketed.

90.    Genus's GOPRELTO® should have had a significant market advantage over Lannett's C-Topical because Genus's product is the only FDA-approved cocaine hydrochloride 4% solution on the market, and customers strongly prefer FDA-approved products.  (Exhibit 5 at Exhibit 13 ¶ 8 (survey showing nearly 100% of pharmacists preferred FDA approved prescription drugs over unapproved prescriptions drugs).  Lannett's internal documents show that Lannett itself recognized that the ███████████████████████████████████ for the C-Topical brand.  (Exhibit 15 ██████████████████████████████████

91.    Genus quickly learned that customers falsely believed that C-Topical was FDA-approved and legally marketed by Lannett.  Customers believed Genus's GOPRELTO® was a different and inferior product to Lannett's C-Topical, and C-Topical could not be substituted with Genus's GOPRELTO® for routine diagnostic and surgical procedures.  Lannett's years of falsely advertising its product as FDA approved and legally marketed effectively neutralized GOPRELTO®'s market advantage over C-Topical as the only FDA-approved cocaine hydrochloride 4% solution on the market.  To sell its product, Genus was forced to take steps of corrective advertising and to explain to customers that Genus's product was the only FDA-approved cocaine hydrochloride product on the market.

92.    In an effort to combat Lannett's false advertising and market advantage due to historical false advertising, Genus hired marketing consultants to assist Genus with its marketing efforts, and deployed a number of marketing campaigns to neutralize Lannett's false advertising, including, but not limited to: (i) placing advertisements in medical journals; (ii) e-mail advertisements directed at health services professionals; (iii) email advertisements directed at group purchasing organizations;

(iv) wholesale banner advertisements employed on partner websites; (v) leave behinds; (vi) tradeshow and exhibition panels; (vii) direct mailing advertisements targeting pharmacists; and (viii) telemarketing and telesales waves.  Despite these efforts, Genus still encountered problems selling its FDA-approved GOPRELTO® and had minimal profits.  Genus even offered its product at a lower price than C-Topical, which had minimal effect.

93.    Lannett's long term false advertising of C-Topical as FDA-approved and legally marketed resulted in the fact that only an extremely small percentage of actual customers knew the truth about C-Topical when Genus obtained FDA approval of GOPRELTO® in 2017.  If Lannett's customers knew that Lannett was not legally marketing C-Topical, and that C-Topical was not FDA-approved, to the extent the customer was still purchasing C-Topical, Genus's launch of an FDA-approved version of cocaine hydrochloride 4% solution would require little marketing to replace C-Topical because customers strongly prefer FDA-approved products.

94.    Upon information and belief, virtually all of Lannett's sales of C-Topical from January 2018 through August 2019 would instead have been sales of Genus's GOPRELTO® if customers did not falsely believe that C-Topical was FDA approved and legally marketed.  From January 2018 through August 2019, Lannett sold 208,577 bottles of 4 mL 4% C Topical.  (*See* Exhibit 56.)  But for Lannett's false and misleading advertising of its C-Topical, customers would not have purchased C-Topical, and instead would have purchased Genus's GOPRELTO®.

95.    C-Topical has a reported wholesale acquisition cost ("WAC") of $178.49.  (Exhibit 57 at 3.)  Based on these numbers, between January 2018 and August 2019, Lannett sold wholesalers $37,228,909 (WAC) worth of 4 mL bottles of C-Topical.  As a result of Lannett's false and misleading advertising, Genus is entitled to Lannett's profits of more $37 million dollars minus expenses, or Genus's lost profits which could be higher to the extent Genus could have sold its FDA-approved GOPRELTO® at a higher price absent Lannett's unapproved C-Topical.  Genus has been meaningfully harmed by Lannett's false advertising.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**LANNETT FALSELY ADVERTISES**

**C-TOPICAL TO MISLEAD CONSUMERS**

96.     Lannett falsely advertises its C-Topical in order to trick customers into believing that C-Topical is already FDA approved, either as a generic drug product or as a branded drug product pursuant to an NDA, and to trick customers into believing that C-Topical is legally marketed, either as a "pre-1938 grandfathered" product, based on a "preliminary new drug application," or based on having conducted a clinical trial.  Lannett also falsely advertises C-Topical as superior and as falsely having a topical route of administration.  Lannett has intentionally engaged in the targeted delivery of C-Topical into California, including this District, through such false advertising.

**Lannett Falsely Advertised, and Advertises, Its C-Topical as FDA-Approved**

**In Various Ways For Over Ten Years**

97.     For years, Lannett advertised C-Topical as an FDA-approved drug product, which is material to customers.  Lannett's marketing comprises numerous false and misleading statements designed to trick customers into falsely believing that C-Topical is an FDA-approved drug product.

98.     The FDA approval status of a prescription drug is material to customers because approved drugs provide customers assurance as to the quality of the product not afforded to unapproved prescription drugs.  Because the marketing of unapproved drugs is not FDA regulated, such marketing may present a serious safety issue to customers.  (Exhibit 2 at 1 ("Unapproved drugs are *not* generic medications, and neither their safety nor their efficacy can be assured"); Exhibit 3 at 1–2; Exhibit 4 at 3.)  In a past survey of pharmacists, 100% of pharmacists stated that if they had a choice, the pharmacist would choose to purchase a prescription drug for their pharmacy that was approved by the FDA, rather than a prescription drug that was not approved by the FDA.  (Exhibit 5 at Exhibit 13 ¶ 8.)

99.     Based on a recent survey of actual customers of cocaine hydrochloride, 62.8% of Lannett's customers acknowledged that if he or she was told that the cocaine hydrochloride solution product sold by Lannett was not FDA-approved, that information would influence his or her decision about whether to purchase or dispense Lannett's cocaine hydrochloride solution.  Based on a recent survey, 60.6% of Lannett's customers would be less likely to purchase, use, or dispense Lannett's

cocaine hydrochloride solution product if he or she had information that the cocaine hydrochloride solution product sold by Lannett was not FDA-approved.

100.   On information and belief, despite customers' preference for FDA-approved prescription drugs, customers are misled to purchase and dispense Lannett's C-Topical.   A past nationwide survey of 500 pharmacists found that 91% thought all products pharmacists dispense are FDA approved.  (Exhibit 58 at 3.)  FDA also recognizes that healthcare providers are confused by unapproved drugs:

> Many healthcare providers are unaware of the unapproved status of drugs and have continued to unknowingly prescribe them because the drugs' labels do not disclose that they lack FDA approval.  In addition, since many unapproved drugs are marketed without brand names and have been available for many years, it is often assumed that these unapproved drugs are generic drugs.  This is not correct.  Generic drugs have been evaluated and approved by FDA to demonstrate bioequivalence to a brand name reference drug.

(Exhibit 2 at 1.)

101.   Preying upon the misconception of pharmacists, healthcare providers, and the public, including upon information and belief, in California and this District, Lannett falsely advertises its C-Topical product as an approved drug.  Because customers are misled to believe C-Topical is FDA-approved or otherwise authorized by FDA, customers choose to purchase Lannett's C-Topical product over Genus's product, thereby, directly harming Genus.

102.   On information and belief, if customers, including pharmacists and doctors, knew that Lannett's C-Topical product was unapproved, they would not purchase it or distribute it to patients.

<div align="center">

Lannett Falsely Advertises Its C-Topical as a

"Generic Pharmaceutical C-Topical® Solution CII "

</div>

103.   At the time Genus filed its Complaint, Lannett falsely advertised its C-Topical as "Generic Pharmaceutical C-Topical® Solution CII" to deceive customers into believing that its product is approved by FDA.  In particular, Lannett provided a meta-description of its webpage for its C-Topical that described it as follows: "Learn more about the facts and characteristics of the generic pharmaceutical C-Topical® Solution CII."  (Exhibit 59.)

104.    When a customer searched for "Lannett C-Topical" in Google's search engine, the following result appears:



(*See id.* for full results from October 22, 2018.)

105.    This description in the search result that identified C-Topical as a "generic pharmaceutical" is called a meta description, which is an HTML attribute that provides a concise summary of a webpage.  Meta descriptions are often one or two sentences long and appear underneath the blue clickable links in a search engine results page.  The meta description appears in the HTML code in the following form:  <meta name="description" content= "A description of the page" />.

106.    A meta description is associated with a particular webpage, and in the case above, the meta description is associated with the following URL: https://www.lannett.com/product/c-topical-solution-cii/ ("C-Topical Webpage").  By its nature, a meta description is an advertisement directed at anyone searching for C-Topical via the applicable search engine.

107.    The HTML code written by Lannett for its C-Topical Webpage contained the false and misleading meta description describing C-Topical as generic: <meta name="description" content= "Learn more about the facts and characteristics of the generic pharmaceutical C-Topical® Solution CII."/>.  (Exhibit 60 at 1.)  This description is linked to the C-Topical Webpage: <link rel="canonical" href="https://www.lannett.com/product/c-topical-solution-cii/"/>.  (*Id.*)  Upon information and belief, Lannett's meta-descriptions have been published on its website for public consumption since December 2017, misleading customers since December 2017.

108.    Lannett's repeated public and commercial statements that C-Topical is "generic" are literally false because C-Topical is not a generic pharmaceutical product.  A generic drug product must have an approved ANDA, which means that it is bioequivalent to an existing approved drug product. FDA has not approved ANDAs for any generic cocaine hydrochloride products to date.

109.    After the December 14, 2017 date when Genus's product received FDA approval, Lannett intentionally misled, and continues to mislead, customers as to FDA approval status of C-Topical, falsely suggesting and implying that it is a generic drug product under an approved ANDA, even though it is not.

<u>Lannett and Cody Package and Advertise Their C-Topical to</u>

<u>Mislead Consumers into Falsely Believing C-Topical Is FDA Approved</u>

110.    Unapproved drugs do not have design or content requirements for packaging and labeling.  Nevertheless, Lannett and Cody purposefully design their product packaging and labeling to look like FDA approved drugs.  Having packaging and labeling that mimics FDA approved drugs misleads the purchasing public into believing that the C-Topical product is FDA approved.

111.    Lannett and Cody intentionally mislead customers by making the product packaging for C-Topical look like it is approved by the FDA.

112.    For example, Lannett's and Cody's label on the bottle for C-Topical contains all the hallmarks of an FDA approved label, including storage conditions, prescribing information, National Drug Codes ("NDCs"), controlled substance marks, lot numbers and expiration dates, the date when the bottle label was last revised, the "Rx Only" symbol, strength of the dosage form, bar code, "Lannett" as the labeler, and "Cody Laboratories, Inc." as the manufacturer.  Below is a comparison of the bottle label for Lannett's and Cody' unapproved C-Topical and Lannett's FDA approved Oxycodone Hydrochloride Oral Solution, USP:



(*See* Exhibit 61 (Lannett's C-Topical bottle label); Exhibit 62 (Lannett's oxycodone bottle label).)

113.    Lannett's and Cody's packaging for its C-Topical bottle contains all the hallmarks of an FDA approved packaging:



(Exhibit 63.)

114.    In February 2019, Lannett made a conclusory statement to this Court when moving to dismiss a claim in Genus's original complaint that its packaging does not mislead purchasers of

C-Topical, which contradicted Genus's allegation that Lannett's packaging misleads purchasers of C-Topical.

115.    Lannett suggested to this Court that it is not even plausible that Lannett's packaging misleads purchasers of C-Topical.

116.    Based on a recent survey, after reviewing Lannett's packaging for its C-Topical, 73.4% of Lannett's customers falsely believed that C-Topical is FDA approved.  Customers who falsely believed C-Topical is FDA approved were asked, "What makes you say the cocaine hydrochloride solution product sold by Lannett is FDA approved?"  The responses included, *inter alia*, the following:

- "Packaging"
- "Package labeling."
- "Package insert"
- "by the labelling on the packaging"
- "Packaging"
- "Label of the package said so with Rx symbol"
- "package label"
- "packaging pictured"
- "Marking on package"
- "The label contained most if not all the consistent information that an FDA approved medication label would have."
- "FDA markings on the package"
- "Rx and C signs.  Prescribing info"
- "package said DEA order form required"
- "all Rx drugs must be FDA approved, or can't be sold in USA"
- "Has the markings of RX only, provides an NDC number and has the DEA scheduling"
- "based on the label"
- "The product label contained all of the required FDA information"

- "Label would [sic] pretty official and had all the things I look for on a label: manufacturer, drug, conc, etc.  Although I don't recall seeing a lot number or expiration date."
- "The labeling on the product."
- "there isn't any message that it is not fda approved"
- "It was labelled as a C-II."
- "It has an NDC number and Federal Legend"
- "product labeling did indicate drug classification"
- "contained an NDC number"
- "IT HAS NDC"
- "label"
- "it has a schedule and NDC number"
- "It has a ndc number"
- "I feel the labeling conveys it's FDA approved.  If they were a compounding pharmacy, they could not market the same way."
- "The label"
- "label"
- "Has NDC number on it.  Labeled correctly"
- "Label"
- "The external packaging says that a DEA license is required to purchase the product so this restriction must mean that it is FDA approved."
- "labeled as so"
- "Packaging says DEA form required"
- "The packaging had the FDA seal"
- "label"
- "Labeling indicates this"
- "code numbers"
- "label"

31

SECOND AMENDED COMPLAINT

1    • "labelling"

2    117.    Lannett's and Cody's package insert is also designed to mislead customers into

3    believing that C-Topical is FDA-approved.   (Exhibit 8.)   Lannett's and Cody's package insert

4    incorporates similar sections and uses similar fonts as a package insert for an FDA approved product.

5    (*See id.*)   The package insert also includes other design themes designed to mislead consumers into

6    believing that C-Topical is FDA approved including an "Rx only" designation and NDCs.   (*Id.* at 1.)

7    The package insert does not contain a disclaimer explaining that the product is unapproved.   (*See, e.g.*,

8    Exhibit 64.)

9    118.    To mislead customers further, Lannett obtained a U.S. Trademark Registration for

10   C-Topical.   This misleads customers as to the brand status of the drug, suggesting that FDA has

11   approved an NDA authorizing Lannett to market C-Topical.   Lannett admits that until recently, it

12   advertised C-Topical as a brand: Lannett "continues to actively market the product utilizing a group

13   of brand representatives in key market locations throughout the United States."   (Exhibit 6 at 8.)

14   119.    A former sales representative of Lannett who marketed C-TOPICAL agreed that:

15   ████████████████████████████████████████████████████████████████████

16   (Exhibit 42 ██████████ at 231:23–232:15, 231:8–13.)   ████████████████████

17   ████████████████████████████████████   (*Id.* at 58:4–14.)   Lannett prominently

18   displayed its brand name across its advertisements beginning at least as early as 2012.   (Exhibit 65.)

19   The prominent display of the brand name is ubiquitous across Lannett's advertisements continuing

20   through 2019.   (*See, e.g.*, Exhibits 46; 49; 66.)

21   120.    Lannett's packaging for its C-Topical actually deceives a substantial segment of the

22   relevant purchasers of cocaine hydrochloride solution.   As recently as September 2019, an actual

23   customer of cocaine hydrochloride believed that Lannett's C-Topical was an innovator, FDA-

24   approved branded product, and falsely believed that Genus's product was a generic version of

25   Lannett's C-Topical.

26

27

28

32

<u>Lannett Misleads and Deceives Wholesale Distributors,</u>

<u>GPOs, IDNs, Price Lists, Pharmacists, Patients, and Doctors as to</u>

<u>the Unapproved FDA Status of C-Topical</u>

121.    Lannett further misleads customers by providing incomplete or false information about C-Topical to third party intermediaries in the supply chain of pharmaceutical products, including wholesalers, GPOs, integrated delivery networks ("IDNs"), and third party managed price lists.

122.    Instead of purchasing a pharmaceutical product like C-Topical directly from a manufacturer (e.g., Lannett), pharmacists, hospitals, and doctors often purchase prescription products from wholesalers like ABC, Cardinal, and McKesson (headquartered in California and this District) (collectively, "wholesalers").   The drug manufacturer contracts with the wholesaler to provide a certain amount of the product, and the wholesaler advertises the product to customers through proprietary databases, which allow customers to order the product directly from the wholesaler. Wholesalers collect information about the product directly from the manufacturer.  Lannett contracts with at least one California-based wholesaler for its unapproved C-Topical and sells its product to such wholesaler for distribution in California.  (*See* Exhibit 67 at 4 of pdf (listing McKesson Corp. as a wholesaler).)

123.    Lannett misrepresented the FDA approval status and legality (grandfather status) of C-Topical to wholesalers.  For example, in one wholesaler listing of C-Topical, ███████████ ██████████████████████████████████████████████████████ (Exhibit 68.)  ████████████████████████████████████████████████████████████ █████████ (Exhibit 69.)   In response, ████████████████████████ ███████████████ (*Id.*)  In response to Lannett's statement, ██████████ █████████████████████████████████████████████████████████████████ █████████████ (*Id.*) ████████████████████████████████████████████ █████████████████████████████████████████████████████████████████ ██████████████████████ (Exhibit 70.)  Furthermore, based on Lannett's false representation to

33

McKesson, McKesson's website indicates that Lannett's product is "generic" and does not identify Lannett's product as an unapproved drug.  (Exhibit 71.)

124.   In another example, Lannett told the wholesaler ███████████████ ████████████████ (Exhibit 72.) ███████████████████████████ ███████████████████████████████████ (*Id.*) ████████████ ██████████████████████████████████████████ █████████████████████████████████████████████ ████████████████████████████████ (*Id.*)  This is literally false.

125.   Lannett misrepresented the FDA approval status and legality of C-Topical to wholesalers so that wholesalers would continue to sell C-Topical.  On information and belief, knowing that C-Topical was not FDA approved or otherwise legal to market would influence wholesalers' decisions to sell C-Topical.  Lannett would have no other reason to make false statements to them if it did not believe the FDA approval status and legality of the product was not material to the wholesalers.

126.   As an alternative to purchasing pharmaceutical products from wholesalers, some healthcare providers (e.g., hospitals and hospital pharmacies) form GPOs and IDNs to aggregate purchasing volume for the purpose of negotiating discounts with manufacturers and wholesale distributors.   Such organizations and networks—which include Intalere, HealthTrust Purchasing Group, LP, MedAssets Company, Novation, LLC, Premier Health, and Kaiser Health Network— maintain agreements with manufacturers for purchasing on a national basis various pharmaceutical products used by hospitals and other health care facilities.  On information and belief, GPOs and IDNs collect information about a particular product directly from the manufacturer.

127.   Wholesalers, GPOs, and IDNs also rely on companies that aggregate third-party drug pricing information ("Price Lists"), which provide pricing information for drugs and pharmaceutical equivalents of those drugs.

128.   Price List companies, such as Medi-Span Ltd. ("Medi-Span") and First Databank Inc. ("First Databank"), maintain databases that compare drug products and their prices so that wholesalers

and customers can see all the alternatives available for a particular medication.  Price Lists can be integrated with other computerized information systems used by, for example, wholesalers, GPOs, hospitals, and insurance companies, to allow purchasers to compare drugs and drug prices.  Cardinal and ABC rely mainly on First Databank's information for product information on their own ordering websites, and McKesson relies on Medi-Span or First Databank or both for product information on its own ordering website.

129.    Price List companies collect information about a particular product directly from the manufacturer.  (Exhibit 73 ¶¶ 7–10.)  The information provided by Price Lists are trusted by consumers and relied upon by consumers when deciding what pharmaceuticals to purchase.  Surveys show that customers believe that the information provided by Price Lists is complete.  (Exhibit 5 at Exhibit 5 ¶ 8.)  Surveys show that customers of pharmaceuticals assume that prescription drugs on Price Lists are FDA approved.  (*Id.* at Exhibit 13, p. 13 of pdf.)  Preying on this misconception, Lannett actively provided information regarding C-Topical to Price List companies, such as First Databank, so that C-Topical would be included on the Price Lists.  (Dkt. No. 86 ¶ 133; *see also* Exhibit 73 ¶ 7.)  By causing C-Topical to be listed on Price Lists, Lannett falsely represented to customers that C-Topical was FDA-approved.

130.    In addition to ensuring C-Topical was included in Price Lists, Lannett provided false information about C-Topical to the Price List companies.  For example, Lannett can, and did, submit false product information to First Databank.  In this case, Lannett told First Databank that ███████ ████████████████████████████████████████████ which is literally false.  (Exhibit 74 at FDB_GENUS_000626.)   On another occasion, Lannett told First Databank that ████████████ ██████████ (Exhibit 75 at FDB_GENUS_000588.)  Lannett's statements to First Databank are literally false.  As a result of Lannett's false representations, First Databank's information about C-Topical is false.  For example, First Databank's information about C-Topical indicates that C-Topical has a "topical" route of administration that is literally false.  (*See, e.g.*, Dkt. No. 31-1 at Dkt. pp. 4, 10.)  Medi-Span's information about C-Topical is also false.  Medi-Span's information about C-Topical indicates that C-Topical has an "external" route of administration and has dermatological uses.  (Exhibit 57 at 1, 2.)

131.    Lannett's mischaracterization of the route of administration of C-Topical caused Price List companies, wholesalers, and customers to treat C-Topical and Genus's GOPRELTO® as distinct products and not interchangeable for routine diagnostic and surgical procedures.  For example, Cardinal explained that because Lannett mischaracterizes its C-Topical as "topical," Cardinal itself (along with customers) treat Lannett's C-Topical as a different product from Genus's product. (Exhibit 76.)  Other customers have also reported confusion because Lannett markets C-Topical as having a "topical" route of administration.

132.    Both Medi-Span and First Databank assign each drug product an identifying classification code that allows customer to compare the price of otherwise pharmaceutically equivalent products.  Due to Lannett's mischaracterization of C-Topical, Medi-Span and First Databank assigned different classification codes to Lannett and Genus's respective products, making it impossible for customers to compare the two products and resulting in customers believing C-Topical is different and better than Genus's GOPRELTO®.

133.    For example, First Databank assigns a proprietary Clinical Formulation ID ("CFI") (formally Generic Code Number or "GCN") for each drug product, based on each product's ingredients, strength, dosage form, and route of administration.  Two drug products with the same active pharmaceutical ingredient (cocaine hydrochloride), the same drug strength (4%), the same dosage form (solution), and the same route of administration are assigned the same CFI code.  (Dkt. No. 29-1 at Ex. A at Dkt. p. 5) (explaining how First Databank generates the "Clinical Formulation ID" to include in its products and services).)  Based on the false designation of Lannett's C-Topical as having a "topical" route of administration, First Databank assigned different CFI codes for C-Topical and Genus's product:  First Databank assigned Lannett's C-Topical the CFI code # 7481, but assigned Genus's GOPRELTO® product the CFI code # 78068.  (Exhibit 77.)

134.    Similar to First Databank, Medi-Span assigns a proprietary Generic Product Identifier ("GPI") for each drug product based a number of classifications for the drug, including the drug name, dose form, and dose strength.  (Exhibit 78.)  Based on the false designation of Lannett's C-Topical as having an "external" route of administration, Medi-Span assigned different GPI codes for C-Topical and Genus's GOPRELTO®:  Medi-Span assigned Lannett's C-Topical the GPI code # 90-85-00-30-

00-20-10 ("Cocaine HCl Soln 4%") (Exhibit 57), but assigned Genus's GOPRELTO® the GPI code # 42-23-00-20-10-20-10 ("Cocaine HCl Nasal Soln 40 MG/ML (4%)") (Exhibit 79).

135.   As a result of First Databank and Medi-Span assigning Genus's and Lannett's products different codes, Lannett was able to hide Genus's GOPRELTO® product from customers ordering, or re-ordering, Lannett's C-Topical from wholesaler websites.  For example, when a customer searches for Lannett's C-Topical on wholesaler ABC's website, ABC's website typically would also pull up all other drug products with the same First Databank CFI code.  Because of the difference in CFI codes for Genus's and Lannett's products, customers cannot even learn about the existence of Genus's FDA-approved GOPRELTO®.  Many past customers of cocaine hydrochloride 4% solution are repeat customers, and customers reordering Lannett's C-Topical click a "reorder" option and are never made aware of the existence of Genus's GOPRELTO®.  If Lannett's C-Topical and Genus's GOPRELTO® had the same CFI and GPI codes from Price List companies, customers would see both GOPRELTO® and C-Topical and would be able to select a product based on material factors like price and the FDA status of a drug.  As a result of Lannett's false representations, customers are deceived into believing that Lannett's C-Topical is the only cocaine hydrochloride 4% solution that is available on the market, which is literally false.  This deception directly influences purchasing decisions throughout the United States, including California, and directly injures Genus's sale of GOPRELTO®.

136.   On or around October 2, 2018, Genus notified First Databank that Lannett was incorrectly characterizing its unapproved C-Topical as having a "topical" route of administration.  (*See* Exhibit 80.)  Genus also informed First Databank that its decision to provide different CFI codes is inaccurate.  (*Id*.)  Despite being informed that Lannett's C-Topical is unapproved and not "topical," First Databank made the decision to keep C-Topical in its database and to continue describing it having a "topical" route of administration.  First Databank's Manager of Editorial Content spoke with Genus on October 24, 2018, and confirmed that Genus's product was properly described as having a "nasal" route of administration.  The Manager of Editorial Content could not confirm whether Lannett's C-Topical is properly described as having a "topical" route of administration, in part because C-Topical is unapproved.  On October 30, 2018, Genus informed First Databank again that First Databank has mischaracterized Lannett's unapproved product as having a "topical" route of administration.  Genus

also told First Databank that this mischaracterization is making it impossible for customers to see Genus's GOPRELTO® as the approved drug alternative to Lannett's unapproved product.  First Databank ignored Genus's inquiries, and made the decision to continue mischaracterizing Lannett's C-Topical as having a "topical" route of administration.  On November 20, 2018, Genus's counsel again requested that First Databank de-list Lannett's C-Topical product as an unapproved drug, and demanded that First Databank fix its description of the product and not describe it as having a "topical" route of administration.  First Databank ignored Genus's inquiries and requests, and made the decision to continue mischaracterizing Lannett's C-Topical as having a "topical" route of administration.  On information and belief, and in response to Genus's demands, First Databank added an "obsolete date" of November 14, 2018 to the C-Topical product in its database in November 2018.  (Dkt. No. 31-1 at Dkt. pp. 1, 7.)  On information and belief, First Databank, however, knew that this information would not impact the sales of C-Topical because on information and belief, third party licensees of First Databank's information, including wholesalers, do not advertise the "obsolete date" on their integrated ordering websites that target customers.  Although First Databank placed an "obsolete date" in its database, First Databank refused to remove C-Topical from its database.  Furthermore, even for those customers who learned about First Databank's characterization of C-Topical as "obsolete," there is evidence that ████████████████████████████████████████ (Exhibit 81.)

137.  Lannett also misleads customers by providing incomplete or incorrect information to wholesalers, GPOs, IDNs, and Price Lists.  On information and belief, Lannett does not identify C-Topical as "unapproved" to wholesale distributors, GPOs, IDNs, or Price Lists.  When customers search for a "cocaine hydrochloride" product, Lannett is able to conceal the fact that its C-Topical is an illegally marketed unapproved drug without FDA authorization.  For example, on information and belief, McKesson reports both Genus's FDA approved GOPRELTO® product and Lannett's unapproved C-Topical using descriptions that do not indicate FDA approval status.  (*See, e.g.*, Exhibit 82.)  Because Lannett does nothing to identify C-Topical as "unapproved" on its product packaging, package insert, or Cocaine Website, wholesale distributors, GPOs, IDNs, and Price Lists cannot accurately describe Lannett's C-Topical as unapproved by the FDA.  As a result of Lannett's misrepresentations, the databases and Price Lists managed by these third parties do not differentiate

Genus's GOPRELTO® from Lannett's C-Topical, causing further deception and confusion by customers, including retail pharmacists, hospital pharmacists, and hospital administrators.   On information and belief, Lannett is aware that buyers believe that all prescribed drugs identified in the Price Lists are FDA approved.

<u>Lannett's Website</u>

138.    On information and belief, Lannett maintained or caused to maintain a website for its C-Topical, www.cocainehcl.com, ("Cocaine Website").   The Cocaine Website displayed similar sections as a package insert for an FDA approved product, including for example, sections entitled "indication" and "dosage and administration."  (Exhibit 67.)  The Cocaine Website was designed to mislead customers into believing that C-Topical is FDA-approved.

139.    Lannett and Cody conspicuously omit from their product packaging, package insert, and the Cocaine Website any disclaimer that C-Topical is not approved by the FDA.  A customer looking at the packaging, package insert, or the Cocaine Website for C-Topical is not warned that C-Topical lacks FDA approval.   On information and belief, Lannett's and Cody's packaging and packaging insert actually deceives a substantial segment of customers, including pharmacists, into believing that Lannett's and Cody's C-Topical has FDA approval.

140.    Lannett also maintains a website at www.lannett.com ("Lannett Website").  (Dkt. No. 86 ¶ 119.)  On the Lannett Website, Lannett advertises itself as a pharmaceutical manufacturer that follows FDA regulations for approved drugs.  Lannett states that its "leadership is committed to quality, adherence to FDA standards, *and compliance with regulatory requirements to ensure patient safety*."  (Exhibit 83 at 1 (emphasis added).)  This is false and misleading.  C-Topical does not comply with FDA legal and regulatory requirements by adhering to the basic the FDA requirement of obtaining approval before marketing.  As the owner of an unapproved marketed product, its product has not been reviewed by FDA.  As such, Lannett's statements are literally false.

141.    The Lannett Website advertises Lannett as the purveyor of generic pharmaceutical products, which implies FDA approval through an ANDA.  For example, Lannett states, "[a]s generic pharmaceuticals manufacturers, we serve an important need for the population: making pharmaceutical products affordable."  (Exhibit 84 at 1.)  Lannett also states "[i]t's important to

remember that generic medicines are made to meet the same standards, as provided by FDA, as brand name medicines.  Customers may rest assured that generic pharmaceuticals are produced with the same active ingredients and attention to quality as branded versions."  (Exhibit 85 at 1.)  Lannett also states, "For over 75 years, Lannett has been proudly providing high quality, affordable generic pharmaceutical products to patients who depend on them."  (Exhibit 86.)

142.    By broadly describing itself as a "generic pharmaceuticals manufacturer," Lannett misleads customers into believing that all of its products, including C-Topical, are FDA-approved, at least through ANDAs, which is false.  A customer attempting to determine whether the C-Topical product is an FDA-approved drug is misled by reviewing Lannett's public commercial statements about its business and products.

143.    In February 2019, Lannett made a conclusory statement to this Court when moving to dismiss a claim in Genus's original complaint that the statements on its website do not mislead purchasers into believing that Lannett sells only FDA-approved drug products.

144.    Lannett suggested to this Court that it is not even plausible that Lannett's website misleads purchasers into believing that Lannett only sells FDA approved products.

145.    Based on a recent survey, after reviewing Lannett's homepage for its www.lannett.com website, 70.4% of Lannett's customers falsely believed that Lannett sells only drugs that are FDA approved.  Customers who falsely believed Lannett only sells drugs that are FDA approved were asked, "What makes you say Lannett sells only drugs that are FDA approved?"  The responses included, *inter alia*, the following:

- "Website mentions generic medications, giving impression that they are selling already FDA approved pharmaceuticals."
- "Based on the info I saw on webpage"
- "reviewing the Ad, that was the impression given"
- "The ad indicated that it sells generic drugs, and had high quality standards"
- "generic versions"
- "All prescription products in the US are FDA approved. I saw nothing about OTC Sales"

1      •     "Professional Website"

2      •     "Because they make generics of already approved meds"

3      •     "The website appears to be a quality generic prescription drug supplier"

4      •     "NCQA certification at the bottom of the website"

5      •     "Could not advertise drugs that were not FDA approved on web site"

6      •     "The webpage appears to selling legitimate medications.  The cocaine solution

7           label appears to be a product that would be approved by the FDA."

8      •     "the website showed prescription vials"

9      •     "Website appears set up like other similar sites.  I know cocaine is FDA

10          approved"

11     •     "ANDA's are needed for generic drugs. I don't believe and grandfathered

12          drugs remain on the market."

13     •     "information presented"

14     •     "The webpage looks professional. But more so I saw the cocaine 4%

15          packaging and it seemed to include the typical information that would be seen

16          on a package for an FDA-approved medication."

17     •     "They joined 2 other companies; their motto is patients first. I cannot imagine

18          if that is their motto that they would sell a product that was not FDA

19          approved."

20     •     "This is an assumption, webpage mentions providing generic drugs at

21          reasonable prices"

22     •     "Nothing indicated otherwise/expect all generic medication manufacturers to

23          work w/ FDA"

24     •     "From the website"

25     •     "Sells pharmaceutical drugs.  They have to be FDA approved."

26     •     "The images I saw"

27     •     "Generic medications are non name brand meds that have already been FDA

28          approved"

1       •    "The advertisement seems to indicate that the drugs are FDA approved."

2       •    "Says so"

3       •    "through their website and commitment to quality"

4       •    "based on the first page, it is a generic drug manufacturer. Generic drugs still

5            require FDA approval"

6       •    "They sell generics, so it was an assumption"

7       •    "Per ad"

8       •    "generic medication manufacturer"

9       •    "appeared that way the way it was presented"

10      •    "webpage"

11    146.    Lannett's website actually deceives a substantial segment of the relevant purchasers

12 that Lannett only sells FDA approved drugs.

13 <div align="center">Cody Website</div>

14    147.    Cody and/or Lannett maintained a website at www.codylabs.com (the "Cody

15 Website").  (Dkt. No. 86 ¶ 126.)  The Cody Website stated that "Cody Laboratories is committed to

16 compliance with all Local, State, and Federal requirements and regulations governing our business,

17 especially FDA, DEA . . . ."  (Exhibit 87.)  The Cody Website further stated that "[o]ur active

18 pharmaceutical ingredients are used in FDA approved commercial drug products," and that "[w]e are

19 actively engaged in continuous improvement of our quality systems in accordance with current FDA

20 guidance."  (*See id.*)  These statements misled customers into believing that all of the products,

21 including C-Topical are FDA approved, which is false.  On information and belief, Cody has made

22 these statements on its website since December 2017.

23    148.    Cody's and/or Lannett's statement on the Cody Website that "Our active

24 pharmaceutical ingredients are used in FDA approved commercial drug products" was literally false.

25 (*Id.*)  The Cody Website identified Cocaine Hydrochloride, USP as one of Cody's active

26 pharmaceutical ingredients ("APIs").  (Exhibit 88.)  On information and belief, Cody's Cocaine

27 Hydrochloride, USP is used in C-Topical, which is not an FDA-approved commercial drug product.

28

<div align="center">42</div>

149.   On information and belief, Lannett and Cody do not want potential customers to know that C-Topical is not FDA-approved.

<center>Lannett's Product Catalog Mischaracterizes C-Topical as "Generic "</center>

150.   Lannett intentionally misleads customers by characterizing C-Topical as a "generic" in its product catalog.  (*See, e.g.*, Exhibit 89 (2018 catalog); Exhibit 90 (2017 catalog); Exhibit 91 (2016 catalog); Exhibit 92 (2014 catalog); Exhibit 93 (2010 catalog).)

151.   In the product catalog, Lannett's C-Topical is listed under the category "Generic name" and along-side FDA approved products, and with no indication that C-Topical is not FDA-approved or legally marketed by Lannett.  Lannett's characterization of C-Topical as "generic" is literally false and material to customers, inducing customers into believing C-Topical is FDA approved.

152.   In June 2019, Lannett made a conclusory statement to this Court when moving to dismiss a claim in Genus's first amended complaint that Genus has no standing to challenge the 2010 and 2016 product catalogs because "Genus pleads no facts suggesting that these out of date product catalogs were available to customers after Genus entered the market."  (Dkt. No 64 at 17.)  Lannett suggested to this Court that it is not even plausible that Lannett's product catalogs proximately caused harm to Genus's sale of GOPRELTO®.

153.   After the Court's decision dismissing without prejudice Genus's claims associated with Lannett's catalogs, ████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████

154.   Lannett's 2010, 2014, and 2016 catalogs also proximately caused harm to Genus in 2017, 2018, and 2019, because Lannett's past marketing of C-Topical as FDA approved has a persistent effect in 2017, 2018, and 2019.  Customers misled into believing that C-Topical is FDA approved before 2017 initially tried C-Topical on the false understanding that it was an FDA approved product, and after initially being misled, the customer re-ordered the product based on that earlier false understanding.  Furthermore, Lannett's cumulative and repeated advertisement of C-Topical as "generic" each year for many years strengthened the effect and longevity of its advertising, proximately causing deception in 2017, 2018, and 2019.  *See* ¶ 83 *supra*.

155.    Lannett's product catalogs are literally false and deceive a substantial segment of the relevant purchasers that Lannett C-Topical is a generic drug product.

### LANNETT FALSELY ADVERTISES ITS C-TOPICAL AS LEGALLY MARKETED

156.    When Lannett later began to acknowledge in certain advertisements that C-Topical is not FDA-approved, Lannett still misled customers by simultaneously advertising C-Topical as legally marketed, which is literally false.   For example, Lannett falsely advertises C-Topical as a "grandfathered" and "pre-1938" drug, which is literally false.  Lannett falsely advertises C-Topical as marketed under a New Drug Application submitted to FDA, which is literally false.   Lannett intentionally made these statements to mislead customers: Lannett knew that its product was not legally marketed.

157.    Whether a prescription drug is legally marketed is a material consideration to customers deciding whether or not to purchase the drug.  Customers do not want to purchase drug products that are not legally marketed for similar reasons customers do not want to purchase products that are not FDA approved.  Legally marketed drugs provide customers assurance concerning the quality of the product not afforded to illegally marketed prescription drugs.  The vast majority of customers of local anesthetics would not purchase C-Topical if they knew that Lannett had no legal authority to manufacture and sell it.

158.    The legality of C-Topical is a material consideration for customers, which is evident from communications between Lannett and its customers.  For example, ███████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

(Exhibit 81.) ████████████████████████████████████████████████

████████████████████████████ (*Id.*) ███████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████ (*Id.*). ██████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

44

1 ███████████████████████████████████████████████████████████████

2 ████████   (*Id.* (emphasis added)) ████████████████████████████████

3 ████████████████████████████████████████   Lannett has yet to produce

4 in this case to Genus its correspondence with this customer.

5      159.    The materiality of the legal status of C-Topical is also evident from an internal

6 document titled "Common C-Topical Q&A" prepared for Lannett's sales team.  (Exhibit 94.) ████

7 ███████████████████████████████████████████████████████████████

8 ███████████████████████████████████████████████████████████████

9 █████████████████████████   (*Id.*) █████████████████████████████

10 ███████████████████████████████████████████████████████████████

11 ███████████████████████████████████████████████████████████████

12 ██████████████████████████████████████████   (*Id.* (emphasis added).)

13 Lannett knew that legal issues was a material concern for customers, and in particular, customers

14 asked: ██████████████

15      160.    Once a customer discovers the truth about Lannett's unapproved C-Topical—that it

16 was not legally marketed, Lannett had no basis or FDA authorization to market it—Lannett was forced

17 to lie about the FDA authorization, or grandfather status, of C-Topical to convince customers to

18 purchase the product.  For example, after the FDA in May 2019 told Lannett to come off the market,

19 Lannett informed certain wholesalers about its upcoming discontinuation of C-Topical.  In particular,

20 ███████████████████████████████████████████████████████████████

21 ██████████████████████████████████████████████   (Exhibit 95.) ██████████

22 ███████████████████████████████████████████████████████████████

23 ███████████████████████████████████████████████████████████████

24 ███████████████████████████████████████████████████████████████

25 ████████████████████   (*Id.*)  This is a literally false statement designed to influence a customer into

26 continuing to buy C-Topical.  Lannett has never had authorization to market C-Topical.  Just because

27 the FDA did not take enforcement action to stop Lannett from marketing C-Topical does not make it

28

SECOND AMENDED COMPLAINT

1    legal.  In the same way, a state prosecutor's decision not to prosecute a person for possessing and using

2    heroin does not make possessing and using heroin legal.

3        161.    In the U.S. District Court for the Central District of California's decision in *JHP*

4    *Pharmaceuticals, LLC v. Hospira, Inc*., 52 F. Supp. 3d 992 (C.D. Cal. Oct. 7, 2014), the Honorable

5    Judge Dean Pregerson considered whether the defendant's "falsely representing to consumers that

6    their [unapproved epinephrine] products 'comply with all applicable laws, including FDCA'" was

7    actionable under the Lanham Act.  Judge Pregerson held that "the allegation that the drugs are being

8    sold unlawfully is an issue that would require a more complex finding from the agency," and should

9    be determined by FDA in the first instance.  Despite this ruling, however, Judge Pregerson expressly

10   recognized that a plaintiff could state a claim alleging the illegality of an unapproved drug if FDA has

11   made a clear statement as to the illegality of the drug product.  He wrote:

12              That does not mean, however, that an allegation of illegality under the FDCA

13              could never form the basis of a successful Lanham Act claim.  As *PhotoMedex*

14              and *POM Wonderful* both make abundantly clear, where the court is not called

15              upon to make determinations within the exclusive purview of FDA authority, a

16              Lanham Act claim may be heard, even if the subject of the claim touches the area

17              of authority of the FDCA.  Thus, this claim is not precluded as a categorical

18              matter.  **If the Plaintiff were to pursue the matter with the FDA through its**

19              **administrative procedures and obtain a clear statement from the agency that**

20              **the Defendants are selling their products illegally or otherwise breaking the**

21              **law, and if the Defendants at that point chose to affirmatively declare in their**

22              **advertising that their products comply with the law, a federal court could**

23              **hear a Lanham Act claim for false advertising**.

24   *Id*. at 1004 (emphasis added).

25       162.    In this case, it was not Genus who pursued the matter with the FDA through its

26   administrative procedures to obtain a clear statement from the agency on whether Lannett's may

27   legally market C-Topical as "pre-1938 grandfathered," Lannett itself pursued the matter with its 2012

28   Citizen Petition.

163.    As mentioned above (¶ 50), FDA states that "[a] drug that was subject to the Prescription Drug Wrap-Up **is marketed illegally, unless the manufacturer of such a drug can establish that its drug is grandfathered or otherwise not a *new drug*.**"  (Dkt. No. 54-1, Ex. 6 at 10 (italics emphasis in original; bold emphasis added).)  In 2012, Lannett petitioned the FDA to establish that C-Topical is grandfathered or otherwise not a *new drug*, and in 2015, FDA decided C-Topical is in fact a new drug, it is not grandfathered, and is not a pre-1938 grandfathered drug product.  (Exhibit 23 at 16.)  Lannett obtained a clear statement from FDA that Lannett is selling its C-Topical illegally, and Lannett did not challenge the FDA's decision.  As further evidence that Lannett's C-Topical was illegally marketed, and indeed, Lannett knew that its C-Topical was illegally marketed, ███████████████

████████████████████████████████████████████████████████████

███████████████████████████████████ (Exhibit 96.) ██████████████████████

█████████████████████████ (Exhibit 97.)  To eliminate any doubt as to the illegal status of C-Topical, FDA told Lannett to cease distribution of C-Topical by August 15, 2019.

164.    Lannett knew that the legality of C-Topical was highly material to customers.  In fact, Lannett's current CEO ████████████████████████████████████

████████████████████████████████████████████████████ (Exhibit 43.)  It was because Lannett was aware of the significance of the fact as to whether C-Topical is legally marketed to customers that Lannett went to great lengths to misrepresent C-Topical and deceive customers into believing C-Topical was legally marketed.

### Lannett Falsely Advertises Its C-Topical as a Legally Marketed "Pre-1938 Grandfathered" Drug

165.    Lannett falsely advertised, and falsely advertises, its C-Topical as a "grandfathered" and "pre-1938" drug, which intentionally misleads customers into believing that C-Topical is legally marketed.  Lannett advertised C-Topical as a "pre-1938" or "grandfathered" product in numerous advertisements beginning before 2016 and up through the present, including in academic journals (Exhibits 30; 98–99), a digital sales aid used by Lannett's sales representatives (Exhibits 46; 100; 101), leave-behinds (Exhibits 31–32), websites (Exhibit 33), price lists, case reports (Exhibits 34–36), and direct communications to customers.

166.    Lannett advertised C-Topical as "pre-1938" in various journal advertisements.  Lannett placed an ad in the March 2018 volume of www.entjournal.com, falsely stating: "Cocaine HCl is a pre-1938 drug . . . ."  (Exhibit 98.)  By advertising "Cocaine HCl is a pre-1938 drug" in a C-Topical advertisement, Lannett falsely advertised that C-Topical is a "grandfathered" product and legally marketed.  Lannett's former sales representative testified that ████████████████████████████ ████████████████████████████████████████████████████████████████████  (Exhibit 42 at 84:25–85:5.)  Lannett also advertised C-Topical as a pre-1938 drug in an advertisement appearing in the January/February 2018 volume of www.entjournal.com.  (Exhibit 98.)  Lannett also advertised C-Topical as a pre-1938 drug in an advertisement appearing in the November 2017 volume of www.entjournal.com.  (Exhibit 30.)

167.    Lannett instructed its sales force to tell customers that ████████████████████ ██████████████████████████████████ (Exhibit 42 at 104:11–18; 52:12– 53:7.)  Beginning in 2015, Lannett's sales representatives used a "digital sales aid" to promote C-Topical in one-on-one customer presentations.  (Exhibits 46; 100; 101.)  ████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████

(Exhibit 100.)

48

168.   The version of the digital sales aid used beginning in 2017 states ██████████ ████████   and the advertisement emphasizes that C-Topical has been ██████████ ████████████   (*Id.*)  All aspects of the digital sales aid falsely suggest that Lannett is legally marketing C-Topical.

169.   The ██████████ statement that "Cocaine HCl is a pre-1938 drug" appeared on websites marketing C-Topical, including www.lannettdirect.com.   In February 23, 2017, Auburn obtained the domain name www.lannettdirect.com, on which Lannett advertises its C-Topical.  (*See, e.g.*, Exhibit 102.)  On information and belief, Auburn is owned by Jeff Farber, who is among the largest shareholders of Lannett and was the Chairman of Lannett's Board until December 2017, and who licenses the right to use C-Topical in advertising from Lannett and with Lannett's approval and control.  On information and belief, since December 17, 2017, Lannett advertised its C-Topical as a pre-1938 drug on www.lannettdirect.com, stating: "Cocaine HCL is a pre-1938 drug. . . ."  (*Id.*)

This website falsely suggests that Lannett is legally marketing C-Topical.

170.   In addition to falsely promoting the legality of C-Topical by falsely claiming grandfather status in traditional advertisements, Lannett also misrepresented C-Topical as "pre-1938 grandfathered" to Price Lists and individual customers.

171.   After Genus had already filed its lawsuit in December 2018 alleging that Lannett was falsely marketing C-Topical as grandfathered, and after Lannett filed its February 2019 motion to dismiss that claim because on the technical ground that statement by the CEO to investors are not commercial ads, Lannett told ██████████ that C-Topical was grandfathered. ██████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████

1 ██████ (Exhibit 75.)  Lannett confirmed that C-Topical ████████ (*Id.*) ████████

2 ████████████████████████████████████████████████████████

3 (*Id.*) ██████████████████████████████████████████████████

4 ██████ (*Id.*) ████████████████████████████████████████████

5 ████████████████████████████████████████████████████████

6 ████████████████████████ (*Id.*)  Lannett did not respond.

172.    Lannett also directly advertised C-Topical as pre-1938 and grandfathered to customers. For example, in a February 26, 2018 email, Lannett wrote to a customer who had questions regarding

9 ████████████████████████████████████████████████████████

10 ████████████████████ (Exhibit 103 (emphasis added).)

173.    Lannett's repeated false statements to customers that C-Topical is a "pre-1938" drug or "grandfathered" drug are literally false.  Lannett was not selling C-Topical prior to 1938 (Dkt. No. 86 ¶ 78), and FDA determined in November 2015, based on Lannett's own information about its product, that C-Topical is not a legally marketed grandfathered drug.  (*See* Exhibit 23 at 1.)  Lannett itself acknowledged in November 2015 the ████████████████████ (Exhibit 96.)

174.    As a literally false statement, Lannett's claim to be grandfathered or pre-1938 drug is presumed to be deceptive to a substantial segment of customers and the statement is material to consumers.  "Because these representations were literally false, the statements carry with them the presumption that consumers relied on and were deceived by them."  *Avid Identification Sys., Inc. v. Schering-Plough Corp.*, 33 F. App'x 854, 856 (9th Cir. 2002); *see also Youngevity Int'l v. Smith*, No. 16-CV-704, 2019 WL 2918161, at *3 (S.D. Cal. July 5, 2019) ("When a claim is literally false, a plaintiff need not provide evidence on whether the claim was deceptive or material."); *Hansen Beverage Co. v. Vital Pharm., Inc.*, No. 08-CV-1545, 2010 WL 1734960, at *3 (S.D. Cal. Apr. 27, 2010) ("If literal falsity is proved, the court will presume such literally false statements actually mislead consumers."); *POM Wonderful LLC v. Purely Juice, Inc.*, No. 07-CV-02633, 2008 WL 4222045, at *11 (C.D. Cal. July 17, 2008), *aff'd*, 362 F. App'x 577 (9th Cir. 2009) ("'When representations are actually false, a court does not have to determine whether the representations are likely to create confusion' and actually false claims are presumed material." (quoting *Energy Four*,

*Inc. v. Dornier Med. Sys., Inc.*, 765 F. Supp. 724, 731 (N.D. Ga. 1991)).  Lannett would not have disseminated the literally false representations that C-Topical was "grandfathered" or a "pre-1938" drug if Lannett did not intend for customers to rely on it.

175.   In addition to being presumed misleading and material as a matter of law, the evidence demonstrates that ███████████████████████████████████████████ Actual customers of Lannett have ████████████████████████████████████████████████ ██████████████████████████████ (*See, e.g.*, Exhibit 81.)  Lannett itself recognized that ███ ████████████████████████████████████████████████████████████ ████████████████

176.   Because Lannett actually knew C-Topical was neither legally marketed nor a pre-1938 grandfathered drug based on the FDA November 2015 decision (Exhibit 23 at 1), all of Lannett's commercial advertisements to customers misrepresenting C-Topical as a legally marketed, pre-1938 grandfathered drug were intentionally made by Lannett to mislead customers. ████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████ (Exhibit 104; *see also* Exhibit 27 █████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████ (Exhibit 105.)

177.   Lannett intentionally disseminated false and misleading information about C-Topical, which creates the presumption that consumers were in fact deceived.  *United Tactical Sys., LLC v. Real Action Paintball, Inc.*, No. 14-cv-04050-MEJ, 2014 WL 6788310, at *15 (N.D. Cal. Dec. 2, 2014) ("If the defendant intentionally misled consumers, we would presume consumers were in fact deceived." (quoting *William H. Morris Co. v. Grp. W., Inc.*, 66 F.3d 255, 258 (9th Cir. 1995) (internal alterations omitted))).

**Lannett and Cody Falsely Advertise C-Topical as a**

**Legally Marketed Pursuant to a New Drug Application**

178.    Lannett falsely advertised the fact that C-Topical is legally marketed because Lannett had filed, or prepared to file, a 505(b)(2) NDA seeking FDA approval for a cocaine hydrochloride 4% solution product.  Upon information and belief, Lannett submitted an NDA for a cocaine hydrochloride 4% solution product to the FDA in or around July 2017.

179.    Legally marketed drugs are restricted to those marketed in accordance with an approved NDA, generic copies of such drugs marketed under an approved ANDA, and drugs that are exempt from the NDA requirement.  Drugs that are exempt from the NDA requirement include pre-1938 and pre-1962 "grandfathered" drugs, drugs subject to an ongoing Drug Efficacy Study Implementation ("DESI") proceeding, Generally Recognized as Safe and Effective ("GRASE") prescription drugs, and drugs marketed in accordance with a final or tentative Over-the-Counter ("OTC") drug monograph.  C-Topical is not a grandfathered drug, is not subject to an ongoing DESI proceeding, is not a GRASE prescription drug, and is not marketed in accordance with a final or tentative OTC drug monograph.  C-Topical is not marketed pursuant to an NDA or ANDA.  Lannett had no basis under the FDCA to legally market C-Topical.

180.    FDA does not permit production or marketing of prescription drug products under the submission of a new drug application or a "preliminary new drug application."  "Preliminary new drug application" is not a recognized submission category.  It is a fictitious regulatory category that appears to have been fabricated by Lannett.  By advertising that Lannett is producing and marketing C-Topical under the submission of an NDA or submission of "preliminary new drug application," Lannett actively and intentionally misleads consumers into believing that it has FDA authorization to produce and market C-Topical.

181.    Lannett advertised that C-Topical is subject to a formal FDA application in numerous advertisements beginning before 2016 and up through the present, including in academic journals, websites, leave behinds, and direct communications to customers.[3]

---

[3] In SEC filings and statements by Lannett's CEO, Lannett also told the public on numerous occasions that C-Topical "is produced and marketed under a preliminary new drug application ('PIND')."  (Exhibit 106 at 7; Exhibit 6 at 7; Exhibit 39 at 8.)

182.    For example, Lannett advertised its FDA application in various journal advertisements. For example, in one advertisement for C-Topical, Lannett stated:

> A New Drug Application (NDA), with clinical study data, has been submitted to the FDA.

(Exhibit 98.)  Lannett falsely advertised C-Topical as legally marketed based on the fact that "[a] New Drug Application (NDA), with clinical study data, has been submitted to the FDA."  (*Id.*)  This is misleading because the fact that Lannett had submitted an NDA to the FDA is not a legal basis for Lannett to market C-Topical.  An NDA must be *approved* before a drug product may be marketed in the United States.  FDA does not permit the manufacturing or marketing of prescription drug products after "[a] New Drug Application (NDA), with clinical study data, has been submitted to the FDA." (*Id.*)  Lannett also promoted this misleading advertisement on websites marketing C-Topical.  The Lannettdirect.com website stated: "A New Drug Application (NDA), with clinical study data, has been submitted to the FDA."  (Exhibit 102.)  Lannett promoted the fact that ███████████ ████████████████████████████████████████████████ in a leave-behind. (Exhibits 32; 49.)  Lannett also promoted C-Topical as legally marketed pursuant to an NDA submission specifically to customers.  For example, in August 2018, a customer asked Lannett: ████ ████████████████████████████████ (Exhibit 107.) ████████████ ███████████████████████████████ (*Id.*) ████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ██████████████████████████ (*Id.*)

183.    Lannett's advertisement of C-Topical based on Lannett having filed an NDA with the FDA is also misleading because Lannett's NDA is not seeking approval for oral and laryngeal uses of cocaine hydrochloride.  In Lannett's June 27, 2019 motion to dismiss Genus's First Amended Complaint, Lannett indicated that Genus's GOPRELTO® is inferior to C-Topical because Genus "is required by the FDA to narrowly identify Goprelto's route of administration as 'nasal.'"  (Dkt. No. 64 at 14:25–27.)  Lannett went on to suggest that advertising C-Topical for "oral, nasal, and laryngeal" use is true.  (*Id.* at 15:6–8.)  However, when Lannett advertises C-Topical as legally marketed based

on an NDA, Lannett intentionally misleads customers to believe that C-Topical's use for "oral, nasal, and laryngeal" was submitted to FDA, even though Lannett is not seeking approval for oral and laryngeal uses.  Based on publicly available protocols for Lannett's clinical studies to support an NDA with the FDA, Lannett is only seeking approval of a nasal indication for cocaine hydrochloride 4% solution.  In short, not only does Lannett mislead customers to believe it can legally market C-Topical based on a separate FDA application, Lannett also misleads customers into believing that this application is for the same indications as C-Topical.

184.    Furthermore, Lannett's advertisement of the use of C-Topical orally or laryngeally falsely implies that a cocaine hydrochloride solution product has been approved by FDA for those uses.  FDA has never approved any cocaine hydrochloride product for oral anesthesia.  FDA has never approved any cocaine hydrochloride product for laryngeal anesthesia.  Furthermore, Lannett's marketing its C-Topical for oral or laryngeal use falsely implies that FDA has approved a cocaine hydrochloride product for oral or laryngeal use.

185.    By advertising that it had submitted an NDA, with clinical study data, to FDA in the marketing material for C-Topical, Lannett intentionally misleads consumers into believing that it has FDA authorization for the product and the marketing of C-Topical.  Lannett misleads its customers into believing that Lannett can legally market C-Topical because it has filed a new drug application for cocaine hydrochloride 4% solution.

**Complying with FDA Good Manufacturing Practices ("cGMP")**

186.    Throughout Lannett's marketing, Lannett advertised to customers that ███████ █████████████████████████████████████████████████████████████████████ ████████████████████████████ (Exhibit 108; *see also* Exhibit 109 at LANNETT-CTOP-004382; Exhibit 110 at LANNETT-CTOP-003722.)  All prescription drugs must comply with FDA's cGMPs, and thus, there is no particular reason to advertise that C-Topical complies with cGMPs.  Lannett advertised that it complied with cGMPs to mislead customers into believing that C-Topical was a legally marketed FDA approved drug product, or authorized by the FDA.  For example, sales associates marketed C-Topical as ████████████████████████████████ (Exhibit 111 at LANNETT-CTOP-001257 █████████████████████████████

1    ███████████████ As part of its false advertising campaign, Lannett repeatedly told customers ███

2    ████████████████████████████████████████████████████████████████ to mislead

3    customers into believing C-Topical was legal marketed and authorized by FDA.  (*See* Exhibits 17; 50;

4    108; 112.)

**After Genus's FDA Approval, Lannett Continued Marketing**

**C-Topical as the Only Cocaine Hydrochloride Product Available**

7        187.    While advertising C-Topical, Lannett made the false statement that "Cocaine HCl . . .

8    has not been proven safe and effective by the FDA."  (Exhibits 98–99.)  This statement made after

9    December 14, 2017 is literally false because Genus's cocaine hydrochloride 4% solution product was

10   already proven safe and effective by the FDA.  It is material, because it misleads customers to believe

11   that only Lannett's C-Topical is available.  Lannett's advertisement of C-Topical as the only cocaine

12   hydrochloride solution product available on the market continued into 2018.  In response to a customer

13   question, for example, a Senior Sales Specialist at Lannett told the customer: ████████████████

14   ████████████████████████████████████████████████████████████████████████

15   ████████████████████ (Exhibit 113.)  By falsely telling customers of cocaine hydrochloride

16   that Lannett's was the only product available, Lannett hurt the sales of Genus's GOPRELTO®.

**LANNETT AND CODY FALSELY ADVERTISE C-TOPICAL AS SUPERIOR TO GENUS'S**

**PRODUCT, AS FALSELY HAVING A TOPICAL ROUTE OF ADMINISTRATION, AND**

**AS HAVING MORE USES THAN GENUS'S PRODUCT**

20       188.    FDA has not approved any aspect of Lannett's C-Topical.  Lannett's product, product

21   label, and packaging are not FDA approved or pre-approved by the FDA.

22       189.    Because Lannett's C-Topical is not approved by the FDA, all of Lannett's public

23   statements about C-Topical to customers constitute commercial speech subject to the Lanham Act.

24   For example, because Lannett's package insert was not reviewed for approval by the FDA, the package

25   insert is a mere advertisement for Lannett's C-Topical product.

26

27

28

**Lannett Falsely Advertises Its Route of Administration as "Topical "**

190.    Lannett falsely advertises C-Topical as a "topical solution . . . indicated for the introduction of local (topical) anesthesia of accessible mucous membranes of the oral, laryngeal, and nasal cavities."  (Exhibits 8; 64.)

191.    Lannett's C-Topical is not indicated for the introduction of local anesthesia to the outer surface of the body.

192.    Lannett's advertisement of the route of administration for C-Topical as "topical" is literally false, misleading, and unsubstantiated.

193.    Lannett's advertisement of C-Topical as having a "topical" route of administrative is material because the route of administration is a key characteristic used by customers to determine whether one drug product (like Genus's) may be interchanged with another drug product (like C-Topical).  By falsely characterizing C-Topical as having a "topical" route of administration, Lannett ensured that customers would not treat GOPRELTO® as an alternative product for routine surgical and diagnostic procedures.  For example, Cardinal explained to Genus that "we have discovered that your item is not cardkey equivalent to Lannett's item . . . Your specific item is only indicated for Internasal route or administration whereas Lannett's is indicated as topical route of administration. The reason I bring this up is because it means that when a customer is looking at Lannett's item they will not see your item as an equivalent."  (Exhibit 76.)  Moreover, under the Lanham Act, if a misrepresentation concerns an inherent quality or characteristic of the product, it is presumed material. *See POM Wonderful LLC*, 2008 WL 4222045, at *11 ("The fact that Purely Juice's false advertising pertained to the very nature of its juice product establishes its materiality" (citing *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242 (11th Cir. 2002)).

194.    Lannett's false description of C-Topical as having a "topical" route of administration significantly hurt Genus's sales of GOPRELTO®.

**Lannett Falsely Advertised Its Product as Having More Uses that Genus's Product**

195.    By advertising C-Topical as a topical solution indicated for oral and laryngeal use, as useful for ███████        and as useful for ███████████, Lannett misled customers into

1  believing that C-Topical is a superior product to Genus's GOPRELTO® or has more uses than

2  GOPRELTO®.  This is literally false.

3      196.  For example, Lannett falsely advertises its C-Topical (cocaine hydrochloride 4%

4  solution) as a topical product indicated "for the introduction of local (topical) anesthesia of accessible

5  mucous membranes of the oral, laryngeal and nasal cavities" (Exhibits 8; 64), whereas GOPRELTO®

6  (cocaine hydrochloride 4% solution) is approved by FDA as an intranasal product indicated for "the

7  induction of local anesthesia of the mucous membranes when performing diagnostic procedures and

8  surgeries on or through the nasal cavities in adults." (Exhibit 54.)  The implication is that C-Topical

9  has more uses or is superior to GOPRELTO®, which is literally false.  Lannett's promotion of

10  C-Topical as having oral and laryngeal uses is material to customers.  For example, Genus recently

11  fielded an inquiry from a customer who explained that he or she had previously purchased a different

12  cocaine solution (C-Topical) which could be used orally for the throat, and who asked whether

13  GOPRELTO® could be used orally for the throat.  Genus had to explain that it can only recommend

14  use of GOPRELTO® according to Genus's approved drug label.

15      197.  Lannett also misleads customers ███████████████████████

16  ████████████████████████████████████████████████████████████

17  ██████████████████████████████████████ (Exhibit 42 at 28:3–5.)

18  ████████████████████████████████████████████████████████████

19  ███████████████ (*Id.* at 40:3–42:8.)  On information and belief, members of the C-

20  Topical sales team ████████████████████████████████████████████

21  ██████████████████████████████ █████████████████████████████

22  ██████████████████████████████████████████ C-Topical has

23  more uses or is superior to GOPRELTO®, which is literally false.

24      198.  Lannett also misleads customers ████████████████████████

25  ███████████████████████████████ (Exhibit 49; Exhibit 100 at

26  LANNETT-CTOP-031796; Exhibits 46; 101; 114.) ████████████████████

27  ████████████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████████████

1  ██████████████████████████████████████ (Exhibit 42 at 44:25–45:25;

2  47:19–48:15; 50:10–25). ████████████████████████████████████████

3  ████████████████████████████████████████████████████████████

4  ████████████████████████████████████████████████████████████

5  ██████████████████████ (Exhibit 115.) ████████ █████████

6  ████████████████████████████████  The implication of Lannett's promotion of C-

7  Topical ████████████████████████████ C-Topical has more uses or is

8  superior to GOPRELTO®, which is literally false.

9       199.   Lannett intentionally promoted its product as having oral and laryngeal uses, as having

10  ████████████████, and as having ████████████. On information and belief, ████████

11  ████████████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████████████

13  (Exhibit 42 at 43:14–44:10.)  Lannett intentional dissemination of false and misleading information

14  about C-Topical creates the presumption that consumers were in fact deceived.  *United Tactical Sys.,*

15  *LLC*, 2014 WL 6788310, at *15 ("If the defendant intentionally misled consumers, we would presume

16  consumers were in fact deceived." (quoting *William H. Morris Co. v. Grp. W., Inc.*, 66 F.3d 255, 258

17  (9th Cir. 1995) (internal alterations omitted))).  On information and belief, customers were in fact

18  deceived into believing that GOPRELTO® was not substitutable for C-Topical.

19       200.   Lannett's false and misleading advertising that C-Topical is superior, better, or has

20  more uses than GOPRELTO® is material to purchasers.  Lannett's false statements deceive customers

21  into believing it is more desirable for pharmacists to stock C-Topical at their pharmacy.  Lannett's

22  false statements also lead customers to believe that C-Topical is a different product and that

23  GOPRELTO® is not substitutable. These beliefs directly affect sales of GOPRELTO® because

24  customers do not see GOPRELTO® as an alternative product.  Even where GOPRELTO® was less

25  expensive than C-Topical and was FDA approved, customers did not substitute GOPRELTO® for

26  C-Topical.

27

28

## COUNT I:

## FALSE ADVERTISING AND UNFAIR

## COMPETITION UNDER 15 U.S.C. § 1125(a)

## (AGAINST LANNETT AND CODY)

201.    Genus realleges and incorporates herein the allegations contained in Paragraphs 1–200 of this Complaint.

202.    On information and belief, Lannett and Cody advertise, promote, distribute, and sell their C-Topical throughout the United States and California to wholesale distributors, GPOs, IDNs, hospitals, outpatient centers, pharmacists, physicians, and patients.  Lannett's and Cody's statements, materials, and communications described above are false and misleading representations of fact in commercial advertising or promotion, made in interstate commerce, that misrepresent the nature, characteristics, and qualities of Lannett' and Cody's goods and commercial activities, and deceive and/or have the capacity to deceive a substantial segment of relevant consumers and potential consumers.

203.    Lannett and Cody advertise, promote, distribute, and sell their C-Topical in a manner that misleads relevant purchasers into believing that C-Topical is legally marketed and/or FDA approved by making false and misleading statements, omissions, and using other tactics likely to create false impressions and confusion regarding FDA approval status of the C-Topical.

204.    Lannett and Cody make literally false statements including (1) that C-Topical is produced and marketed under a PIND or based on the fact that Lannett's submitted a NDA for a cocaine drug, and (2) that C-Topical is "grandfathered" and a "pre-1938" drug.  These and similar statements are literally false because FDA does not grant marketing authorization under PINDs and FDA denied Lannett's request to designate C-Topical as a grandfathered drug.

205.    Lannett and Cody make other literally false statements in their advertising and promotional materials related to C-Topical.  For example, Lannett and Cody provide a meta description of the webpage for C-Topical that describes it as follows: "Learn more about the facts and characteristics of the generic pharmaceutical C-Topical® Solution CII."  This statement is literally false at least because C-Topical is not a generic pharmaceutical product.

206.    Lannett and Cody also intentionally mislead the relevant consumers about FDA approval status of C-Topical through at least their product packaging and package insert, which have all of the hallmarks of FDA approved product packaging and package inserts and omit any statement that the products are not FDA approved.   For example, the packaging contains an "Rx only" designation and an NDC as well as other design themes which suggest to pharmacists and other relevant consumers that the product is FDA approved.

207.    Lannett's and Cody's deception and intended deception was and is material, in that it is likely to influence relevant consumers' purchasing decisions.   FDA approval status of a drug product is material to customers, including pharmacists and physicians.   Whether C-Topical is legally marketed is material to customers, including pharmacists and physicians.

208.    As a direct result of Lannett's and Cody's false and misleading descriptions of fact, false and misleading representations, and false and deceptive advertising and unfair competition, there is actual deception or, at a minimum, a tendency to deceive a substantial portion of the intended audience.

209.    As a direct result of Lannett's and Cody's false and misleading descriptions of fact, false and misleading representations, and false and deceptive advertising and unfair competition, Genus has suffered, currently suffers, and will continue to suffer damage and irreparable injury, including injury to its business, reputation, and goodwill, including by direct diversion of sales from Genus to Lannett and Cody or by a lessening of the goodwill associated with Genus.

210.    Pursuant to 15 U.S.C. § 1117, Genus is entitled to damages for Lanham Act violations, an accounting for profits made by Lannett and Cody on sales of C-Topical, as well as recovery of costs of this action.   Furthermore, the conduct alleged herein was undertaken willfully and with the intention of causing confusion, mistake, or deception, making this an exceptional case entitling Genus to recover additional damages in an amount exceeding $111,000,000 and reasonable attorney fees pursuant to 15 U.S.C. § 1117.

211.    Lannett's and Cody's conduct has caused, and will continue to cause, immediate and irreparable harm to Genus for which there is no adequate remedy at law.   As such, Genus is also entitled to injunctive relief as set forth in 15 U.S.C. § 1116.

212.     Lannett's and Cody's unlawful conduct including, *inter alia*, advertising, promotion, selling, and distribution of an unapproved C-Topical has harmed and will continue to irreparably harm Genus and pose grave risks to California purchasers, residents, and other consumers.

<div align="center">

**COUNT II:**

**CALIFORNIA FALSE ADVERTISING LAW**

**Cal. Bus. & Prof Code § 17500**

**<u>(AGAINST LANNETT AND CODY)</u>**

</div>

213.     Genus realleges and incorporates herein the allegations contained in Paragraphs 1–212 of this Complaint.

214.     California's False Advertising Law, Cal. Bus. & Prof. Code § 17500 *et seq.*, prohibits false and misleading advertising and/or advertising which has the capacity, likelihood or tendency to deceive or confuse the public.

215.     Lannett and Cody advertise, promote, distribute, sell, cause to be distributed, authorize the distribution of and/or otherwise disseminate false and/or misleading statements regarding C-Topical, including false and misleading statements regarding C-Topical's approval status.  Lannett's and Cody's advertisements and promotional materials were made and distributed in California and this District and come within the definition of advertising as contained in Business and Professions Code § 17500, *et seq*. in that the product packaging and labeling, and promotional materials were intended as inducements to purchase Lannett's and Cody's C-Topical, and are statements disseminated by Lannett and Cody.

216.     On information and belief, Lannett and Cody intend purchasers and users to believe that their C-Topical is FDA approved and/or legally marketed.  On information and belief, Lannett and Cody knew, or in the exercise of reasonable care should have known, that the statements were untrue and/or misleading.

217.     Lannett's and Cody's deception and intended deception was and is material, in that it was and is likely to influence relevant consumers' purchasing decisions.  Lannett's and Cody's misrepresentations are likely to deceive and/or mislead a significant portion of the relevant consumers acting reasonably under the circumstances.

218.    Lannett and Cody prepared and distributed in California and this District via product packaging and labeling, and other promotional materials, statements that falsely advertise C-Topical, falsely misrepresent the nature of the C-Topical, and/or have the capacity, likelihood or tendency to deceive or confuse the public.  Lannett's and Cody's conduct described above violates Cal. Bus. & Prof. Code § 17500 *et seq.*

219.    Lannett's and Cody's conduct has caused damage to Genus's business, reputation, and goodwill, including loss of money and property and will continue to cause harm to Genus, and, unless restrained, will cause further harm to Genus.

220.    As a direct and proximate result of Lannett's and Cody's willful and intentional actions, Genus has and will continue to suffer damages, including lost sales, revenue, market share, and asset value in an amount to be determined at trial.  Genus suffers irreparable damage, and unless Lannett and Cody are restrained, Genus will continue to suffer irreparable damage.

221.    On information and belief, Lannett's and Cody's acts of unfair competition are willful, deliberate, and in bad faith.

222.    Genus is entitled to injunctive relief and restitution under California Bus. & Prof. Code § 17535.

### COUNT III:

### CALIFORNIA UNFAIR COMPETITION LAW,

### Cal. Bus. & Prof Code § 17200 *et seq.*

### (AGAINST LANNETT AND CODY)

223.    Genus realleges and incorporates herein the allegations contained in Paragraphs 1–222 of this Complaint.

224.    California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*, provides a private right of action against any person who engages in "unfair competition."  Cal. Bus. & Prof. Code § 17203.  "Unfair competition" includes "any unlawful, unfair or fraudulent business act or practice."  *Id.* § 17200.

225.    The acts of Lannett and Cody, as herein alleged, constitute unlawful, unfair, and deceptive business practices in violation of Cal. Bus. & Prof. Code § 17200.  Such acts include, without

limitation, Lannett's and Cody's unlawful distribution and sale of C-Topical in violation of state and federal law, their unfair competition and false advertising in connection with the marketing and sale of C-Topical in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) and Cal. Bus. & Prof. Code § 17500 *et seq.* and Defendants' deceptive statements regarding C-Topical as alleged above.

226.    For example, California regulates drugs under the Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code § 109875 *et seq.* (the "Sherman Law").  The Sherman Law provides that in relevant part that "[n]o person shall sell, deliver, or give away any new drug" that has not been approved by FDA or by the State of California.  *Id.* § 111550(a)–(b).  C-Topical qualifies as a "new drug" under the Sherman law.  *See*, *e.g.*, Cal. Health & Safety Code § 109980.  On information and belief, Lannett and Cody are illegally distributing and/or selling C-Topical for which they have not obtained FDA approval or approval by the State of California in violation of the Sherman Law, and thereby have engaged in an unlawful business practice that constitutes unfair competition in violation of Cal. Bus. & Prof. Code § 17200 *et seq.*

227.    On information and belief, Lannett's and Cody's business practices are further unlawful under § 17200, *et seq.* by virtue of Defendant's violations of Cal. Bus. & Prof. Code § 17500, *et seq.*, which forbids untrue and misleading advertising.  As alleged above, Defendants have engaged in unfair competition arising under California Business and Professions Code § 17200 *et seq.*, through their conduct alleged herein, inter alia, making untrue and misleading statements in advertisements and promotions causing at least a likelihood of confusion or misunderstanding of FDA approval of the unapproved C-Topical.  This is an unfair business practice at least because the reasons, justifications, and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims, and those practices are likely to deceive members of the consuming public in the State of California and this District.  On information and belief, Lannett's and Cody's business practices are further unlawful under § 17200, *et seq.* by virtue of their violations of the Sherman Law's false advertising provisions.

228.    Lannett and Cody acted willfully during the time period relevant to this action, and Lannett and Cody unlawfully derived and will continue to derive income, profits, and goodwill from

their wrongful activities. Lannett's and Cody's conduct has caused, and will continue to cause, immediate and irreparable harm to Genus for which there is no adequate remedy at law, including damage to Genus's business, reputation, and goodwill. As an actual and proximate result of Lannett's and Cody's willful and intentional actions, Genus has and will continue to suffer damages, including lost sales, revenue, market share, and asset value in an amount to be determined at trial, and unless Lannett and Cody are restrained, Genus will continue to suffer irreparable harm. Genus is entitled to injunctive relief and restitution under California Bus. & Prof. Code § 17203.

## COUNT IV:

## CONTRIBUTORY FALSE ADVERTISING

## 15 U.S.C. § 1125(a)

## (AGAINST CODY)

229.    Genus realleges and incorporates herein the allegations contained in Paragraphs 1–228 of this Complaint.

230.    On information and belief, based on the conduct alleged herein, Lannett has engaged in false advertising that has injured Genus.

231.    On information and belief, Cody actively engages in the false advertising, but Cody is alternatively contributorily liable because it knowingly induces, causes, and/or materially participates in Lannett's misleading conduct. Cody contributes to Lannett's false advertising because, for example, Cody supplies, manufactures, labels, and packages the unapproved C-Topical, knows or should know about Lannett's conduct alleged herein, and directly or indirectly, ships it, to or on behalf of Lannett, into California. Cody is actively and materially furthering Lannett's false or misleading advertising and promotion of C-Topical as FDA approved and/or legally marketed.

232.    Such false or misleading statements about C-Topical have actually deceived or have the tendency to deceive a substantial segment of their audience as to the nature, quality, and characteristics of C-Topical.

233.    Such false or misleading statements about C-Topical are material and likely to influence purchasing, dispensing, reimbursement, and stocking decisions of the relevant customers.

234.    The false or misleading representations are made in interstate commerce for commercial purposes.

235.    As a direct and proximate result of Cody's conduct, Genus will suffer damages, including a loss of sales, profits and customers, which Genus would have made but for the false or misleading representations by Lannett and Cody.

236.    Lannett's and Cody's actions as alleged herein will continue to cause irreparable and inherently unquantifiable injury and harm to the public and Genus's business, reputation, and goodwill, unless Lannett's and Cody's unlawful conduct is enjoined by this Court.

237.    Genus is entitled to preliminary and permanent injunctive relief to enjoin Lannett's and Cody's continuing acts pursuant to 15 U.S.C. § 1116.

238.    Genus is entitled to recover all damages sustained on account of Lannett's and Cody's actions, an accounting for profits realized by Lannett and Cody, and the costs of this action pursuant to 15 U.S.C. § 1117.

239.    Cody's actions have been willful and deliberate, entitling Genus to recover treble damages and/or profits.  In addition, this is an exceptional case pursuant to 15 U.S.C. § 1117(a), and Genus is entitled to an award of reasonable attorneys' fees.

## **PRAYER FOR RELIEF**

WHEREFORE, Genus prays that this Court enter judgment against the Defendants as follows:

A.    That Lannett and Cody and all of their respective officers, agents, representatives, employees, attorneys, and all other persons acting in concert with them be permanently enjoined from:

1.    listing the unapproved C-Topical on the prescription drug dispensing databases and in Price Lists, including but not limited to Medi-Span and First Databank, until at least such time as those databases and Price Lists provide clear and conspicuous notice that C-Topical is not FDA approved;

2.    directly or indirectly engaging in false, misleading, or deceptive advertising or promotions of the unapproved C-Topical or using such advertising or promotions to induce others to purchase the unapproved C-Topical over Genus's FDA approved GOPRELTO®;

3.    making or inducing others to make any false, misleading, or deceptive statement of fact, or misrepresentation of fact in connection with the promotion, advertisement, display, sale,

offering for sale, manufacture, production, circulation, or distribution (including but not limited to repackaging) of the unapproved C-Topical in such a fashion as to suggest that C-Topical is a generic version of Genus's FDA approved GOPRELTO®;

        4.     making or inducing others to make any false, misleading, or deceptive statement of fact, or misrepresentation of fact in connection with the promotion, advertisement, display, sale, offering for sale, manufacture, production, circulation, or distribution (including but not limited to repackaging) of the unapproved C-Topical in such a fashion as to suggest that C-Topical is superior to Genus's FDA approved GOPRELTO® based on the representation that unapproved C-Topical is approved for oral and laryngeal uses;

        5.     making or inducing others to make any false, misleading, or deceptive statement of the fact, or misrepresentation of fact in connection with the promotion, advertisement, display, sale, offering for sale, manufacture, production, circulation, or distribution (including but not limited to repackaging) of the unapproved C-Topical in such a fashion as to suggest that C-Topical has a topical route of administration;

        6.     making or inducing others to make any false, misleading, or deceptive statement of fact, or misrepresentation of fact in connection with the promotion, advertisement, display, sale, offering for sale, manufacture, production, circulation, or distribution (including but not limited to repackaging) of the unapproved C-Topical in such a fashion as to suggest that C-Topical is FDA approved;

        7.     making or inducing others to make any false, misleading, or deceptive statement of fact, or misrepresentation of fact in connection with the promotion, advertisement, display, sale, offering for sale, manufacture, production, circulation, or distribution (including but not limited to repackaging) of the unapproved C-Topical in such a fashion as to suggest that C-Topical is a grandfathered or pre-1938 drug; and

        8.     making or inducing others to make any false, misleading, or deceptive statement of fact, or misrepresentation of fact in connection with the promotion, advertisement, display, sale, offering for sale, manufacture, production, circulation, or distribution (including but not limited to

repackaging) of the unapproved C-Topical in such a fashion as to suggest that C-Topical is approved, or will be approved, under a preliminary new drug application;

     B.     That Lannett and Cody be ordered to correct any erroneous impression customers may have derived concerning the nature, characteristics, or qualities of either the unapproved C-Topical or Genus's FDA approved GOPRELTO®, including without limitation:

     1.     sending a registered letter (with a copy to Genus) to all databases and Price Lists that list the unapproved C-Topical product, including but not limited to Medi-Span and First Databank, requesting that the unapproved C-Topical be immediately listed as obsolete in said databases and Price Lists, and instructing the database and Price List companies to remove any listing of C-Topical, as soon as commercially possible;

     2.     placing corrective advertising, for a period of 12 months, in the form of a printed advertisement on the Defendants' websites stating that the unapproved C-Topical is not FDA approved in a font no smaller than the font used throughout their websites;

     3.     placing corrective advertising, for a period of 12 months, in the form of a printed advertisement on the Defendants' websites stating that the unapproved C-Topical is not a grandfathered or pre-1938 product in a font no smaller than the font used throughout their websites;

     4.     placing corrective advertising, for a period of 12 months, in the form of a printed advertisement on the Defendants' websites stating that the unapproved C-Topical is not approved under a "preliminary new drug application" in a font no smaller than the font used throughout their websites;

     5.     providing notice to each person or entity that purchased, dispensed, ordered, and prescribed the unapproved C-Topical (including wholesale generic drug purchasers, pharmacists, GPOs, outpatient centers, hospitals, doctors, and purchasers or buyers of such products) that FDA has approved only Genus's GOPRELTO®;

     6.     providing notice to patients that have used the product that C-Topical is not approved by the FDA; and

     7.     providing a disclaimer on any C-Topical packaging, including the carton and bottle label, stating that the product is not FDA approved;

C.     That Lannett and Cody be adjudged to have violated the provisions of 15 U.S.C. § 1125(a) by unfairly competing against Genus by using false or misleading descriptions or representations of fact that misrepresent the nature, quality, and characteristics of C-Topical;

D.     That Lannett and Cody be adjudged to have unlawfully competed against Genus by engaging in unfair competition under California Business & Professions Code, § 17200 *et seq.*;

E.     That Lannett and Cody recall and remove their unapproved C-Topical from the distribution supply chains until such time as they clearly and conspicuously state that the unapproved C-Topical is not FDA approved;

F.     That Genus be awarded damages pursuant to 15 U.S.C. § 1117, sufficient to compensate it for the damage caused by the false, misleading, and deceptive statements by Defendants related to or about C-Topical;

G.     That Genus be awarded profits derived by reason of said acts, or as determined by an accounting;

H.     That such damages and profits be trebled to an amount more than $111,000,000, and awarded to Genus and that Genus be awarded its costs, attorneys' fees and expenses in this suit under 15 U.S.C. § 1117, as a result of the willful, intentional and deliberate acts alleged herein in violation of the Lanham Act;

I.     That Genus be awarded damages in an amount sufficient to compensate it for the damage caused by Lannett's and Cody's unlawful competition and false or misleading acts and deceptive trade practices under the California Business and Professions Code, § 17200 *et seq.* and the common law;

J.     That Genus be granted injunctive relief under the California Business and Professions Code, § 17200 *et seq.*;

K.     That Genus be awarded damages in an amount sufficient to compensate it for the damage caused by Lannett's and Cody's unlawful competition and false or misleading acts and deceptive trade practices under the California Business and Professions Code, § 17500 *et seq.* and the common law;

1       L.      That Genus be granted injunctive relief under the California Business and Professions

2   Code, § 17500 *et seq.*;

3       M.     That all of the Defendants' false, deceptive, or misleading materials and products be

4   destroyed as allowed under 15 U.S.C. § 1118;

5       N.     That each Defendant file, within ten days from entry of an injunction, a declaration

6   with this Court signed under penalty of perjury certifying the manner in which each Defendant has

7   complied with the terms of any injunction;

8       O.     That Genus be granted pre-judgment and post-judgment interest;

9       P.      That Genus be granted costs associated with the prosecution of this action; and

10      Q.     That Genus be granted such further relief as the Court may deem just.

11  <div align="center">**DEMAND FOR JURY TRIAL**</div>

12      Genus hereby demands a trial by jury of all issues in this case.

13

14  <div align="center">K&L GATES LLP</div>

15  Dated:   November 19, 2019        By:   */s/ Michael J. Freno*

16

17                                   Michael J. Freno
                                 michael.freno@klgates.com

18                                   Jeffrey C. Johnson
                                 jeff.johnson@klgates.com

19                                   Harold Storey
                                 harold.storey@klgates.com

20                                   Elizabeth Weiskopf
                                 elizabeth.weiskopf@klgates.com

21                                   **K&L GATES LLP**
                                 925 Fourth Avenue, Suite 2900

22                                   Seattle, WA 98104
                                 206.623.7580 t

23                                   206.623.7022 f

24                                   Jason N. Haycock
                                 jason.haycock@klgates.com

25                                   **K&L GATES LLP**
                                 4 Embarcadero Center, Suite 1200

26                                   San Francisco, CA 94111-5994
                                 jason.haycock@klgates.com

27                                   415.882.8200 t
                                 415.882.8220 f

28

<div align="center">69</div>

Allen Bachman
allen.bachman@klgates.com
**K&L GATES LLP**
1601 K Street NW
Washington D.C., 20006-1600
202.778.9000 t
202.778.9100 f

*Attorneys for Genus Lifesciences Inc.*

SECOND AMENDED COMPLAINT