# EXHIBIT 1

# CENTER FOR DRUG EVALUATION AND RESEARCH

## Approval Package for:

### *APPLICATION NUMBER:*

### 209963Orig1s000

| | |
|---|---|
| *Trade Name:* | GOPRELTO nasal solution, 4% |
| *Generic or Proper Name:* | cocaine hydrochloride |
| *Sponsor:* | Genus Lifesciences, Inc. |
| *Approval Date:* | December 14, 2017 |
| *Indication:* | GOPRELTO (cocaine hydrochloride nasal solution, 4%), for the induction of local anesthesia of the mucous membranes when performing diagnostic procedures and surgeries on or through the nasal cavities in adults. |

# CENTER FOR DRUG EVALUATION AND RESEARCH

# 209963Orig1s000

## CONTENTS

| Reviews / Information Included in this NDA Review. | |
|---|---|
| Approval Letter | X |
| Other Action Letters | |
| Labeling | X |
| REMS | |
| Summary Review | X |
| Officer/Employee List | X |
| Office Director Memo | |
| Cross Discipline Team Leader Review | |
| Clinical Review(s) | X |
| Product Quality Review(s) | X |
| Non-Clinical Review(s) | X |
| Statistical Review(s) | X |
| Clinical Microbiology / Virology Review(s) | |
| Clinical Pharmacology Review(s) | X |
| Other Reviews | X |
| Risk Assessment and Risk Mitigation Review(s) | |
| Proprietary Name Review(s) | X |
| Administrative/Correspondence Document(s) | X |

# CENTER FOR DRUG EVALUATION AND RESEARCH

*APPLICATION NUMBER:*

## 209963Orig1s000

## <u>APPROVAL LETTER</u>



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Food and Drug Administration**
**Silver Spring  MD  20993**

NDA 209963

**NDA APPROVAL**

Genus Lifesciences, Inc.
514 North 12th Street
Allentown, PA 18102

Attention:  William Reightler
                   Vice President of Regulatory Affairs

Dear Mr. Reightler:

Please refer to your New Drug Application (NDA) dated and received November 23, 2016, and
your amendments, submitted pursuant to section 505(b)(2) of the Federal Food, Drug, and
Cosmetic Act (FDCA), for GOPRELTO (cocaine hydrochloride nasal solution, 4%).

We acknowledge receipt of your major amendment dated July 31, 2017, which extended the goal
date by three months.

This new drug application provides for the use of GOPRELTO (cocaine hydrochloride nasal
solution, 4%), for the induction of local anesthesia of the mucous membranes when performing
diagnostic procedures and surgeries on or through the nasal cavities in adults.

We have completed our review of this application, as amended.  It is approved, effective on the
date of this letter, for use as recommended in the enclosed agreed-upon labeling text.

**CONTENT OF LABELING**

As soon as possible, but no later than 14 days from the date of this letter, submit the content of
labeling [21 CFR 314.50(l)] in structured product labeling (SPL) format using the FDA
automated drug registration and listing system (eLIST), as described at
http://www.fda.gov/ForIndustry/DataStandards/StructuredProductLabeling/default.htm.  Content
of labeling must be identical to the enclosed labeling text for the package insert.  Information on
submitting SPL files using eLIST may be found in the guidance for industry *SPL Standard for
Content of Labeling Technical Qs and As*, available at
http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/U
CM072392.pdf

The SPL will be accessible via publicly available labeling repositories.

## CARTON AND IMMEDIATE CONTAINER LABELS

Submit final printed carton and immediate container labels that are identical to the enclosed carton and immediate container labels as soon as they are available, but no more than 30 days after they are printed.  Please submit these labels electronically according to the guidance for industry titled *Providing Regulatory Submissions in Electronic Format — Certain Human Pharmaceutical Product Applications and Related Submissions Using the eCTD Specifications (May 2015, Revision 3)*.  For administrative purposes, designate this submission "**Final Printed Carton and Container Labels for approved NDA 209963**."  Approval of this submission by FDA is not required before the labeling is used.

## REQUIRED PEDIATRIC ASSESSMENTS

Under the Pediatric Research Equity Act (PREA) (21 U.S.C. 355c), all applications for new active ingredients, new indications, new dosage forms, new dosing regimens, or new routes of administration are required to contain an assessment of the safety and effectiveness of the product for the claimed indication(s) in pediatric patients unless this requirement is waived, deferred, or inapplicable.

We are deferring submission of your pediatric studies according to the timetables listed below, because this product is ready for approval for use in adults and the pediatric studies have not been completed.

Your deferred pediatric studies required under section 505B(a) of the Federal Food, Drug, and Cosmetic Act/FDCA are required postmarketing studies. The status of these postmarketing studies must be reported annually according to 21 CFR 314.81 and section 505B(a)(3)(C) of the Federal Food, Drug, and Cosmetic Act/FDCA. These required studies are listed below.

3241-1    Conduct a juvenile animal study to characterize the impact of cocaine on brain development and male reproductive tissue and development to support pediatric dosing in children under 3 years of age.

The timetable you submitted on November 20, 2017, states that you will conduct this study according to the following schedule:

Draft Protocol Submission:   12/2017
Final Protocol Submission:   06/2018
Study Completion:            11/2018
Final Report Submission:     02/2019

3241-2    Conduct a juvenile animal study to characterize the impact of cocaine on brain development and male reproductive tissue and development to support pediatric dosing in children 3 years of age to less than 17 years of age.

NDA 209963
Page 3

The timetable you submitted on November 20, 2017, states that you will conduct this study according to the following schedule:

>Draft Protocol Submission:    12/2017
>Final Protocol Submission:    06/2018
>Study Completion:             11/2018
>Final Report Submission:      02/2019

3241-3     Conduct a multicenter, sequential age-group trial to evaluate the pharmacokinetic and safety profiles of a single topical administration of GOPRELTO for the induction of local anesthesia of the mucous membranes when performing diagnostic procedures and surgeries on or through the nasal cavities in pediatric subjects two years of age to less than 17 years of age.

The timetable you submitted on December 1, 2017, states that you will conduct this study according to the following schedule:

>Draft Protocol Submission:    02/2018
>Final Protocol Submission:    11/2018
>Trial Completion:             12/2020
>Final Report Submission:      06/2021

3241-4     Conduct a multicenter trial to evaluate the pharmacokinetic profile, efficacy, and safety of a single topical administration of GOPRELTO for the induction of local anesthesia of the mucous membranes when performing diagnostic procedures and surgeries on or through the nasal cavities in pediatric patients from birth to less than two years of age.

The timetable you submitted on December 1, 2017, states that you will conduct this study according to the following schedule:

>Draft Protocol Submission:    10/2020
>Final Protocol Submission:    04/2021
>Trial Completion:             12/2023
>Final Report Submission:      06/2024

Submit the protocols to your IND 118527, with a cross-reference letter to this NDA.

Reports of these required pediatric postmarketing studies must be submitted as a new drug application (NDA) or as a supplement to your approved NDA with the proposed labeling changes you believe are warranted based on the data derived from these studies. When submitting the reports, please clearly mark your submission "**SUBMISSION OF REQUIRED PEDIATRIC ASSESSMENTS**" in large font, bolded type at the beginning of the cover letter of the submission.

NDA 209963
Page 4

## POSTMARKETING REQUIREMENTS UNDER 505(o)

Section 505(o)(3) of the FDCA authorizes FDA to require holders of approved drug and biological product applications to conduct postmarketing studies and clinical trials for certain purposes, if FDA makes certain findings required by the statute.

We have determined that an analysis of spontaneous postmarketing adverse events reported under subsection 505(k)(1) of the FDCA will not be sufficient identify an unexpected serious risk of fertility, embryo-fetal developmental, and/or pre-/post-natal developmental adverse events.

Furthermore, the new pharmacovigilance system that FDA is required to establish under section 505(k)(3) of the FDCA will not be sufficient to assess these serious risks.

Therefore, based on appropriate scientific data, FDA has determined that you are required to conduct the following studies:

3241-5    Conduct a female fertility and early embryonic development study in the rat model to adequately characterize the effect of cocaine on female fertility and early embryonic development.

The timetable you submitted on November 20, 2017, states that you will conduct this study according to the following schedule:

|  |  |
|---|---|
| Draft Protocol Submission: | 01/2018 |
| Final Protocol Submission: | 04/2018 |
| Study Completion: | 10/2018 |
| Final Report Submission: | 03/2019 |

3241-6    Conduct an embryo-fetal development study in the rat model to characterize the teratogenic potential of cocaine.

The timetable you submitted on November 20, 2017, states that you will conduct this study according to the following schedule:

|  |  |
|---|---|
| Draft Protocol Submission: | 12/2017 |
| Final Protocol Submission: | 03/2018 |
| Study Completion: | 05/2018 |
| Final Report Submission: | 10/2018 |

3241-7    Conduct an embryo-fetal development study in the rabbit model to characterize the teratogenic potential of cocaine.

NDA 209963
Page 5

The timetable you submitted on November 20, 2017, states that you will conduct this study according to the following schedule:

|  |  |
|---|---|
| Draft Protocol Submission: | 12/2017 |
| Final Protocol Submission: | 03/2018 |
| Study Completion: | 06/2018 |
| Final Report Submission: | 11/2018 |

3241-8   Conduct a pre- and post-natal development study in the rat model to characterize the impact of cocaine on development, including exposure during lactation to weaning, growth and development, functional assessments, and reproductive capacity of the offspring.

The timetable you submitted on November 20, 2017, states that you will conduct this study according to the following schedule:

|  |  |
|---|---|
| Draft Protocol Submission: | 03/2018 |
| Final Protocol Submission: | 06/2018 |
| Study Completion: | 02/2019 |
| Final Report Submission: | 08/2019 |

3241-9   Submit a complete histopathological assessment from the 14-day rat intranasal toxicology study testing _____ (b) (4) (Study Number 256501 or 558503) and revise the final study report accordingly.

The timetable you submitted on November 20, 2017, states that you will conduct this study according to the following schedule:

|  |  |
|---|---|
| Study Completion: | 12/2017 |
| Final Report Submission: | 01/2018 |

Submit protocols to your IND 118527 with a cross-reference letter to this NDA. Submit nonclinical and chemistry, manufacturing, and controls protocols and all final report(s) to your NDA. Prominently identify the submission with the following wording in bold capital letters at the top of the first page of the submission, as appropriate: **Required Postmarketing Protocol Under 505(o), Required Postmarketing Final Report Under 505(o), Required Postmarketing Correspondence Under 505(o).**

Section 505(o)(3)(E)(ii) of the FDCA requires you to report periodically on the status of any study or clinical trial required under this section. This section also requires you to periodically report to FDA on the status of any study or clinical trial otherwise undertaken to investigate a safety issue. Section 506B of the FDCA, as well as 21 CFR 314.81(b)(2)(vii) requires you to report annually on the status of any postmarketing commitments or required studies or clinical trials.

NDA 209963
Page 6

FDA will consider the submission of your annual report under section 506B and 21 CFR 314.81(b)(2)(vii) to satisfy the periodic reporting requirement under section 505(o)(3)(E)(ii) provided that you include the elements listed in 505(o) and 21 CFR 314.81(b)(2)(vii).  We remind you that to comply with 505(o), your annual report must also include a report on the status of any study or clinical trial otherwise undertaken to investigate a safety issue.  Failure to submit an annual report for studies or clinical trials required under 505(o) on the date required will be considered a violation of FDCA section 505(o)(3)(E)(ii) and could result in enforcement action.

## PROMOTIONAL MATERIALS

You may request advisory comments on proposed introductory advertising and promotional labeling.  To do so, submit, in triplicate, a cover letter requesting advisory comments, the proposed materials in draft or mock-up form with annotated references, and the package insert, Medication Guide, and patient PI (as applicable) to:

> OPDP Regulatory Project Manager
> Food and Drug Administration
> Center for Drug Evaluation and Research
> Office of Prescription Drug Promotion
> 5901-B Ammendale Road
> Beltsville, MD 20705-1266

Alternatively, you may submit a request for advisory comments electronically in eCTD format. For more information about submitting promotional materials in eCTD format, see the draft Guidance for Industry (available at: http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM443702.pdf ).

As required under 21 CFR 314.81(b)(3)(i), you must submit final promotional materials, and the package insert, at the time of initial dissemination or publication, accompanied by a Form FDA 2253. Form FDA 2253 is available at http://www.fda.gov/downloads/AboutFDA/ReportsManualsForms/Forms/UCM083570.pdf. Information and Instructions for completing the form can be found at http://www.fda.gov/downloads/AboutFDA/ReportsManualsForms/Forms/UCM375154.pdf. For more information about submission of promotional materials to the Office of Prescription Drug Promotion (OPDP), see http://www.fda.gov/AboutFDA/CentersOffices/CDER/ucm090142.htm.

## REPORTING REQUIREMENTS

We remind you that you must comply with reporting requirements for an approved NDA (21 CFR 314.80 and 314.81).

NDA 209963
Page 7

If you have any questions, call Diana L. Walker, PhD, Regulatory Project Manager, at (301) 796-4029.

Sincerely,

*{See appended electronic signature page}*

Rigoberto Roca, MD
Deputy Director
Division of Anesthesia, Analgesia, and
    Addiction Products
Office of Drug Evaluation II
Center for Drug Evaluation and Research

Enclosures:
    Content of Labeling
    Carton and Container Labeling

---------------------------------------------------------------------------------------------

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

---------------------------------------------------------------------------------------------

/s/

-----------------------------------------------------

RIGOBERTO A ROCA

12/14/2017

Reference ID: 4195367

Exhibit 2


U.S. Department of Health and Human Services


**U.S. Food and Drug Administration**
Protecting and Promoting *Your* Health

A to Z Index | Follow FDA | En Español

Search FDA

≡ Home | Food | Drugs | Medical Devices | Radiation-Emitting Products | Vaccines, Blood & Biologics | Animal & Veterinary | Cosmetics | Tobacco Products

## About FDA

Home > About FDA > Transparency > FDA Basics

**FDA Basics**

FDA Fundamentals

Animal & Veterinary

Cosmetics

Children

Dietary Supplements

Drugs

Food

Medical Devices

Radiation-Emitting Products

Tobacco Products

Vaccines, Blood, and Biologics

Ask Us: FDA Basics Webinar Series

# What are unapproved drugs and why are they on the market?

f SHARE  ♥ TWEET  in LINKEDIN  ℗ PIN IT  ✉ EMAIL  🖶 PRINT

The original Federal Food and Drugs Act of 1906 brought drug regulation under federal law. That Act prohibited the sale of adulterated or misbranded drugs, but did not require that drugs be approved by FDA. In 1938, Congress required that new drugs be approved for safety. In 1962, Congress amended the 1938 law to require manufacturers to show that their drug products were effective, as well as safe. As a result, all drugs approved between 1938 and 1962 had to be reviewed again for effectiveness. To be consistent with current regulations and to ensure that all drugs have been shown to be safe and effective, all new drugs are required to have an approved application for continued marketing.

Many healthcare providers are unaware of the unapproved status of drugs and have continued to unknowingly prescribe them because the drugs' labels do not disclose that they lack FDA approval. In addition, since many unapproved drugs are marketed without brand names and have been available for many years, it is often assumed that these unapproved drugs are generic drugs. This is not correct. Generic drugs have been evaluated and approved by FDA to demonstrate bioequivalence to a brand name reference drug. Healthcare professionals and consumers can be assured that FDA-approved generic drug products have met the same quality, strength, purity and stability as brand name drugs. Additionally, the generic manufacturing, packaging, and testing sites must meet the same quality standards as those of brand name drugs. Unapproved drug products have not been evaluated and approved by FDA. Unapproved drugs are *not* generic medications, and neither their safety nor their efficacy can be assured.

**Show all related FDA Basics Questions** ∨

**Search the FDA Basics Section**

[                    ] SEARCH

**Spotlight**

• CDER Contact Information

**Related Resources**

• FDA's Concerns About Unapproved Drugs

Page Last Updated: 05/12/2016

Note: If you need help accessing information in different file formats, see Instructions for Downloading Viewers and Players.

FDA

Accessibility | Careers | FDA Basics | FOIA | No FEAR Act | Site Map | Transparency | Website Policies

**U.S. Food and Drug Administration**
10903 New Hampshire Avenue
Silver Spring, MD 20993
1-888-INFO-FDA (1-888-463-6332)

Contact FDA

🔊 🐦 f 📺 ⚬⚬

Q FDA Archive

⊪ Combination Products

📋 Advisory Committees

⚒ Regulatory Information

ⓘ Safety

⚠ Emergency Preparedness

🌐 International Programs

📅 News & Events

📕 Training & Continuing Education

◎ Inspections & Compliance

⚐ Federal, State & Local Officials

👥 Consumers

➕ Health Professionals

⚕ Science & Research

⚙ Industry

**U.S. Food and Drug Administration**
Protecting and Promoting *Your* Health

# What are unapproved drugs and why are they on the market?

The original Federal Food and Drugs Act of 1906 brought drug regulation under federal law. That Act prohibited the sale of adulterated or misbranded drugs, but did not require that drugs be approved by FDA. In 1938, Congress required that new drugs be approved for safety.  In 1962, Congress amended the 1938 law to require manufacturers to show that their drug products were effective, as well as safe. As a result, all drugs approved between 1938 and 1962 had to be reviewed again for effectiveness.  To be consistent with current regulations and to ensure that all drugs have been shown to be safe and effective, all new drugs are required to have an approved application for continued marketing.

Many healthcare providers are unaware of the unapproved status of drugs and have continued to unknowingly prescribe them because the drugs' labels do not disclose that they lack FDA approval.   In addition, since many unapproved drugs are marketed without brand names and have been available for many years, it is often assumed that these unapproved drugs are generic drugs.  This is not correct. Generic drugs have been evaluated and approved by FDA to demonstrate bioequivalence to a brand name reference drug.  Healthcare professionals and consumers can be assured that FDA-approved generic drug products have met the same quality, strength, purity and stability as brand name drugs. Additionally, the generic manufacturing, packaging, and testing sites must meet the same quality standards as those of brand name drugs. Unapproved drug products have not been evaluated and approved by FDA. Unapproved drugs are *not* generic medications, and neither their safety nor their efficacy can be assured.



| **Show all related FDA Basics Questions** | ⌄ |
|---|---|

## Search the FDA Basics Section

**SEARCH**

| **Spotlight** |
|---|
| • **CDER Contact Information (/AboutFDA/CentersOffices /OfficeofMedicalProductsandTobacco/CDER/ContactCDER/default.htm)** |

**Related Resources**

- **FDA's Concerns About Unapproved Drugs (/Drugs /GuidanceComplianceRegulatoryInformation/EnforcementActivitiesbyFDA /SelectedEnforcementActionsonUnapprovedDrugs/ucm118961.htm)**

**More in FDA Basics (/AboutFDA/Transparency/Basics/default.htm)**

**FDA Fundamentals (/AboutFDA/Transparency/Basics/ucm192695.htm)**

**Animal & Veterinary (/AboutFDA/Transparency/Basics/ucm193613.htm)**

**Cosmetics (/AboutFDA/Transparency/Basics/ucm193940.htm)**

**Children (/AboutFDA/Transparency/Basics/ucm319792.htm)**

**Dietary Supplements (/AboutFDA/Transparency/Basics/ucm193949.htm)**

**Drugs (/AboutFDA/Transparency/Basics/ucm192696.htm)**

**Food (/AboutFDA/Transparency/Basics/ucm195786.htm)**

**Medical Devices (/AboutFDA/Transparency/Basics/ucm193731.htm)**

**Radiation-Emitting Products (/AboutFDA/Transparency/Basics/ucm193809.htm)**

**Tobacco Products (/AboutFDA/Transparency/Basics/ucm194188.htm)**

**Vaccines, Blood, and Biologics (/AboutFDA/Transparency/Basics/ucm193816.htm)**

**Ask Us: FDA Basics Webinar Series (/AboutFDA/Transparency/Basics /ucm197102.htm)**

Exhibit 3

# Guidance for FDA Staff and Industry

# Marketed Unapproved Drugs — Compliance Policy Guide

### Sec. 440.100
### Marketed New Drugs Without
### Approved NDAs or ANDAs

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**
**June 2006**

**Compliance**

# Guidance for FDA Staff and Industry

# Marketed Unapproved Drugs — Compliance Policy Guide

## Sec. 440.100
## Marketed New Drugs Without
## Approved NDAs or ANDAs

*Additional copies are available from:*

*Office of Training and Communications*
*Division of Communications Management*
*Drug Information Branch, HFD-210*
*Center for Drug Evaluation and Research*
*Food and Drug Administration*
*5600 Fishers Lane, Rockville, MD 20857*
*(Phone 301-827-4573)*
*Internet:  http://www.fda.gov/cder/guidance/index.htm*

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**
**June 2006**

**Compliance**

*Contains Nonbinding Recommendations*

## TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................ 1

II.      BACKGROUND ............................................................................................... 1

     A.    Reason for This Guidance ..................................................................... 1

     B.    Historical Enforcement Approach ......................................................... 2

III.    FDA'S ENFORCEMENT POLICY ............................................................. 2

     A.    Enforcement Priorities .......................................................................... 3

     B.    Notice of Enforcement Action and Continued Marketing of Unapproved Drugs ................... 4

     C.    Special Circumstances — Newly Approved Product ............................. 5

APPENDIX ............................................................................................................... 8

*Contains Nonbinding Recommendations*

# Guidance for FDA Staff and Industry[1]

# Marketed Unapproved Drugs — Compliance Policy Guide
## Chapter - 4
## Subchapter - 440

**Sec. 440.100  Marketed New Drugs Without Approved NDAs or ANDAs**

This guidance represents the Food and Drug Administration's (FDA's) current thinking on this topic.  It does not create or confer any rights for or on any person and does not operate to bind FDA or the public. You can use an alternative approach if it satisfies the requirements of the applicable statutes and regulations.  If you want to discuss an alternative approach, contact the FDA staff responsible for implementing this guidance.  If you cannot identify the appropriate FDA staff, call the appropriate number listed on the title page of this guidance.

## I.      INTRODUCTION

This compliance policy guide (CPG) describes how we intend to exercise our enforcement discretion with regard to drugs marketed in the United States that do not have required FDA approval for marketing.  This CPG supersedes section 440.100, Marketed New Drugs Without Approved NDAs or ANDAs (CPG 7132c.02).  It applies to any drug required to have FDA approval for marketing, including new drugs covered by the Over-the-Counter (OTC) Drug Review, except for licensed biologics and veterinary drugs.

FDA's guidance documents, including this guidance, do not establish legally enforceable responsibilities.  Instead, guidances describe the Agency's current thinking on a topic and should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited.  The use of the word *should* in Agency guidances means that something is suggested or recommended, but not required.

## II.     BACKGROUND

### A.      Reason for This Guidance

For historical reasons, some drugs are available in the United States that lack required FDA approval for marketing.  A brief, informal summary description of the various categories of these drugs and their regulatory status is provided in Appendix A as general background for this document.  The manufacturers of these drugs have not received FDA approval to legally market

---

[1]  This guidance has been prepared by the Center for Drug Evaluation and Research (CDER) at the Food and Drug Administration.

*Contains Nonbinding Recommendations*

their drugs, nor are the drugs being marketed in accordance with the OTC drug review.  The new drug approval and OTC drug monograph processes play an essential role in ensuring that all drugs are both safe and effective for their intended uses.  Manufacturers of drugs that lack required approval, including those that are not marketed in accordance with an OTC drug monograph, have not provided FDA with evidence demonstrating that their products are safe and effective, and so we have an interest in taking steps to either encourage the manufacturers of these products to obtain the required evidence and comply with the approval provisions of the Federal Food, Drug, and Cosmetic Act (the Act) or remove the products from the market.  We want to achieve these goals without adversely affecting public health, imposing undue burdens on consumers, or unnecessarily disrupting the market.

The goals of this guidance are to (1) clarify for FDA personnel and the regulated industry how we intend to exercise our enforcement discretion regarding unapproved drugs and (2) emphasize that illegally marketed drugs must obtain FDA approval.

### B.    Historical Enforcement Approach

FDA estimates that, in the United States today, perhaps as many as several thousand drug products are marketed illegally without required FDA approval.[2]  Because we do not have complete data on illegally marketed products, and because the universe of such products is constantly changing as products enter and leave the market, we first have to identify illegally marketed products before we can contemplate enforcement action.  Once an illegally marketed product is identified, taking enforcement action against the product would typically involve one or more of the following:  requesting voluntary compliance; providing notice of action in a *Federal Register* notice; issuing an untitled letter; issuing a Warning Letter; or initiating a seizure, injunction, or other proceeding.  Each of these actions is time-consuming and resource intensive.  Recognizing that we are unable to take action immediately against all of these illegally marketed products and that we need to make the best use of scarce Agency resources, we have had to prioritize our enforcement efforts and exercise enforcement discretion with regard to products that remain on the market.

In general, in recent years, FDA has employed a risk-based enforcement approach with respect to marketed unapproved drugs.  This approach includes efforts to identify illegally marketed drugs, prioritization of those drugs according to potential public health concerns or other impacts on the public health, and subsequent regulatory follow-up.  Some of the specific actions the Agency has taken have been precipitated by evidence of safety or effectiveness problems that has either come to our attention during inspections or been brought to our attention by outside sources.

## III.    FDA'S ENFORCEMENT POLICY

In the discussion that follows, we intend to clarify our approach to prioritizing our enforcement actions and exercising our enforcement discretion with regard to the universe of unapproved, illegally marketed drug products in all categories.

---

[2]  This rough estimate comprises several hundred drugs (different active ingredients) in various strengths, combinations, and dosage forms from multiple distributors and repackagers.

*Contains Nonbinding Recommendations*

### A.      Enforcement Priorities

Consistent with our risk-based approach to the regulation of pharmaceuticals, FDA intends to continue its current policy of giving higher priority to enforcement actions involving unapproved drug products in the following categories:

**Drugs with potential safety risks.**  Removing potentially unsafe drugs protects the public from direct and indirect health threats.

**Drugs that lack evidence of effectiveness.**  Removing ineffective drugs protects the public from using these products in lieu of effective treatments.  Depending on the indication, some ineffective products would, of course, pose safety risks as well.

**Health fraud drugs.**  FDA defines health fraud as "[t]he deceptive promotion, advertisement, distribution or sale of articles . . . that are represented as being effective to diagnose, prevent, cure, treat, or mitigate disease (or other conditions), or provide a beneficial effect on health, but which have not been scientifically proven safe and effective for such purposes.  Such practices may be deliberate or done without adequate knowledge or understanding of the article" (CPG Sec. 120.500).  Of highest priority in this area are drugs that present a direct risk to health.  Indirect health hazards exist if, as a result of reliance on the product, the consumer is likely to delay or discontinue appropriate medical treatment.  Indirect health hazards will be evaluated for enforcement action based on section 120.500, Health Fraud - Factors in Considering Regulatory Action  (CPG 7150.10).  FDA's health fraud CPG outlines priorities for evaluating regulatory actions against indirect health hazard products, such as whether the therapeutic claims are significant, whether there are any scientific data to support the safety and effectiveness of the product, and the degree of vulnerability of the prospective user group (CPG Sec. 120.500).

**Drugs that present direct challenges to the new drug approval and OTC drug monograph systems.**  The drug approval and OTC drug monograph systems are designed to avoid the risks associated with potentially unsafe, ineffective, and fraudulent drugs. The drugs described in the preceding three categories present direct challenges to these systems, as do unapproved drugs that directly compete with an approved drug, such as when a company obtains approval of a new drug application (NDA) for a product that other companies are marketing without approval (*see* section III.C., Special Circumstances – Newly Approved Product).  Also included are drugs marketed in violation of a final and effective OTC drug monograph.  Targeting drugs that challenge the drug approval or OTC drug monograph systems buttresses the integrity of these systems and makes it more likely that firms will comply with the new drug approval and monograph requirements, which benefits the public health.

**Unapproved new drugs that are also violative of the Act in other ways**.  The Agency also intends, in circumstances that it considers appropriate, to continue its policy of enforcing the preapproval requirements of the Act against a drug or firm that also violates another provision of the Act, even if there are other unapproved versions of the drug

made by other firms on the market.  For instance, if a firm that sells an unapproved new drug also violates current good manufacturing practice (CGMP) regulations, the Agency is not inclined to limit an enforcement action in that instance to the CGMP violations. Rather, the Agency may initiate a regulatory action that targets both the CGMP violation *and* the violation of section 505 of the Act (21 U.S.C. 355).  This policy efficiently preserves scarce Agency resources by allowing the Agency to pursue all applicable charges against a drug and/or a firm and avoiding duplicative action.  *See United States v. Sage Pharmaceuticals, Inc.*, 210 F.3d 475, 479-80 (5th Cir. 2000).

**Drugs that are reformulated to evade an FDA enforcement action**.  The Agency is also aware of instances in which companies that anticipate an FDA enforcement action against a specific type or formulation of an unapproved product have made formulation changes to evade that action, but have not brought the product into compliance with the law. Companies should be aware that the Agency is not inclined to exercise its enforcement discretion with regard to such products.  Factors that the Agency may consider in determining whether to bring action against the reformulated products include, but are not limited to, the timing of the change, the addition of an ingredient without adequate scientific justification (*see, e.g.*, 21 CFR 300.50 and 330.10(a)(4)(iv)), the creation of a new combination that has not previously been marketed, and the claims made for the new product.

B.     **Notice of Enforcement Action and Continued Marketing of Unapproved Drugs**

**FDA is not required to, and generally does not intend to, give special notice that a drug product may be subject to enforcement action, unless FDA determines that notice is necessary or appropriate to protect the public health.**[3]  **The issuance of this guidance is intended to provide notice that any product that is being marketed illegally is subject to FDA enforcement action at any time.**[4]  The only exception to this policy is, as set forth elsewhere, that generally products subject to an ongoing DESI[5] proceeding or ongoing OTC drug monograph proceeding (i.e., an OTC product that is part of the OTC drug review for which an effective final monograph is not yet in place) may remain on the market during the pendency of

---

[3]  For example, in 1997, FDA issued a *Federal Register* notice declaring all orally administered levothyroxine sodium products to be new drugs and requiring manufacturers to obtain approved new drug applications (62 FR 43535, August 14, 1997).  Nevertheless, FDA gave manufacturers 3 years (later extended to 4 (65 FR 24488, April 26, 2000)) to obtain approved applications and allowed continued marketing without approved new drug applications because FDA found that levothyroxine sodium products were medically necessary to treat hypothyroidism and no alternative drug provided an adequate substitute.

[4]  For example, FDA may take action at any time against a product that was originally marketed before 1938, but that has been changed since 1938 in such a way as to lose its *grandfather* status (21 U.S.C. 321(p)).

[5]  The Drug Efficacy Study Implementation (DESI) was the process used by FDA to evaluate for effectiveness for their labeled indications over 3,400 products that were approved only for safety between 1938 and 1962.  DESI is explained more fully in the appendix to this document.

*Contains Nonbinding Recommendations*

that proceeding[6] and any additional period specifically provided in the proceeding (such as a delay in the effective date of a final OTC drug monograph).[7]   However, once the relevant DESI or OTC drug monograph proceeding is completed and any additional grace period specifically provided in the proceeding has expired, all products that are not in compliance with the conditions for marketing determined in that proceeding are subject to enforcement action at any time without further notice (*see, e.g.*, 21 CFR 310.6).

FDA intends to evaluate on a case-by-case basis whether justification exists to exercise enforcement discretion to allow continued marketing for some period of time after FDA determines that a product is being marketed illegally.  In deciding whether to allow such a grace period,[8] we may consider the following factors:  (1) the effects on the public health of proceeding immediately to remove the illegal products from the market (including whether the product is medically necessary and, if so, the ability of legally marketed products to meet the needs of patients taking the drug); (2) the difficulty associated with conducting any required studies, preparing and submitting applications, and obtaining approval of an application; (3) the burden on affected parties of immediately removing the products from the market; (4) the Agency's available enforcement resources; and (5) any special circumstances relevant to the particular case under consideration.

### C.      Special Circumstances — Newly Approved Product

Sometimes, a company may obtain approval of an NDA for a product that other companies are marketing without approval.[9]  We want to encourage this type of voluntary compliance with the new drug requirements because it benefits the public health by increasing the assurance that marketed drug products are safe and effective — it also reduces the resources that FDA must expend on enforcement.  Thus, because they present a direct challenge to the drug approval system, FDA is more likely to take enforcement action against remaining unapproved drugs in this kind of situation.  However, we intend to take into account the circumstances once the product is approved in determining how to exercise our enforcement discretion with regard to the unapproved products.  In exercising enforcement discretion, we intend to balance the need to provide incentives for voluntary compliance against the implications of enforcement actions on the marketplace and on consumers who are accustomed to using the marketed products.

---

[6]  OTC drugs covered by ongoing OTC drug monograph proceedings may remain on the market as provided in current enforcement policies.  *See, e.g.*, CPG sections 450.200 and 450.300 and 21 CFR part 330.  This document does not affect the current enforcement policies for such drugs.

[7]  Sometimes, a final OTC drug monograph may have a delayed effective date or provide for a specific period of time for marketed drugs to come into compliance with the monograph.  At the end of that period, drugs that are not marketed in accordance with the monograph are subject to enforcement action and the exercise of enforcement discretion in the same way as any other drug discussed in this CPG.

[8]  For purposes of this guidance, the terms *grace period* and *allow a grace period* refer to an exercise of enforcement discretion by the Agency (i.e., a period of time during which FDA, as a matter of discretion, elects not to initiate a regulatory action on the ground that an article is an unapproved new drug).

[9]  These may be products that are the same as the approved product or somewhat different, such as products of different strength.

*Contains Nonbinding Recommendations*

When a company obtains approval to market a product that other companies are marketing without approval, FDA normally intends to allow a grace period of roughly 1 year from the date of approval of the product before it will initiate enforcement action (e.g., seizure or injunction) against marketed unapproved products of the same type.  However, the grace period provided is expected to vary from this baseline based upon the following factors:  (1) the effects on the public health of proceeding immediately to remove the illegal products from the market (including whether the product is medically necessary and, if so, the ability of the holder of the approved application to meet the needs of patients taking the drug); (2) whether the effort to obtain approval was publicly disclosed;[10] (3) the difficulty associated with conducting any required studies, preparing and submitting applications, and obtaining approval of an application; (4) the burden on affected parties of removing the products from the market; (5) the Agency's available enforcement resources; and (6) any other special circumstances relevant to the particular case under consideration.   To assist in an orderly transition to the approved product(s), in implementing a grace period, FDA may identify interim dates by which firms should first cease *manufacturing* unapproved forms of the drug product, and later cease *distributing* the unapproved product.

The length of any grace period and the nature of any enforcement action taken by FDA will be decided on a case-by-case basis.  Companies should be aware that a Warning Letter may not be sent before initiation of enforcement action and should not expect any grace period that is granted to protect them from the need to leave the market for some period of time while obtaining approval.  Companies marketing unapproved new drugs should also recognize that, while FDA normally intends to allow a grace period of roughly 1 year from the date of approval of an unapproved product before it will initiate enforcement action (e.g., seizure or injunction) against others who are marketing that unapproved product, it is possible that a substantially shorter grace period would be provided, depending on the individual facts and circumstances.[11]

The shorter the grace period, the more likely it is that the first company to obtain an approval will have a period of de facto market exclusivity before other products obtain approval.  For example, if FDA provides a 1-year grace period before it takes action to remove unapproved competitors from the market, and it takes 2 years for a second application to be approved, the first approved product could have 1 year of market exclusivity before the onset of competition.  If FDA provides for a shorter grace period, the period of effective exclusivity could be longer.

---

[10]   For example, at the Agency's discretion, we may provide for a shorter grace period if an applicant seeking approval of a product that other companies are marketing without approval agrees to publication, around the time it submits the approval application, of a *Federal Register* notice informing the public that the applicant has submitted that application.  A shortened grace period may also be warranted if the fact of the application is widely known publicly because of applicant press releases or other public statements.  Such a grace period may run from the time of approval or from the time the applicant has made the public aware of the submission, as the Agency deems appropriate.

[11]   Firms are reminded that this CPG does not create any right to a grace period; the length of the grace period, if any, is solely at the discretion of the Agency.  For instance, firms should not expect any grace period when the public health requires immediate removal of a product from the market, or when the Agency has given specific prior notice in the *Federal Register* or otherwise that a drug product requires FDA approval.

*Contains Nonbinding Recommendations*

FDA hopes that this period of market exclusivity will provide an incentive to firms to be the first to obtain approval to market a previously unapproved drug.[12]

### D.   Regulatory Action Guidance

District offices are encouraged to refer to CDER for review (with copies of labeling) any unapproved drugs that appear to fall within the enforcement priorities in section III.A.  Charges that may be brought against unapproved drugs include, but are not limited to, violations of 21 U.S.C. 355(a) and 352(f)(1) of the Act. Other charges may also apply based on, among others, violations of 21 U.S.C. 351(a)(2)(B) (CGMP), 352(a) (misbranding), or 352(o) (failure to register or list).

---

[12]  The Agency understands that, under the Act, holders of NDAs must list patents claiming the approved drug product and that newly approved drug products may, in certain circumstances, be eligible for marketing exclusivity. Listed patents and marketing exclusivity may delay the approval of competitor products.  If FDA believes that an NDA holder is manipulating these statutory protections to inappropriately delay competition, the Agency will provide relevant information on the matter to the Federal Trade Commission (FTC).  In the past, FDA has provided information to the FTC regarding patent infringement lawsuits related to pending abbreviated new drug applications (ANDAs), citizen petitions, and scientific challenges to the approval of competitor drug products.

*Contains Nonbinding Recommendations*

# APPENDIX

## BRIEF HISTORY OF FDA MARKETING APPROVAL REQUIREMENTS AND CATEGORIES OF DRUGS THAT LACK REQUIRED FDA APPROVAL[13]

Key events in the history of FDA's drug approval regulation and the categories of drugs affected by these events are described below.

## A.      1938 and 1962 Legislation

The original Federal Food and Drugs Act of June 30, 1906, first brought drug regulation under federal law.  That Act prohibited the sale of adulterated or misbranded drugs, but did not require that drugs be approved by FDA.  In 1938, Congress passed the Federal Food, Drug, and Cosmetic Act (the Act), which required that new drugs be approved for safety.  As discussed below, the active ingredients of many drugs currently on the market were first introduced, at least in some form, before 1938.  Between 1938 and 1962, if a drug obtained approval, FDA considered drugs that were identical, related, or similar (IRS) to the approved drug to be covered by that approval, and allowed those IRS drugs to be marketed without independent approval. Many manufacturers also introduced drugs onto the market between 1938 and 1962 based on their own conclusion that the products were generally recognized as safe (GRAS) or based on an opinion from FDA that the products were not new drugs.  Between 1938 and 1962, the Agency issued many such opinions, although all were formally revoked in 1968 (*see* 21 CFR 310.100).

## B.      DESI

In 1962, Congress amended the Act to require that a *new drug* also be proven effective, as well as safe, to obtain FDA approval.  This amendment also required FDA to conduct a retrospective evaluation of the effectiveness of the drug products that FDA had approved as *safe* between 1938 and 1962 through the new drug approval process.

FDA contracted with the National Academy of Science/National Research Council (NAS/NRC) to make an initial evaluation of the effectiveness of over 3,400 products that were approved only for safety between 1938 and 1962.  The NAS/NRC created 30 panels of 6 professionals each to conduct the review, which was broken down into specific drug categories.  The NAS/NRC reports for these drug products were submitted to FDA in the late 1960s and early 1970s.  The Agency reviewed and re-evaluated the findings of each panel and published its findings in *Federal Register* notices.  FDA's administrative implementation of the NAS/NRC reports was called the Drug Efficacy Study Implementation (DESI).  DESI covered the 3,400 products specifically reviewed by the NAS/NRCs as well as the even larger number of IRS products that entered the market without FDA approval.

Because DESI products were covered by approved (pre-1962) applications, the Agency concluded that, prior to removing products not found effective from the market, it would follow

---

[13]  This brief history document should be viewed as a secondary source.  To determine the regulatory status of a particular drug or category of drugs, the original source documents cited should be consulted.

*Contains Nonbinding Recommendations*

procedures in the Act and regulations that apply when an approved new drug application is withdrawn:

- All initial DESI determinations are published in the *Federal Register* and, if the drug is found to be less than fully effective, there is an opportunity for a hearing.

- The Agency considers the basis of any hearing request and either grants the hearing or denies the hearing on summary judgment and publishes its final determination in the *Federal Register.*

- If FDA's final determination classifies the drug as effective for its labeled indications, as required by the Act, FDA still requires approved applications for continued marketing of the drug and all drugs IRS to it – NDA supplements for those drugs with NDAs approved for safety, or new ANDAs or NDAs, as appropriate, for IRS drugs.  DESI-effective drugs that do not obtain approval of the required supplement, ANDA, or NDA are subject to enforcement action.

- If FDA's final determination classifies the drug as ineffective, the drug and those IRS to it can no longer be marketed and are subject to enforcement action.

      1.      Products Subject to Ongoing DESI Proceedings

Some unapproved marketed products are undergoing DESI reviews in which a final determination regarding efficacy has not yet been made.  In addition to the products specifically reviewed by the NAS/NRC (i.e., those products approved for safety only between 1938 and 1962), this group includes unapproved products identical, related, or similar to those products specifically reviewed (*see* 21 CFR 310.6).  In virtually all these proceedings, FDA has made an initial determination that the products lack substantial evidence of effectiveness, and the manufacturers have requested a hearing on that finding.  It is the Agency's longstanding policy that products subject to an ongoing DESI proceeding may remain on the market during the pendency of the proceeding.  *See, e.g.*, *Upjohn Co. v. Finch*, 303 F. Supp. 241, 256-61 (W.D. Mich. 1969).[14]

      2.      Products Subject to Completed DESI Proceedings

Some unapproved marketed products are subject to already-completed DESI proceedings and lack required approved applications.  This includes a number of products IRS to DESI products for which approval was withdrawn due to a lack of substantial evidence of effectiveness.  This group also includes a number of products IRS to those DESI products for which FDA made a

---

[14]  Products first marketed after a hearing notice is issued with a different formulation than those covered by the notice are not considered subject to the DESI proceeding.  Rather, they need approval prior to marketing.  Under longstanding Agency policies, a firm holding an NDA on a product for which a DESI hearing is pending must submit a supplement prior to reformulating that product.  The changed formulation may not be marketed as a related product under the pending DESI proceeding; it is a new drug, and it must be approved for safety and efficacy before it can be legally marketed.  *See, e.g.*, "Prescription Drugs Offered for Relief of Symptoms of Cough, Cold, or Allergy" (DESI 6514), 49 FR 153 (January 3, 1984) (Dimetane and Actifed); "Certain Drugs Containing Antibiotic, Corticosteroid, and Antifungal Components" (DESI 10826), 50 FR 15227 (April 17, 1985) (Mycolog).  *See also* 21 U.S.C. 356a(c)(2)(A).  Similarly, firms without NDAs cannot market new formulations of a drug without first getting approval of an NDA.

*Contains Nonbinding Recommendations*

final determination that the product is effective, but applications for the IRS products have not been both submitted and approved as required under the statute and longstanding enforcement policy (*see* 21 CFR 310.6).  FDA considers all products described in this paragraph to be marketed illegally.

## C.      Prescription Drug Wrap-Up

As mentioned above, many drugs came onto the market before 1962 without FDA approvals.  Of these, many claimed to have been marketed prior to 1938 or to be IRS to such a drug.  Drugs that did not have pre-1962 approvals and were not IRS to drugs with pre-1962 approvals were not subject to DESI.  For a period of time, FDA did not take action against these drugs and did not take action against new unapproved drugs that were IRS to these pre-1962 drugs that entered the market without approval.

Beginning in 1983, it was discovered that one drug that was IRS to a pre-1962 drug, a high potency Vitamin E intravenous injection named E-Ferol, was associated with adverse reactions in about 100 premature infants, 40 of whom died.  In November of 1984, in response to this, a congressional oversight committee issued a report to FDA expressing the committee's concern regarding the thousands of unapproved drug products in the marketplace.

In response to the E-Ferol tragedy, CDER assessed the number of pre-1962 non-DESI marketed drug products.  To address those drug products, the Agency significantly revised and expanded CPG section 440.100 to cover all marketed unapproved prescription drugs, not just DESI products.  The program for addressing these marketed unapproved drugs and certain others like them became known as the *Prescription Drug Wrap-Up*.  Most of the Prescription Drug Wrap-Up drugs first entered the market before 1938, at least in some form.  For the most part, the Agency had evaluated neither the safety nor the effectiveness of the drugs in the Prescription Drug Wrap-Up.

A drug that was subject to the Prescription Drug Wrap-Up is marketed illegally, unless the manufacturer of such a drug can establish that its drug is grandfathered or otherwise not a *new drug*.

Under the 1938 grandfather clause (*see* 21 U.S.C. 321(p)(1)), a drug product that was on the market prior to passage of the 1938 Act and which contained in its labeling the same representations concerning the conditions of use as it did prior to passage of that Act was not considered a *new drug* and therefore was exempt from the requirement of having an approved new drug application.

Under the 1962 grandfather clause, the Act exempts a drug from the effectiveness requirements if its composition and labeling has not changed since 1962 and if, on the day before the 1962 Amendments became effective, it was (a) used or sold commercially in the United States, (b) not a new drug as defined by the Act at that time, and (c) not covered by an effective application. *See* Pub. L. 87-781, section 107 (reprinted following 21 U.S.C.A. 321); *see also USV Pharmaceutical Corp. v. Weinberger,* 412 U.S. 655, 662-66 (1973).

*Contains Nonbinding Recommendations*

The two grandfather clauses in the Act have been construed very narrowly by the courts. FDA believes that there are very few drugs on the market that are actually entitled to grandfather status because the drugs currently on the market likely differ from the previous versions in some respect, such as formulation, dosage or strength, dosage form, route of administration, indications, or intended patient population. If a firm claims that its product is grandfathered, it is that firm's burden to prove that assertion. *See* 21 CFR 314.200(e)(5); *see also United States v. An Article of Drug (Bentex Ulcerine)*, 469 F.2d 875, 878 (5th Cir. 1972); *United States v. Articles of Drug Consisting of the Following: 5,906 Boxes*, 745 F.2d 105, 113 (1st Cir 1984).

Finally, a product would not be considered a *new drug* if it is generally recognized as safe and effective (GRAS/GRAE) and has been used to a material extent and for a material time. *See* 21 U.S.C. 321(p)(1) and (2). As with the grandfather clauses, this has been construed very narrowly by the courts. *See, e.g., Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609 (1973); *United States v. 50 Boxes More or Less Etc.*, 909 F.2d 24, 27-28 (1st Cir. 1990); *United States v. 225 Cartons . . . Fiorinal*, 871 F.2d 409 (3rd Cir. 1989). *See also* Letter from Dennis E. Baker, Associate Commissioner for Regulatory Affairs, FDA, to Gary D. Dolch, Melvin Spigelman, and Jeffrey A. Staffa, Knoll Pharmaceutical Co. (April 26, 2001) (on file in FDA Docket No. 97N-0314/CP2) (finding that Synthroid, a levothyroxine sodium product, was not GRAS/GRAE).

As mentioned above, the Agency believes it is not likely that any currently marketed prescription drug product is grandfathered or is otherwise not a *new drug*. However, the Agency recognizes that it is at least theoretically possible. No part of this guidance, including the Appendix, is a finding as to the legal status of any particular drug product. In light of the strict standards governing exceptions to the approval process, it would be prudent for firms marketing unapproved products to carefully assess whether their products meet these standards.

## D.  New Unapproved Drugs

Some unapproved drugs were first marketed (or changed) after 1962. These drugs are on the market illegally. Some also may have already been the subject of a formal Agency finding that they are new drugs. *See, e.g.*, 21 CFR 310.502 (discussing, among other things, controlled/timed release dosage forms).

## E.  Over-the-Counter (OTC) Drug Review

Although OTC drugs were originally included in DESI, FDA eventually concluded that this was not an efficient use of resources. The Agency also was faced with resource challenges because it was receiving many applications for different OTC drugs for the same indications. Therefore, in 1972, the Agency implemented a process of reviewing OTC drugs through rulemaking by therapeutic classes (e.g., antacids, antiperspirants, cold remedies). This process involves convening an advisory panel for each therapeutic class to review data relating to claims and active ingredients. These panel reports are then published in the *Federal Register*, and after FDA review, tentative final monographs for the classes of drugs are published. The final step is the publication of a final monograph for each class, which sets forth the allowable claims, labeling, and active ingredients for OTC drugs in each class (*see, e.g.*, 21 CFR part 333). Drugs marketed in accordance with a final monograph are considered to be generally recognized as safe and effective (GRAS/GRAE) and do not require FDA approval of a marketing application.

*Contains Nonbinding Recommendations*

Final monographs have been published for the majority of OTC drugs. Tentative final monographs are in place for virtually all categories of OTC drugs.  FDA has also finalized a number of *negative monographs* that list therapeutic categories (*e.g.*, OTC daytime sedatives, 21 CFR 310.519) in which no OTC drugs can be marketed without approval.  Finally, the Agency has promulgated a list of active ingredients that cannot be used in OTC drugs without approved applications because there are inadequate data to establish that they are GRAS/GRAE (*e.g.*, phenolphthalein in stimulant laxative products, 21 CFR 310.545(a)(12)(iv)(B)).

OTC drugs covered by ongoing OTC drug monograph proceedings may remain on the market as provided in current enforcement policies (*see, e.g.*, CPG sections 450.200 and 450.300, and 21 CFR part 330).  This document does not affect the current enforcement policies for such drugs.

OTC drugs that need approval, either because their ingredients or claims are not within the scope of the OTC drug review or because they are not allowed under a final monograph or another final rule, are illegally marketed.  For example, this group would include a product containing an ingredient determined to be ineffective for a particular indication or one that exceeds the dosage limit established in the monograph.  Such products are new drugs that must be approved by FDA to be legally marketed.

Exhibit 4

# Guidance for FDA Staff and Industry

# Marketed Unapproved Drugs – Compliance Policy Guide

Sec. 440.100

Marketed New Drugs Without Approved NDAs or ANDAs

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**

**September 19, 2011**
**Compliance**

# Guidance for FDA Staff and Industry

## Marketed Unapproved Drugs Compliance Policy Guide

Sec. 440.100
Marketed New Drugs Without
Approved NDAS or ANDAs

*Additional copies are available from:*
*Office of Communications*
*Division of Drug Information, WO51, Room 2201*
*10903 New Hampshire Ave.*
*Silver Spring, MD 20993*
*Phone: 301-796-3400; Fax: 301-847-8714*
*druginfo@fda.hhs.gov*
*http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/default.htm*

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**

**September 19, 2011**
**Compliance**

# TABLE OF CONTENTS

I.     **INTRODUCTION**.................................................................................................... **2**

II.    **BACKGROUND** ..................................................................................................... **2**

    A.  **Reason for This Guidance**.............................................................................. 2

    B.  **Historical Enforcement Approach**................................................................ 3

III.   **FDA'S ENFORCEMENT POLICY** ..................................................................... **4**

    A.  **Enforcement Priorities** ................................................................................ 4

    B.  **Notice of Enforcement Action and Continued Marketing of Unapproved Drugs**.............. 5

    C.  **Special Circumstances — Newly Approved Product**................................... 7

    D.  **Regulatory Action Guidance**........................................................................ 8

**APPENDIX**................................................................................................................ **9**

*Contains Nonbinding Recommendations*

# Guidance for FDA Staff and Industry[1]
# Marketed Unapproved Drugs —
# Compliance Policy Guide
## Chapter 4
## Subchapter 440

This guidance represents the Food and Drug Administration's (FDA's) current thinking on this topic. It does not create or confer any rights for or on any person and does not operate to bind FDA or the public. You can use an alternative approach if the approach satisfies the requirements of the applicable statutes and regulations. If you want to discuss an alternative approach, contact the FDA staff responsible for implementing this guidance. If you cannot identify the appropriate FDA staff, call the appropriate number listed on the title page of this guidance.

## I.    INTRODUCTION

This Compliance Policy Guide (CPG) describes how we intend to exercise our enforcement discretion with regard to drugs marketed in the United States that do not have required FDA approval for marketing. This is a revision of a guidance of the same name that was issued in June 2006. The guidance has been revised to state that the enforcement priorities and potential exercise of enforcement discretion discussed in the guidance apply only to unapproved new drugs (including new drugs covered by the Over-the-Counter (OTC) Drug Review), except for licensed biologics and veterinary drugs, that are commercially used or sold[2] prior to September 19, 2011.

FDA's guidance documents, including this guidance, do not establish legally enforceable responsibilities. Instead, guidances describe the Agency's current thinking on a topic and should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited. The use of the word *should* in Agency guidances means that something is suggested or recommended, but not required.

## II.    BACKGROUND

### A.  Reason for This Guidance

For historical reasons, some drugs are available in the United States that lack required FDA approval for marketing. A brief, informal summary description of the various

---

[1] This guidance has been prepared by the Center for Drug Evaluation and Research (CDER) at the Food and Drug Administration.

[2] For the purposes of this guidance, the term "commercially used or sold" means that the product has been used in a business or activity involving retail or wholesale marketing and/or sale.

categories of these drugs and their regulatory status is provided in Appendix A as general background for this document.  The manufacturers of these drugs have not received FDA approval to legally market their drugs, nor are the drugs being marketed in accordance with the OTC drug review.  The new drug approval and OTC drug monograph processes play an essential role in ensuring that all drugs are both safe and effective for their intended uses.  Manufacturers of drugs that lack required approval, including those that are not marketed in accordance with an OTC drug monograph, have not provided FDA with evidence demonstrating that their products are safe and effective, and so we have an interest in taking steps to either encourage the manufacturers of these products to obtain the required evidence and comply with the approval provisions of the Federal Food, Drug, and Cosmetic Act (the FD&C Act) or remove the products from the market.  We want to achieve these goals without adversely affecting public health, imposing undue burdens on consumers, or unnecessarily disrupting the market.

The goals of this guidance are to (1) clarify for FDA personnel and the regulated industry how we intend to exercise our enforcement discretion regarding unapproved drugs and (2) emphasize that illegally marketed drugs must obtain FDA approval.

## B.  Historical Enforcement Approach

FDA estimates that in the United States today perhaps as many as several thousand drug products are marketed illegally without required FDA approval.[3]  Because we do not have complete data on illegally marketed products, and because the universe of such products is constantly changing as products enter and leave the market, we first have to identify illegally marketed products before we can contemplate enforcement action.  Once an illegally marketed product is identified, taking enforcement action against the product would typically involve one or more of the following:  requesting voluntary compliance; providing notice of action in a *Federal Register* notice; issuing an untitled letter; issuing a Warning Letter; or initiating a seizure, injunction, or other proceeding.  Each of these actions is time-consuming and resource intensive.  Recognizing that we are unable to take action immediately against all of these illegally marketed products and that we need to make the best use of scarce Agency resources, we have had to prioritize our enforcement efforts and exercise enforcement discretion with regard to products that remain on the market.

In general, in recent years, FDA has employed a risk-based enforcement approach with respect to marketed unapproved drugs.  This approach includes efforts to identify illegally marketed drugs, prioritization of those drugs according to potential public health concerns or other impacts on the public health, and subsequent regulatory follow-up.  Some of the specific actions the Agency has taken have been precipitated by evidence of safety or effectiveness problems that has either come to our attention during inspections or been brought to our attention by outside sources.

---

[3] This rough estimate comprises several hundred drugs (different active ingredients) in various strengths, combinations, and dosage forms from multiple distributors and repackagers.

## III.    FDA'S ENFORCEMENT POLICY

In the discussion that follows, we intend to clarify our approach to prioritizing our enforcement actions and exercising our enforcement discretion with regard to unapproved, illegally marketed drug products.

The enforcement priorities and potential exercise of enforcement discretion discussed in this guidance apply only to unapproved drug products that are being commercially used or sold as of September 19, 2011.  All unapproved drugs introduced onto the market after that date are subject to immediate enforcement action at any time, without prior notice and without regard to the enforcement priorities set forth below.  In light of the notice provided by this guidance, we believe it is inappropriate to exercise enforcement discretion with respect to unapproved drugs that a company (including a manufacturer or distributor) begins marketing after September 19, 2011.

For unapproved drugs commercially used or sold as of September 19, 2011, FDA's enforcement priorities are described below.

### A.  Enforcement Priorities

Consistent with our risk-based approach to the regulation of pharmaceuticals, FDA intends to continue its current policy of giving higher priority to enforcement actions involving unapproved drug products in the following categories:

***Drugs with potential safety risks.***  Removing potentially unsafe drugs protects the public from direct and indirect health threats.

***Drugs that lack evidence of effectiveness.***  Removing ineffective drugs protects the public from using these products in lieu of effective treatments.  Depending on the indication, some ineffective products would, of course, pose safety risks as well.

***Health fraud drugs.***  FDA defines health fraud as "[t]he deceptive promotion, advertisement, distribution or sale of articles . . . that are represented as being effective to diagnose, prevent, cure, treat, or mitigate disease (or other conditions), or provide a beneficial effect on health, but which have not been scientifically proven safe and effective for such purposes.  Such practices may be deliberate or done without adequate knowledge or understanding of the article" (CPG Sec. 120.500).  Of highest priority in this area are drugs that present a direct risk to health.  Indirect health hazards exist if, as a result of reliance on the product, the consumer is likely to delay or discontinue appropriate medical treatment.  Indirect health hazards will be evaluated for enforcement action based on section 120.500, Health Fraud - Factors in Considering Regulatory Action (CPG Sec. 120.500).  FDA's health fraud CPG outlines priorities for evaluating regulatory actions against indirect health hazard products, such as whether the therapeutic claims are significant, whether there are any scientific data to support the safety and

*Contains Nonbinding Recommendations*

effectiveness of the product, and the degree of vulnerability of the prospective user group (CPG Sec. 120.500).

***Drugs that present direct challenges to the new drug approval and OTC drug monograph systems.***  The drug approval and OTC drug monograph systems are designed to avoid the risks associated with potentially unsafe, ineffective, and fraudulent drugs. The drugs described in the preceding three categories present direct challenges to these systems, as do unapproved drugs that directly compete with an approved drug, such as when a company obtains approval of a new drug application (NDA) for a product that other companies are marketing without approval (see section III.C, Special Circumstances – Newly Approved Product).  Also included are drugs marketed in violation of a final and effective OTC drug monograph.  Targeting drugs that challenge the drug approval or OTC drug monograph systems buttresses the integrity of these systems and makes it more likely that firms will comply with the new drug approval and monograph requirements, which benefits the public health.

***Unapproved new drugs that are also violative of the Act in other ways.***  The Agency also intends, in circumstances that it considers appropriate, to continue its policy of enforcing the preapproval requirements of the FD&C Act against a drug or firm that also violates another provision of the FD&C Act, even if there are other unapproved versions of the drug made by other firms on the market.  For instance, if a firm that sells an unapproved new drug also violates current good manufacturing practice (CGMP) regulations, the Agency is not inclined to limit an enforcement action in that instance to the CGMP violations.  Rather, the Agency may initiate a regulatory action that targets both the CGMP violation and the violation of section 505 of the FD&C Act (21 U.S.C. 355).  This policy efficiently preserves scarce Agency resources by allowing the Agency to pursue all applicable charges against a drug and/or a firm and avoiding duplicative action.  See *United States v. Sage Pharmaceuticals, Inc.*, 210 F.3d 475, 479-80 (5th Cir. 2000).

***Drugs that are reformulated to evade an FDA enforcement action.***  The Agency is also aware of instances in which companies that anticipate an FDA enforcement action against a specific type or formulation of an unapproved product have made formulation changes to evade that action, but have not brought the product into compliance with the law. Companies should be aware that the Agency is not inclined to exercise its enforcement discretion with regard to such products.  Factors that the Agency may consider in determining whether to bring action against the reformulated products include, but are not limited to, the timing of the change, the addition of an ingredient without adequate scientific justification (see, for example, 21 CFR 300.50 and 330.10(a)(4)(iv)), the creation of a new combination that has not previously been marketed, and the claims made for the new product.

**B.  Notice of Enforcement Action and Continued Marketing of Unapproved Drugs**

**FDA is not required to, and generally does not intend to, give special notice that a drug product may be subject to enforcement action, unless FDA determines that**

5

*Contains Nonbinding Recommendations*

notice is necessary or appropriate to protect the public health.[4]  **The issuance of this guidance is intended to provide notice that any product that is being marketed illegally is subject to FDA enforcement action at any time.**[5]  The only exception to this policy is, as set forth elsewhere, that generally products subject to an ongoing DESI[6] proceeding or ongoing OTC drug monograph proceeding (i.e., an OTC product that is part of the OTC drug review for which an effective final monograph is not yet in place) may remain on the market during the pendency of that proceeding[7] and any additional period specifically provided in the proceeding (such as a delay in the effective date of a final OTC drug monograph).[8]  However, once the relevant DESI or OTC drug monograph proceeding is completed and any additional grace period specifically provided in the proceeding has expired, all products that are not in compliance with the conditions for marketing determined in that proceeding are subject to enforcement action at any time without further notice (see, for example, 21 CFR 310.6).

FDA intends to evaluate on a case-by-case basis whether justification exists to exercise enforcement discretion to allow continued marketing for some period of time after FDA determines that a product is being marketed illegally.  In deciding whether to allow such a grace period,[9] we may consider the following factors:  (1) the effects on the public health of proceeding immediately to remove the illegal products from the market (including whether the product is medically necessary and, if so, the ability of legally marketed products to meet the needs of patients taking the drug); (2) the difficulty associated with conducting any required studies, preparing and submitting applications, and obtaining approval of an application; (3) the burden on affected parties of

---

[4] For example, in 1997, FDA issued a *Federal Register* notice declaring all orally administered levothyroxine sodium products to be new drugs and requiring manufacturers to obtain approved new drug applications (62 FR 43535, August 14, 1997).  Nevertheless, FDA gave manufacturers 3 years (later extended to 4 (65 FR 24488, April 26, 2000)) to obtain approved applications and allowed continued marketing without approved new drug applications because FDA found that levothyroxine sodium products were medically necessary to treat hypothyroidism and no alternative drug provided an adequate substitute.

[5] For example, FDA may take action at any time against a product that was originally marketed before 1938, but that has been changed since 1938 in such a way as to lose its grandfather status (21 U.S.C. 321(p)).

[6] The Drug Efficacy Study Implementation (DESI) was the process used by FDA to evaluate for effectiveness for their labeled indications over 3,400 products that were approved only for safety between 1938 and 1962.  DESI is explained more fully in the appendix to this document.

[7] OTC drugs covered by ongoing OTC drug monograph proceedings may remain on the market as provided in current enforcement policies.  See, for example, CPG sections 450.200 and 450.300 and 21 CFR part 330.  This document does not affect the current enforcement policies for such drugs.

[8] Sometimes, a final OTC drug monograph may have a delayed effective date or provide for a specific period of time for marketed drugs to come into compliance with the monograph.  At the end of that period, drugs that are not marketed in accordance with the monograph are subject to enforcement action and the exercise of enforcement discretion in the same way as any other drug discussed in this CPG.

[9] For purposes of this guidance, the terms *grace period* and *allow a grace period* refer to an exercise of enforcement discretion by the Agency (i.e., a period of time during which FDA, as a matter of discretion, elects not to initiate a regulatory action on the ground that an article is an unapproved new drug).

immediately removing the products from the market; (4) the Agency's available enforcement resources; and (5) any special circumstances relevant to the particular case under consideration.  However, as stated above, FDA does not intend to apply any such grace period to an unapproved drug that was introduced onto the market after September 19, 2011.

## C.  Special Circumstances — Newly Approved Product

Sometimes, a company may obtain approval of an NDA for a product that other companies are marketing without approval.[10]  We want to encourage this type of voluntary compliance with the new drug requirements because it benefits the public health by increasing the assurance that marketed drug products are safe and effective — it also reduces the resources that FDA must expend on enforcement.  Thus, because they present a direct challenge to the drug approval system, FDA is more likely to take enforcement action against remaining unapproved drugs in this kind of situation.  However, we intend to take into account the circumstances once the product is approved in determining how to exercise our enforcement discretion with regard to the unapproved products.  In exercising enforcement discretion, we intend to balance the need to provide incentives for voluntary compliance against the implications of enforcement actions on the marketplace and on consumers who are accustomed to using the marketed products.

When a company obtains approval to market a product that other companies are marketing without approval, FDA normally intends to allow a grace period of roughly 1 year from the date of approval of the product before it will initiate enforcement action (e.g., seizure or injunction) against marketed unapproved products of the same type.  However, the grace period provided is expected to vary from this baseline based upon the following factors:  (1) the effects on the public health of proceeding immediately to remove the illegal products from the market (including whether the product is medically necessary and, if so, the ability of the holder of the approved application to meet the needs of patients taking the drug); (2) whether the effort to obtain approval was publicly disclosed;[11] (3) the difficulty associated with conducting any required studies, preparing and submitting applications, and obtaining approval of an application; (4) the burden on affected parties of removing the products from the market; (5) the Agency's available enforcement resources; and (6) any other special circumstances relevant to the particular case under consideration.  To assist in an orderly transition to the approved product(s), in implementing a grace period, FDA may identify interim dates by which firms should first

---

[10] These may be products that are the same as the approved product or somewhat different, such as products of different strength.

[11] For example, at the Agency's discretion, we may provide for a shorter grace period if an applicant seeking approval of a product that other companies are marketing without approval agrees to publication, around the time it submits the approval application, of a *Federal Register* notice informing the public that the applicant has submitted that application.  A shortened grace period may also be warranted if the fact of the application is widely known publicly because of applicant press releases or other public statements.  Such a grace period may run from the time of approval or from the time the applicant has made the public aware of the submission, as the Agency deems appropriate.

*Contains Nonbinding Recommendations*

cease manufacturing unapproved forms of the drug product, and later cease distributing the unapproved product.

The length of any grace period and the nature of any enforcement action taken by FDA will be decided on a case-by-case basis.  Companies should be aware that a Warning Letter may not be sent before initiation of enforcement action and should not expect any grace period that is granted to protect them from the need to leave the market for some period of time while obtaining approval.  Companies marketing unapproved new drugs should also recognize that, while FDA normally intends to allow a grace period of roughly 1 year from the date of approval of an unapproved product before it will initiate enforcement action (e.g., seizure or injunction) against others who are marketing that unapproved product, it is possible that a substantially shorter grace period would be provided, depending on the individual facts and circumstances.[12]

The shorter the grace period, the more likely it is that the first company to obtain an approval will have a period of de facto market exclusivity before other products obtain approval.  For example, if FDA provides a 1-year grace period before it takes action to remove unapproved competitors from the market, and it takes 2 years for a second application to be approved, the first approved product could have 1 year of market exclusivity before the onset of competition.  If FDA provides for a shorter grace period, the period of effective exclusivity could be longer.  FDA hopes that this period of market exclusivity will provide an incentive to firms to be the first to obtain approval to market a previously unapproved drug.[13]

### D.  Regulatory Action Guidance

District offices are encouraged to refer to CDER for review (with copies of labeling) any unapproved drugs that appear to fall within the enforcement priorities in section III.A.  Charges that may be brought against unapproved drugs include, but are not limited to, violations of 21 U.S.C. 355(a) and 352(f)(1) of the FD&C Act. Other charges may also apply based on, among others, violations of 21 U.S.C. 351(a)(2)(B) (CGMP), 352(a) (misbranding), or 352(o) (failure to register or list).

---

[12] Firms are reminded that this CPG does not create any right to a grace period; the length of the grace period, if any, is solely at the discretion of the Agency.  For instance, firms should not expect any grace period when the public health requires immediate removal of a product from the market, or when the Agency has given specific prior notice in the *Federal Register* or otherwise that a drug product requires FDA approval.

[13] The Agency understands that, under the Act, holders of NDAs must list patents claiming the approved drug product and that newly approved drug products may, in certain circumstances, be eligible for marketing exclusivity. Listed patents and marketing exclusivity may delay the approval of competitor products.  If FDA believes that an NDA holder is manipulating these statutory protections to inappropriately delay competition, the Agency will provide relevant information on the matter to the Federal Trade Commission (FTC).  In the past, FDA has provided information to the FTC regarding patent infringement lawsuits related to pending abbreviated new drug applications (ANDAs), citizen petitions, and scientific challenges to the approval of competitor drug products.

*Contains Nonbinding Recommendations*

## APPENDIX

## BRIEF HISTORY OF FDA MARKETING APPROVAL REQUIREMENTS AND CATEGORIES OF DRUGS THAT LACK REQUIRED FDA APPROVAL[14]

Key events in the history of FDA's drug approval regulation and the categories of drugs affected by these events are described below.

### A.  1938 and 1962 Legislation

The original Federal Food and Drugs Act of June 30, 1906, first brought drug regulation under federal law.  That Act prohibited the sale of adulterated or misbranded drugs, but did not require that drugs be approved by FDA.  In 1938, Congress passed the Federal Food, Drug, and Cosmetic Act (the FD&C Act), which required that new drugs be approved for safety.  As discussed below, the active ingredients of many drugs currently on the market were first introduced, at least in some form, before 1938.  Between 1938 and 1962, if a drug obtained approval, FDA considered drugs that were identical, related, or similar (IRS) to the approved drug to be covered by that approval, and allowed those IRS drugs to be marketed without independent approval.  Many manufacturers also introduced drugs onto the market between 1938 and 1962 based on their own conclusion that the products were generally recognized as safe (GRAS) or based on an opinion from FDA that the products were not new drugs.  Between 1938 and 1962, the Agency issued many such opinions, although all were formally revoked in 1968 (see 21 CFR 310.100).

### B.  DESI

In 1962, Congress amended the Act to require that a new drug also be proven effective, as well as safe, to obtain FDA approval.  This amendment also required FDA to conduct a retrospective evaluation of the effectiveness of the drug products that FDA had approved as safe between 1938 and 1962 through the new drug approval process.

FDA contracted with the National Academy of Science/National Research Council (NAS/NRC) to make an initial evaluation of the effectiveness of over 3,400 products that were approved only for safety between 1938 and 1962.  The NAS/NRC created 30 panels of 6 professionals each to conduct the review, which was broken down into specific drug categories.  The NAS/NRC reports for these drug products were submitted to FDA in the late 1960s and early 1970s.  The Agency reviewed and re-evaluated the findings of each panel and published its findings in *Federal Register* notices.  FDA's administrative implementation of the NAS/NRC reports was called the Drug Efficacy Study Implementation (DESI).  DESI covered the 3,400 products specifically reviewed by the NAS/NRCs as well as the even larger number of IRS products that entered the market without FDA approval.

---

[14] This brief history document should be viewed as a secondary source.  To determine the regulatory status of a particular drug or category of drugs, the original source documents cited should be consulted.

*Contains Nonbinding Recommendations*

Because DESI products were covered by approved (pre-1962) applications, the Agency concluded that, prior to removing products not found effective from the market, it would follow procedures in the FD&C Act and regulations that apply when an approved new drug application is withdrawn:

- All initial DESI determinations are published in the *Federal Register* and, if the drug is found to be less than fully effective, there is an opportunity for a hearing.

- The Agency considers the basis of any hearing request and either grants the hearing or denies the hearing on summary judgment and publishes its final determination in the *Federal Register*.

- If FDA's final determination classifies the drug as effective for its labeled indications, as required by the FD&C Act, FDA still requires approved applications for continued marketing of the drug and all drugs IRS to it – NDA supplements for those drugs with NDAs approved for safety, or new ANDAs or NDAs, as appropriate, for IRS drugs. DESI-effective drugs that do not obtain approval of the required supplement, ANDA, or NDA are subject to enforcement action.

- If FDA's final determination classifies the drug as ineffective, the drug and those IRS to it can no longer be marketed and are subject to enforcement action.

1.     Products Subject to Ongoing DESI Proceedings

Some unapproved marketed products are undergoing DESI reviews in which a final determination regarding efficacy has not yet been made.  In addition to the products specifically reviewed by the NAS/NRC (i.e., those products approved for safety only between 1938 and 1962), this group includes unapproved products identical, related, or similar to those products specifically reviewed (see 21 CFR 310.6).  In virtually all these proceedings, FDA has made an initial determination that the products lack substantial evidence of effectiveness, and the manufacturers have requested a hearing on that finding.  It is the Agency's longstanding policy that products subject to an ongoing DESI proceeding may remain on the market during the pendency of the proceeding.  See, e.g., *Upjohn Co. v. Finch*, 303 F. Supp. 241, 256-61 (W.D. Mich. 1969).[15]

2.     Products Subject to Completed DESI Proceedings

---

[15] Products first marketed after a hearing notice is issued with a different formulation than those covered by the notice are not considered subject to the DESI proceeding.  Rather, they need approval prior to marketing.  Under longstanding Agency policies, a firm holding an NDA on a product for which a DESI hearing is pending must submit a supplement prior to reformulating that product.  The changed formulation may not be marketed as a related product under the pending DESI proceeding; it is a new drug, and it must be approved for safety and efficacy before it can be legally marketed.  See, e.g., "Prescription Drugs Offered for Relief of Symptoms of Cough, Cold, or Allergy" (DESI 6514), 49 FR 153 (January 3, 1984) (Dimetane and Actifed); "Certain Drugs Containing Antibiotic, Corticosteroid, and Antifungal Components" (DESI 10826), 50 FR 15227 (April 17, 1985) (Mycolog).  See also 21 U.S.C. 356a(c)(2)(A).  Similarly, firms without NDAs cannot market new formulations of a drug without first getting approval of an NDA.

*Contains Nonbinding Recommendations*

Some unapproved marketed products are subject to already-completed DESI proceedings and lack required approved applications. This includes a number of products IRS to DESI products for which approval was withdrawn due to a lack of substantial evidence of effectiveness. This group also includes a number of products IRS to those DESI products for which FDA made a final determination that the product is effective, but applications for the IRS products have not been both submitted and approved as required under the statute and longstanding enforcement policy (see 21 CFR 310.6). FDA considers all products described in this paragraph to be marketed illegally.

## C. Prescription Drug Wrap-Up

As mentioned above, many drugs came onto the market before 1962 without FDA approvals. Of these, many claimed to have been marketed prior to 1938 or to be IRS to such a drug. Drugs that did not have pre-1962 approvals and were not IRS to drugs with pre-1962 approvals were not subject to DESI. For a period of time, FDA did not take action against these drugs and did not take action against new unapproved drugs that were IRS to these pre-1962 drugs that entered the market without approval.

Beginning in 1983, it was discovered that one drug that was IRS to a pre-1962 drug, a high potency Vitamin E intravenous injection named E-Ferol, was associated with adverse reactions in about 100 premature infants, 40 of whom died. In November of 1984, in response to this, a congressional oversight committee issued a report to FDA expressing the committee's concern regarding the thousands of unapproved drug products in the marketplace.

In response to the E-Ferol tragedy, CDER assessed the number of pre-1962 non-DESI marketed drug products. To address those drug products, the Agency significantly revised and expanded CPG section 440.100 to cover all marketed unapproved prescription drugs, not just DESI products. The program for addressing these marketed unapproved drugs and certain others like them became known as the Prescription Drug Wrap-Up. Most of the Prescription Drug Wrap-Up drugs first entered the market before 1938, at least in some form. For the most part, the Agency had evaluated neither the safety nor the effectiveness of the drugs in the Prescription Drug Wrap-Up.

A drug that was subject to the Prescription Drug Wrap-Up is marketed illegally, unless the manufacturer of such a drug can establish that its drug is grandfathered or otherwise not a new drug.

Under the 1938 grandfather clause (see 21 U.S.C. 321(p)(1)), a drug product that was on the market prior to passage of the 1938 Act and which contained in its labeling the same representations concerning the conditions of use as it did prior to passage of that act was not considered a new drug and therefore was exempt from the requirement of having an approved new drug application.

Under the 1962 grandfather clause, the FD&C Act exempts a drug from the effectiveness requirements if its composition and labeling has not changed since 1962 and if, on the day before the 1962 Amendments became effective, it was (a) used or sold commercially in the United

*Contains Nonbinding Recommendations*

States, (b) not a new drug as defined by the FD&C Act at that time, and (c) not covered by an effective application.  See Public Law 87-781, section 107 (reprinted following 21 U.S.C.A. 321); see also *USV Pharmaceutical Corp. v. Weinberger*, 412 U.S. 655, 662-66 (1973).

The two grandfather clauses in the FD&C Act have been construed very narrowly by the courts. FDA believes that there are very few drugs on the market that are actually entitled to grandfather status because the drugs currently on the market likely differ from the previous versions in some respect, such as formulation, dosage or strength, dosage form, route of administration, indications, or intended patient population.  If a firm claims that its product is grandfathered, it is that firm's burden to prove that assertion.  See 21 CFR 314.200(e)(5); see also *United States v. An Article of Drug (Bentex Ulcerine)*, 469 F.2d 875, 878 (5th Cir. 1972); *United States v. Articles of Drug Consisting of the Following: 5,906 Boxes*, 745 F.2d 105, 113 (1st Cir 1984).

Finally, a product would not be considered a new drug if it is generally recognized as safe and effective (GRAS/GRAE) and has been used to a material extent and for a material time.  See 21 U.S.C. 321(p)(1) and (2).  As with the grandfather clauses, this has been construed very narrowly by the courts.  See, e.g., *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609 (1973); United States *v. 50 Boxes More or Less Etc*., 909 F.2d 24, 27-28 (1st Cir. 1990); *United States v. 225 Cartons . . . Fiorinal*, 871 F.2d 409 (3rd Cir. 1989).  See also Letter from Dennis E. Baker, Associate Commissioner for Regulatory Affairs, FDA, to Gary D. Dolch, Melvin Spigelman, and Jeffrey A. Staffa, Knoll Pharmaceutical Co. (April 26, 2001) (on file in FDA Docket No. 97N-0314/CP2) (finding that Synthroid, a levothyroxine sodium product, was not GRAS/GRAE).

As mentioned above, the Agency believes it is not likely that any currently marketed prescription drug product is grandfathered or is otherwise not a *new drug*.  However, the Agency recognizes that it is at least theoretically possible.  No part of this guidance, including the Appendix, is a finding as to the legal status of any particular drug product.  In light of the strict standards governing exceptions to the approval process, it would be prudent for firms marketing unapproved products to carefully assess whether their products meet these standards.

## D.  New Unapproved Drugs

Some unapproved drugs were first marketed (or changed) after 1962.  These drugs are on the market illegally.  Some also may have already been the subject of a formal Agency finding that they are new drugs.  See, e.g., 21 CFR 310.502 (discussing, among other things, controlled/timed release dosage forms).

## E.  Over-the-Counter (OTC) Drug Review

Although OTC drugs were originally included in DESI, FDA eventually concluded that this was not an efficient use of resources.  The Agency also was faced with resource challenges because it was receiving many applications for different OTC drugs for the same indications.  Therefore, in 1972, the Agency implemented a process of reviewing OTC drugs through rulemaking by therapeutic classes (e.g., antacids, antiperspirants, cold remedies).  This process involves convening an advisory panel for each therapeutic class to review data relating to claims and active ingredients.  These panel reports are then published in the *Federal Register*, and after

*Contains Nonbinding Recommendations*

FDA review, tentative final monographs for the classes of drugs are published.  The final step is the publication of a final monograph for each class, which sets forth the allowable claims, labeling, and active ingredients for OTC drugs in each class (see, e.g., 21 CFR part 333).  Drugs marketed in accordance with a final monograph are considered to be generally recognized as safe and effective (GRAS/GRAE) and do not require FDA approval of a marketing application.

Final monographs have been published for the majority of OTC drugs.  Tentative final monographs are in place for virtually all categories of OTC drugs.  FDA has also finalized a number of *negative monographs* that list therapeutic categories (e.g., OTC daytime sedatives, 21 CFR 310.519) in which no OTC drugs can be marketed without approval.  Finally, the Agency has promulgated a list of active ingredients that cannot be used in OTC drugs without approved applications because there are inadequate data to establish that they are GRAS/GRAE (e.g., phenolphthalein in stimulant laxative products, 21 CFR 310.545(a)(12)(iv)(B)).

OTC drugs covered by ongoing OTC drug monograph proceedings may remain on the market as provided in current enforcement policies (see, e.g., CPG sections 450.200 and 450.300, and 21 CFR part 330).  This document does not affect the current enforcement policies for such drugs.

OTC drugs that need approval, either because their ingredients or claims are not within the scope of the OTC drug review or because they are not allowed under a final monograph or another final rule, are illegally marketed.  For example, this group would include a product containing an ingredient determined to be ineffective for a particular indication or one that exceeds the dosage limit established in the monograph.  Such products are new drugs that must be approved by FDA to be legally marketed.

Exhibit 5

Michael J. Freno (admitted *pro hac vice*)
  mikef@seedip.com
Harold M. Storey (No. 268603)
  harolds@seedip.com
SEED IP LAW GROUP PLLC
701 Fifth Avenue, Suite 5400
Seattle, WA 98104
Telephone: 206.622.4900
Facsimile: 206.682.6031

Amy E. Pomerantz (No. 275691)
  pomerantz@caldwell-leslie.com
725 South Figueroa Street, 31st Floor
Los Angeles, CA 90017-5524
Telephone: 213.629.9040
Facsimile: 213.629.9022

*Attorneys for Plaintiff Par Sterile Products, LLC*

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| PAR STERILE PRODUCTS, LLC, | Case No. 2:13-cv-07460-DDP (Ex) |
| Plaintiff, | |
| v. | **DECLARATION OF HAROLD M. STOREY IN SUPPORT OF PAR STERILE PRODUCTS, LLC'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS** |
| HOSPIRA, INC., INTERNATIONAL MEDICATION SYSTEMS, LTD., and AMERICAN REGENT, INC., | |
| Defendants. | Hon. Dean D. Pregerson |

STOREY DECL. ISO PAR STERILE
PRODUCTS, LLC'S MEMORANDUM IN
OPPOSITION TO DEFENDANTS' MOTIONS
TO DISMISS

I, Harold M. Storey, hereby state as follows:

1.     I am an attorney at Seed Intellectual Property Law Group, PLLC, counsel for defendant Par Sterile Products, LLC ("Par") in this action.  I have personal knowledge of the facts set forth herein.

2.     I submit this declaration in support of Par's Opposition to Defendants' Motions to Dismiss.

3.     Attached hereto as Exhibit 1 is a true and correct copy of excerpts from the U.S. Department of Health and Human Services, Food and Drug Administration ("FDA") Center for Drug Evaluation and Research ("CDER") Medical Review(s) for ANDA No. 204200.

4.     Attached hereto as Exhibit 2 is a true and correct copy of "Justice News" from the United States Department of Justice, dated July 30, 2013, titled "Wyeth Pharmaceuticals Agrees to Pay $490.9 Million for Marketing the Prescription Drug Rapamune for Unapproved Uses," retrieved on August 8, 2014.

5.     Attached hereto as Exhibit 3 is a true and correct copy of "Justice News" from the United States Department of Justice, dated September 1, 2010, titled "Allergan Agrees to Plead Guilty and Pay $600 Million to Resolve Allegations of Off-Label Promotion of Botox®," retrieved on August 8, 2014.

6.     Attached hereto as Exhibit 4 is a true and correct copy of "Justice News" from the United States Department of Justice, dated September 2, 2009,

2     STOREY DECL. ISO PAR STERILE
PRODUCTS, LLC'S MEMORANDUM IN
OPPOSITION TO DEFENDANTS' MOTIONS
TO DISMISS

titled "Justice Department Announces Largest Health Care Fraud Settlement in Its History," retrieved on August 8, 2014.

7.     Attached hereto as Exhibit 5 is a true and correct copy of a Declaration of Martin Buncher, filed on August 21, 2006 in *Mutual Pharm. Co. v. Ivax Pharm., Inc.,* U.S. Central District of California, Case No. 06-4474.

8.     Attached hereto as Exhibit 6 is a true and correct copy of a Declaration of Joseph A. Matijow, filed on August 22, 2006 in *Mutual Pharm. Co. v. Ivax Pharm., Inc.,* U.S. Central District of California, Case No. 06-4474.

9.     Attached hereto as Exhibit 7 is a true and correct copy of a document titled "Marketed Unapproved Drugs – Overview and FDA Enforcement Policies," by Kurt Karst dated August 10, 2006.

10.    Attached hereto as Exhibit 8 is a true and correct copy of the FDA "Marketed Unapproved Drugs – Compliance Policy Guide," dated June 2006.

11.    Attached hereto as Exhibit 9 is a true and correct copy of the FDA "Marketed Unapproved Drugs – Compliance Policy Guide," dated September 19, 2011.

12.    Attached hereto as Exhibit 10 is a true and correct copy of a print out from Hospira, Inc.'s website for its "Epinephrine Injection, USP" product, retrieved on August 7, 2014.

STOREY DECL. ISO PAR STERILE
PRODUCTS, LLC'S MEMORANDUM IN
OPPOSITION TO DEFENDANTS' MOTIONS
TO DISMISS

13.     Attached hereto as Exhibit 11 is a true and correct copy of the question presented for *Pom Wonderful LLC. v. Coca-Cola Co.*

14.     Attached hereto as Exhibit 12 is a true and correct copy of a print out from http://labels.fda.gov/, retrieved on August 12, 2014

15.     Attached hereto as Exhibit 13 is a true and correct copy of a declaration by Joseph A. Matijow, filed on September 11, 2009 in *Mutual Pharm. Co. v. Watson Pharm., Inc.*, U.S. Central District of California, Case No. 09-cv-05700.

16.     Attached hereto as Exhibit 14 is a true and correct copy of a document relating to American Regent, Inc.'s EPINEPHRINE Injection, USP (1 mg/mL) product.

17.     Attached hereto as Exhibit 15 is a true and correct copy of a document relating to Hospira, Inc.'s EPINEPHRINE Injection, USP 1:1000 (1 mg/mL) product.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 13th day of August, 2014 in Seattle, Washington.

By:

Harold M. Storey

4       STOREY DECL. ISO PAR STERILE PRODUCTS, LLC'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

# Exhibit 5

1   COOKSEY, TOOLEN, GAGE, DUFFY & WOOG
    PATRICK J. DUFFY [SBN 37881]
2   A Professional Corporation
    535 Anton Boulevard, Tenth Floor
3   Costa Mesa, California 92626-1977
    Telephone: (714) 431-1100
4   Facsimile: (714) 431-1119

5   COOLEY GODWARD LLP
    MICHAEL G. RHODES (116127)
6   JOHN S. KYLE (199196)
    4401 Eastgate Mall
7   San Diego, CA 92121
    Telephone: (858) 550-6000
8   Facsimile: (858) 550-6420
    Email: rhodesmg@cooley.com; kylejs@cooley.com

9
    COOLEY GODWARD LLP
10   PETER J. WILLSEY (pro hac vice pending)
    ADAM L. BAREA (pro hac vice pending)
11   875 15th Street NW, Suite 800
    Washington, DC 20005-2221
12   Telephone: (202) 842-7845
    Facsimile: (202) 842-7899
13   Email: pwillsey@cooley.com; abarea@cooley.com

14   Attorneys for Plaintiffs MUTUAL PHARMACEUTICAL COMPANY, INC.
    AR SCIENTIFIC, INC., AND AR HOLDING COMPANY, INC.

15

16           UNITED STATES DISTRICT COURT

17      FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| 18   MUTUAL PHARMACEUTICAL COMPANY, INC., a Pennsylvania corporation; AR SCIENTIFIC, INC., a Delaware corporation; and AR HOLDING COMPANY, INC., a Delaware corporation, <br><br> Plaintiffs, <br><br> v. <br><br> IVAX PHARMACEUTICALS, INC., a Florida corporation; ZENITH GOLDLINE PHARMACEUTICALS, INC., a Florida corporation, <br><br> Defendants. | CASE NO. ED CV-06-4474 SGL(JCx) <br><br> **DECLARATION OF MARTIN BUNCHER IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION DIRECTED TO DEFENDANTS IVAX AND ZENITH** <br><br> **DATE:** September 25, 2006 <br> **TIME:** 10:00 a.m. <br> **DEPT.:** Ctrm 1 <br> **JUDGE:** Hon. Stephen G. Larson |

                      1
DEC MARTIN BUNCHER ISO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

510353 V1/SD

EXHIBIT 5
23

I, Martin Buncher, pursuant to 28 U.S.C. § 1746, hereby declare and say as follows:

1.     I earned a Masters Degree in Consumer and Industrial Psychology at the University of Southern California in 1964 and have provided marketing research and marketing consulting services for 42 years across a broad spectrum of American and foreign industries.  My experience with consumer and trade advertising and communications is extensive, and includes literally thousands of studies both qualitative and quantitative in nature, with many in the health care and pharmaceutical product field.

2.     I have served as Vice-President and Member of the Board of the national American Marketing Association (AMA), as well as being similarly active in the American Society of Trial Consultants (ASTC), California Trial Lawyers Association (CTLA American Psychological Association (APA), Marketing Research Association (MRA), European Society for Marketing And Opinion Research (ESOMAR), and San Diego Advertising Association.

3.     I have served on the faculty of San Diego State University and the University of California San Diego teaching marketing and marketing research courses. I have been a contributing author to marketing communications texts used world-wide in leading business schools as part of the teaching curriculum.

4.     Since 1977, I have served as managing director of Intercontinental Marketing Investigations Inc.  Our clients reflect a very broad cross-section of manufacturers and service providers , as well as, government, social, and political agencies in the United States and over 50 foreign countries.

///
///
///
///
///

510353 V1/SD

**EXHIBIT 5**
**24**

5. Specific examples of our areas of involvement include aging/mature markets, agriculture, airlines/aerospace, alcoholic beverages, apparel, automotive, confectionery, chemicals, computers/hi-tech hardware and software, construction, real estate, education, employee benefit programs, energy/utilities, financial/banking, foods, health/beauty aids, household products, health care/medical products and services, human resources, hotels/resorts, insurance, newspapers/magazines, pets, political campaigns, radio/TV, security systems, telecommunications, tobacco, toys/games, tourism, and zoological agencies.

6. In June, 2006, I conducted two surveys to probe the extent of confusion existing among Pharmacists and Buyers of major pharmaceutical chains. They are attached as Exhibit 1. Both surveys revealed confusion in these populations attributable to the marketing of non-FDA-approved products such as quinine sulfate and colchicine. For the pharmacist survey, it was determined that:

- 48% of the pharmacists surveyed indicated that all of the drugs on "Price Lists" provided by the major distributors of drug products, which would generally include quinine sulfate as a listed drug, were FDA approved.

- More specifically, 62% stated that quinine sulfate was FDA approved.

- 28% of the pharmacists surveyed felt that in general the "Price Lists " provided complete information regarding claims adjudication and drug interaction pertaining to the use of quinine sulfate, but among those who recalled this drug appearing on the price list they used, the proportion rose to 38%.

///
///
///
///

3
DEC MARTIN BUNCHER ISO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

510353 V1/SD

EXHIBIT 5
25

1          • 35% of the pharmacists that had quinine sulfate on their cost sheets
2          and that were dispensing it felt they had complete information on
3          that drug. Thus, a noteworthy percentage of those most immediately
4          involved with dispensing quinine sulfate believed their price sheet
5          provided complete claims adjudication and drug interaction
6          information.

7          • 56% of the pharmacists surveyed indicated that if they had two
8          different prescription quinine sulfate products with identical
9          strength, molecules and form, and if one of them were FDA
10         approved, the other one would also be approved.

11      7.    For the pharmaceutical chain store buyers interviewed, whose

12 companies, I am advised, represent over 50% of the market in terms of sales volume,

13 it was determined that:

14          • All refer to these Price Lists, primarily all of the time or frequently,
15          in the purchase of drugs.

16          • The primary perception among these buyers is that all or most of the
17          prescription drugs listed are FDA approved. However, results show
18          that all are ordering a non-approved drug on their price list
19          (Colchicine), demonstrating the misconception generated about such
20          a non-FDA-approved drug. Though it was not practical to test
21          perceptions for all non-approved drugs on the price lists, it is logical
22          to conclude that if one is wrongly perceived in this manner, so are
23          others.

24          • Identification of the non-approved drug by name (Colchicine)
25          confirmed the strong tendency among buyers to consider it an
26          approved drug.

27 ///
28 ///

4

510353 V1/SD

**EXHIBIT 5**
**26**

- Nearly half the buyers feel they receive complete information regarding Colchicine claims adjudication and drug interaction pertaining to its use, which also shows confusion, as this information is in fact not completely provided, as I have been advised.

- The tendency for buyers to be confused about FDA approved versus non-FDA-approved drugs was clearly indicated when they were asked to draw a conclusion about the approval status of any drug of identical strength, molecules and form to another which had FDA approval. All of the buyers responded that it "might or might not be" or that they "could not say".

8. The data from these surveys show that a high percentage of pharmacists and buyers not only believe all listed drugs are FDA-approved, but that the usage information provided is complete. This is another misconception, caused by instructions for use and labeling. I have been advised that the labeling information for non-FDA-approved drugs is incomplete, failing to show all mandated contraindications and adverse drug reactions.

9. Moreover, by omitting the complete adverse event warnings from its labels, it is logical to conclude that non-FDA-approved products would appear safer in comparison to an FDA-approved product which does include all of the adverse event warnings, based on the principle that the more warnings presented, the less the trade and consumer is likely to perceive the drug as safe.

10. Listing of non-FDA-approved quinine sulfate drug product on numerous drug reporting "Price Lists" is therefore shown to deceive these consumer gatekeepers in the pharmaceutical trade, and to cause confusion.

11. Survey results have thus demonstrated that Defendant's active

///
///
///

1 participation in the Price Lists which are known to represent a major drug-marketing

2 communication-channel to pharmacists and chain store buyers, and providing these

3 Price List compilers with incomplete information, knowing that these Price Lists are

4 used to order, prescribe, purchase and/or dispense their non-FDA-approved drugs

5 throughout the United States and California, constitutes deceptive advertising,

6 deceptive promotion and deceptive marketing.

7 ///

8       12.   Based on the survey data, a substantial portion of pharmacists and buyers

9 wrongly perceive that non-FDA-approved drugs including quinine sulfate as well as

10 others such as colchicine listed by price/dispensing services are FDA-approved, that

11 is, safe and effective according to FDA standards, while in fact, no quinine sulfate drug

12 except Qualiquin™, as I have been advised, meets these standards.

13       I declare under penalty of perjury under the laws of the United States that the

14 foregoing is true and correct.

15       Executed at _San Diego_ , _California_ on August _18_ , 2006.

16

17                                   MARTIN BUNCHER

18                               MARTIN BUNCHER

19

20

21

22

23

24

25

26

27

28

EXHIBIT 5
28

# Exhibit 13

COOLEY GODWARD KRONISH LLP
MICHAEL G. RHODES (CALIFORNIA BAR NO. 116127)
(RHODESMG@COOLEY.COM)
JOHN S. KYLE (CALIFORNIA BAR NO. 199196)
(JKYLE@COOLEY.COM)
4401 Eastgate Mall
San Diego, CA 92121-1909
Telephone: (858) 550-6000
Facsimile: (858) 550-6420

PETER J. WILLSEY (*PRO HAC VICE*)
(PWILLSEY@COOLEY.COM)
NISHAN KOTTAHACHCHI (CALIFORNIA BAR NO. 221612)
(NKOTTAHACHCHI@COOLEY.COM)
BRENDAN J. HUGHES (*PRO HAC VICE*)
(BHUGHES@COOLEY.COM)
777 6th Street N.W., Suite 1100
Washington, DC 20001-3703
Telephone: (202) 842-7800
Facsimile: (202) 842-7899

VALLE & ASSOCIATES
JEFFREY B. VALLE (CALIFORNIA BAR NO. 110060)
(JVALLE@VALLEASSOCIATES.COM)
THOMAS P. FRIEDMAN (CALIFORNIA BAR NO. 205407)
(TFRIEDMAN@VALLEASSOCIATES.COM)
11911 San Vicente Blvd., Suite 324
Los Angeles, CA 90049
Telephone: (310) 476-0300
Facsimile: (310) 476-0333

Attorneys for Plaintiffs
MUTUAL PHARMACEUTICAL COMPANY, INC., AR
SCIENTIFIC, INC., and AR HOLDING COMPANY, INC.

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MUTUAL PHARMACEUTICAL COMPANY, INC., a Pennsylvania corporation; AR SCIENTIFIC, INC., a Delaware corporation; and AR HOLDING COMPANY, INC., a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>WATSON PHARMACEUTICALS, INC., a Nevada corporation; WEST-WARD PHARMACEUTICAL CORP., | Case No. CV 09-05700 PA (RZx)<br>*Related to*: CV 09-05761 PA (RZx)<br>Honorable Percy Anderson<br><br>**DECLARATION OF JOSEPH A. MATIJOW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>**Time: 1:30 pm** |

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
WASHINGTON

99583 v2/DC

1.

a Delaware corporation; VISION PHARMA, LLC, a New Jersey corporation; and EXCELLIUM PHARMACEUTICAL, INC., a New Jersey corporation,

Defendants.

Date: October 5, 2009
Courtroom No. 15

I, Joseph A. Matijow, pursuant to 28 U.S.C. § 1746, hereby declare and say as follows:

1.  I am the Vice President of Operations and Business Development at Medical Marketing Research, Inc. ("MMR").

2.  I obtained a Bachelor of Arts degree from North Carolina State University and a Master of Business Administration degree from Campbell University.

3.  I am a market research professional with 10 years of experience in healthcare-related market research, including qualitative and quantitative research relating to specialties such as cardiology, rheumatology, dermatology, gastroenterology, infectious diseases, neurology, oncology, pulmonology, surgery, and urology. I have continuously worked for MMR since January 1999.

4.  As Vice President of Operations and Business Development at MMR, I am involved with all aspects of research design, including but not limited to methodology selection, questionnaire design, sample management, and the analysis and presentation of results. I have experience conducting qualitative and quantitative research among consumers, physicians, pharmacists, and other healthcare professionals.

5.  Over the past 10 years at MMR, I have conducted research in numerous therapeutic categories, including but not limited to allergic rhinitis, anxiety disorders, epilepsy, atrial fibrillation, asthma, attention deficit disorder (ADD)/attention deficit hyperactivity disorder (ADHD), bi-polar disorder, contraceptives, diabetes, HIV/AIDS, incontinence, impotence, migraines, oncology, Parkinson's disease, psoriasis, pain management, sleep apnea, and spasticity.

6.  I have experience designing numerous types of research, including but not

2.

DECLARATION OF JOSEPH A. MATIJOW IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

EXHIBIT 13
101

1    limited to: consumer confusion studies; awareness, tracking, and usage studies; ad

2    testing; segmentation studies; pricing studies; Rx-OTC switch studies; and concept

3    testing.

4         7.    From August 11, 2009 to September 2, 2009, MMR, under my

5    supervision, conducted a national research study to determine whether confusion exists

6    among retail pharmacists as a result of pharmaceutical companies using clinical and

7    pricing drug information databases ("Price Lists"), which are integrated with

8    pharmacy computer systems, and online drug product ordering systems provided by

9    wholesalers ("Wholesaler Ordering Systems") to market prescription drug products that

10   are not approved by the FDA.  The relevant survey results are detailed in the attached

11   report, a true and correct copy of which is attached as Exhibit A.

12        8.    The survey revealed the following:

13   • Approximately 99% of pharmacists use a pharmacy computer system to

14      determine the clinical and pricing information for prescription drugs;

15   • Approximately 95% of pharmacists believe that when they dispense a

16      prescription drug listed on their pharmacy computer systems, the prescription

17      drug is approved by the FDA;

18   • Approximately 93% of pharmacists believe that if colchicine products are

19      listed on their pharmacy computer systems, those products are approved by

20      the FDA;

21   • Approximately 41% of the surveyed pharmacists identified either First

22      Databank, Medi-Span, Gold Standard, or Redbook as the source of the

23      clinical and pricing information integrated in their pharmacy computer

24      systems;

25   • Approximately 86% of pharmacists purchase prescription drugs for their

26      pharmacy using an online ordering system;

27   • Approximately 94% of pharmacists believe that when they purchase a

28      prescription drug listed on their online ordering system, the prescription drug

                                        3.    DECLARATION OF JOSEPH A. MATIJOW IN SUPPORT OF
                                              PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

EXHIBIT 13
102

1   is approved by the FDA;

2   • Approximately 93% of pharmacists believe that if colchicine products are
3   listed on their online ordering system, those products are approved by the
4   FDA;

5   • 100% of pharmacists, if they had the choice, would choose to purchase a
6   prescription drug for their pharmacy that was approved by the FDA, rather
7   than a prescription drug that was not approved by the FDA;

8   • Approximately 90% of pharmacists stated that a drug product wholesaler
9   provides the online ordering systems used by their pharmacy; and

10  • Approximately 83% of the surveyed pharmacists identified either McKesson
11  Corporation, Cardinal Health, Inc., or AmerisourceBergen Corporation as a
12  wholesaler that provides the online ordering systems used by their pharmacy.

13

14      I declare under penalty of perjury under the laws of the United States that the
15  foregoing is true and correct.

16

17  Executed at Raleigh, North Carolina on September 9, 2009.

18

19                              Joseph A. Matijow

20                              JOSEPH A. MATIJOW

21

22

23

24

25

26

27

28

4.      DECLARATION OF JOSEPH A. MATIJOW IN SUPPORT OF
        PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

EXHIBIT 13
103

# EXHIBIT A

EXHIBIT 13
104

---

# Pharmacist Confusion Survey

---

# Conducted by Medical Marketing Research, Inc.
# August/September 2009

---

Case 2:09-cv-05700-PA-RZ    Document 54    Filed 09/11/2009    Page 7 of 16

Pharmacist Confusion Survey                                          August/September 2009

# Do you use a pharmacy computer system to determine the clinical and pricing information for prescription drugs?



| Statistics | | | |
|---|---|---|---|
| | Percentage | Frequency | Base |
| Yes | 98.8% | 494 | 500 |
| No | 1.2% | 6 | |

Exhibit A
6

**EXHIBIT 13**

106

# When you dispense a prescription drug listed on the pharmacy computer system, do you believe that the prescription drug is approved by the FDA?



| Statistics | | | |
|---|---|---|---|
| | Percentage | Frequency | Base |
| Yes | 95.14% | 470 | 494 |
| No | 4.86% | 24 | |

Exhibit A
7

**EXHIBIT 13**

107

Case 2:09-cv-05700-PA-RZ    Document 54    Filed 09/11/2009    Page 8 of 16

# If colchicine products are listed on your pharmacy computer system, would you believe that those products are approved by the FDA?



Case 2:09-cv-05700-PA-RZ     Document 54     Filed 09/11/2009     Page 9 of 16

| Statistics | | | |
|---|---|---|---|
| | Percentage | Frequency | Base |
| Yes | 93.12% | 460 | 494 |
| No | 6.88% | 34 | |

Exhibit A
8

**EXHIBIT 13**

108

Case 2:09-cv-05700-PA-RZ   Document 54   Filed 09/11/2009   Page 10 of 16

Pharmacist Confusion Survey                                        August/September 2009

# What data provider supplies the clinical and pricing information to your pharmacy computer system?



| Statistics | | | |
|---|---|---|---|
| | Percentage | Frequency | Base |
| First Databank | 25.71% | 127 | |
| Medi-Span | 10.32% | 51 | |
| Gold Standard | 2.83% | 14 | 494 |
| Red Book | 2.02% | 10 | |
| Other | 24.29% | 120 | |
| Don't Know | 34.82% | 172 | |

Exhibit A
9

**EXHIBIT 13**
**109**

# Do you purchase prescription drugs for your pharmacy using an online ordering system?



| Statistics | | | |
|---|---|---|---|
| | Percentage | Frequency | Base |
| Yes | 85.8% | 429 | 500 |
| No | 14.2% | 71 | |

Exhibit A
10

**EXHIBIT 13**

110

Case 2:09-cv-05700-PA-RZ Document 54 Filed 09/11/2009 Page 12 of 16

Pharmacist Confusion Survey                                    August/September 2009

# When you purchase a prescription drug listed on your online ordering system, do you believe that the prescription drug is approved by the FDA?



| Statistics | | | |
|---|---|---|---|
| | Percentage | Frequency | Base |
| Yes | 94.17% | 404 | 429 |
| No | 5.83% | 25 | |

Exhibit A
11

**EXHIBIT 13**

111

# If colchicine products are listed on your online ordering system, do you believe that those products are approved by the FDA?



| Statistics | | | |
|---|---|---|---|
| | Percentage | Frequency | Base |
| Yes | 92.77% | 398 | 429 |
| No | 7.23% | 31 | |

Exhibit A
12

**EXHIBIT 13**

112

If you had the choice between purchasing a prescription drug for your pharmacy that was not approved by the FDA and a prescription drug that was approved by the FDA, which prescription drug would you purchase?



| Statistics | | | |
|---|---|---|---|
| | Percentage | Frequency | Base |
| Prescription Drug Approved by the FDA | 100% | 429 | 429 |
| Prescription Drug Not Approved by the FDA | 0% | 0 | |

Exhibit A
13

**EXHIBIT 13**

113

Pharmacist Confusion Survey

August/September 2009

# Does a drug product wholesaler provide the online ordering system used by your pharmacy?



| Statistics | | | |
|---|---|---|---|
| | Percentage | Frequency | Base |
| Yes | 90.44% | 388 | 429 |
| No | 9.56% | 41 | |

Exhibit A
14

**EXHIBIT 13**

**114**

# What drug product wholesaler provides the online ordering system used by your pharmacy?  (Select all that apply)



| Statistics | | | |
|---|---|---|---|
| | Percentage | Frequency | Base |
| McKesson | 43.81% | 170 | |
| Cardinal Health | 27.58% | 107 | |
| AmerisourceBergen Corporation (ABC) | 17.01% | 66 | 388 |
| Other | 18.30% | 71 | |
| Don't Know | 1.03% | 4 | |

Exhibit A
15

**EXHIBIT 13**

115

Exhibit 6

Morningstar® Document Research℠

# FORM 10-K

## LANNETT CO INC - LCI

**Filed: August 28, 2017 (period: June 30, 2017)**

Annual report with a comprehensive overview of the company

*The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.*

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-K

**(Mark One)**

☒ **ANNUAL REPORT UNDER SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended June 30, 2017**

**OR**

☐ **TRANSITION REPORT UNDER SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from          to**

**Commission File No. 001-31298**

# LANNETT COMPANY, INC.
### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **State of Delaware** | **23-0787699** |
| State of Incorporation | I.R.S. Employer I.D. No. |

**9000 State Road**
**Philadelphia, Pennsylvania 19136**
**Registrant's telephone number, including area code: (215) 333-9000**
(Address of principal executive offices and telephone number)

Securities registered under Section 12(b) of the Exchange Act:

**Common Stock, $.001 Par Value**
(Title of class)

Securities registered under Section 12(g) of the Exchange Act: **None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒  No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days. Yes ☒  No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.  (Check one):

| | |
|---|---|
| Large accelerated filer ☒ | Accelerated filer ☐ |
| Non-accelerated filer ☐ | Smaller reporting company ☐ |
| (Do not check if a smaller reporting company) | Emerging growth company ☐ |

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒  No ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12B-12 of the Exchange Act).  Yes ☐  No ☒

Aggregate market value of common stock held by non-affiliates of the registrant, as of December 31, 2016 was $613,312,878 based on the closing price of the stock on the NYSE.

As of July 31, 2017, there were 37,284,317 shares of the registrant's common stock, $.001 par value, outstanding.

Source: LANNETT CO INC, 10-K, August 28, 2017

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**TABLE OF CONTENTS**

PART I
    ITEM 1. DESCRIPTION OF BUSINESS    4
    ITEM 1A. RISK FACTORS    22
    ITEM 2. DESCRIPTION OF PROPERTY    37
    ITEM 3. LEGAL PROCEEDINGS    37
    ITEM 4. MINE SAFETY DISCLOSURES    37
PART II
    ITEM 5. MARKET FOR COMMON EQUITY AND RELATED STOCKHOLDER MATTERS    38
    ITEM 6. SELECTED FINANCIAL DATA    40
    ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS    41
    ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK    58
    ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA    58
    ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE    58
    ITEM 9A. CONTROLS AND PROCEDURES    58
    ITEM 9B. OTHER INFORMATION    60
PART III
    ITEM 10. DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE    60
    ITEM 11. EXECUTIVE COMPENSATION    64
    ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS    84
    ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE    87
    ITEM 14. PRINCIPAL ACCOUNTANT FEES AND SERVICES    88
PART IV
    ITEM 15. EXHIBITS, FINANCIAL STATEMENT SCHEDULES    88
SIGNATURES    93

2

Source: LANNETT CO INC, 10-K, August 28, 2017

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information,
except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Butalbital products, which are orally administered in capsule or tablet dosage forms, are prescribed to treat migraines and tension headaches caused by contractions of the muscles in the neck and shoulder area.  The drug is prescribed primarily for adults of various demographics.  Migraines are an increasingly prevalent condition in the United States, and we believe the demand for effective medical treatments will continue to increase.  Net sales of Butalbital products totaled $19.6 million in fiscal year 2017.  Although new innovator drugs to treat migraines have been introduced by brand-name drug companies, we believe that there is still a loyal following of doctors and consumers who prefer to use Butalbital products for treatment.  In our distribution of these products, we compete with products from Mallinckrodt, Mikart, Qualitest, Watson, West-Ward, Teva and Breckenridge.

*Ursodiol Capsules*

Ursodiol Capsules are produced and marketed in 300 mg capsules and are used for the treatment of gallstones.  Net sales of Ursodiol capsules totaled $48.6 million in fiscal year 2017.  We compete with generic products from Epic and Mylan, as well as the brand product Actigall distributed by Teva.

*Omeprazole Capsules*

Omeprazole is a proton pump inhibitor that decreases the amount of acid produced in the stomach. The product is a generic version of the branded drug Prilosec®. It is indicated for heartburn or irritation of the esophagus caused by gastroesophageal reflux disease. KUPI produces Omeprazole DR capsules in 10mg, 20mg and 40mg dosages. Net sales of Omeprazole capsules totaled $25.3 million in fiscal year 2017. In distributing this product, we compete primarily with Sandoz, Dr. Reddy's and Zydus.

*Methylphendiate Hydrochloride ER*

Methylphenidate ER is a central nervous system stimulant indicated for the treatment of Attention Deficit Hyperactivity Disorder ("ADHD") in children six years of age and older, adolescents and adults up to the age of 65. The product is a generic version of the branded drug Concerta®, which is currently marketed by Janssen Pharmaceuticals, Inc. and competes with a generic product marketed by Mallinckrodt Pharmaceuticals and Mylan as well as an AG marketed by Teva. The product was approved by the FDA in 2013 with a therapeutic equivalence rating of AB, meaning the FDA deemed it therapeutically equivalent to the brand-name drug, Concerta®.  Net sales of Methylphenidate ER tablets totaled $32.7 million in fiscal year 2017.

During a teleconference in November 2014, the FDA informed KUPI that it had concerns about whether generic versions of Concerta® (methylphenidate hydrochloride extended release tablets), including KUPI's Methylphenidate ER product, are therapeutically equivalent to Concerta®.  The FDA indicated that its concerns were based in part on adverse event reports concerning lack of effect and its analyses of pharmacokinetic data.  The FDA informed KUPI that it was changing the therapeutic equivalence rating of its product from "AB" (therapeutically equivalent) to "BX."  A BX-rated drug is a product for which data are insufficient to determine therapeutic equivalence; it is still approved and can be prescribed, but the FDA does not recommend it as automatically substitutable for the brand-name drug at the pharmacy.

During the November 2014 teleconference, the FDA also asked KUPI to either voluntarily withdraw its product or to conduct new bioequivalence ("BE") testing in accordance with the recommendations for demonstrating bioequivalence to Concerta proposed in a new draft BE guidance that FDA issued earlier that November.  The FDA had approved the KUPI product (and originally granted it an AB rating) in 2013, on the basis of KUPI data showing its product met bioequivalence criteria set forth in draft bioequivalence guidance that FDA had issued in 2012.  The FDA's position concerning the KUPI product was the subject of a public announcement by the agency.  The Company agreed to conduct new bioequivalence studies per the new draft bioequivalence guidance. KUPI submitted the data from those studies to FDA in June 2015.  The Company continues to pursue the FDA to obtain its decision on the submitted study as well as its response on whether it will restore the AB-rating for our product.

On October 18, 2016, the Company received notice from the FDA that it will seek to withdraw approval of the Company's ANDA for Methylphenidate ER. The FDA's notice includes an opportunity for the Company to request a hearing on this matter.  The Company initially had until November 17, 2016 to request the hearing and until December 19, 2016 to submit all data, information and analyses upon which the request for a hearing relies.

On November 30, 2016, the Company announced that the FDA granted a 90-day extension to submit documentation related to the hearing request.  On February 22, 2017, the Company announced that the FDA suspended indefinitely the deadline to submit supporting documentation related to the hearing request in order to give the FDA additional time to retrieve documents requested by the Company.

*Pain Management Products*

Cocaine Topical® Solution ("C-Topical®"), a vertically integrated product, is produced and marketed under a preliminary new drug application ("PIND") in two different strengths and two different size containers. C-Topical® is utilized primarily for the anesthetization of the patient during ear, nose or throat surgery, sinuplasty and in emergency rooms.

7

Source: LANNETT CO INC, 10-K, August 28, 2017

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The Company has completed a Phase III clinical trial and our Clinical Research Organization ("CRO") is assembling the data for our New Drug Application ("NDA") for C-Topical® and continues to actively market the product utilizing a group of brand representatives in key market locations throughout the United States.

Morphine Sulfate Oral Solution is produced and marketed in three different size containers.  We manufacture this product at Cody Labs and are currently finishing the manufacturing methods and capabilities to make the API.  This drug is prescribed primarily for the management of pain in adults.

Oxycodone HCl Oral Solution ("Oxycodone") was produced until August 20, 2012 and marketed until October 4, 2012 in two different size containers, at which point, as a result of FDA enforcement actions against all market participants, the Company voluntarily exited the market.  Prior to the enforcement actions the Company had submitted an ANDA to the FDA and subsequently received approval and commenced shipping Oxycodone in September 2014. This drug is prescribed primarily for the management and relief of moderate to moderately severe pain.

Other products in the pain management franchise include Hydromorphone HCl tablets, which we are vertically integrated, and Codeine Sulfate tablets. Additionally, the Company added several pain management products through the Silarx acquisition.  Net sales of pain management products totaled $26.1 million in fiscal year 2017.

**Validated Pharmaceutical Capabilities**

Lannett's 31,000 square foot manufacturing facility sits on 3.5 acres of Company-owned land.  In addition, we own a 63,000 square foot building residing on 3.0 acres of Company-owned land.  This facility is located within one mile of our manufacturing facility.  The facility houses our Quality Control ("QC") laboratories, packaging and research and development and has capacity for additional manufacturing space, if needed.  We also own a 66,000 square foot building on 7.3 acres of land, which is used for certain administrative functions, warehouse space and shipping.  It also has capacity for additional manufacturing space, if needed.  All three of these buildings are located in Philadelphia, Pennsylvania.

The manufacturing facility of our wholly-owned subsidiary, Cody Labs, consists of an approximately 73,000 square foot facility located on 15.0 acres of land in Cody, Wyoming.  Cody Labs leases the facility from Cody LCI Realty, LLC ("Realty"), a variable interest entity ("VIE") in which the Company had a 50% ownership interest until November 30, 2016, when the Company acquired the remaining 50% interest.

The Silarx manufacturing facility consists of an 110,000 square foot facility located in Carmel, New York and sits on 25.8 acres of land.  The facility currently houses manufacturing, packaging, research and development and has capacity for additional manufacturing space, if needed.

In November 2015, we completed the acquisition of KUPI.  KUPI's 432,000 square foot Seymour, Indiana facility contains approximately 107,000 square feet of manufacturing space as well as a leased 116,000 square foot temperature/humidity controlled storage warehouse.  Seymour has had satisfactory inspections conducted by the FDA and EMA and similar regulatory authorities of Japan, Taiwan, Brazil, Korea and Turkey.  Since 2008, KUPI has made significant improvements to its facility and equipment.  These improvements enabled the facility to increase production from approximately 1.2 billion doses in 2008 to over 2.7 billion doses in 2014.  KUPI also completed a 20,000 square foot expansion of the facility which increased capacity to 3.9 billion doses.

We have adopted many processes in support of regulations relating to cGMPs in the last several years and we believe we are operating our facilities in substantial compliance with the FDA's cGMP regulations.  In designing our facilities, full attention was given to material flow, equipment and automation, quality control and inspection.  A granulator, an automatic film coating machine, high-speed tablet presses, blenders, encapsulators, fluid bed dryers, high shear mixers, high-speed bottle filling and high potency or specialized manufacturing suites are a few examples of the sophisticated product development, manufacturing and packaging equipment used in the production process.  In addition, our Quality Control laboratory facilities are equipped with high precision instruments, such as automated liquid chromatographs ("HPLC" and "UPLC"), gas chromatographs and laser particle size analyzers.

We continue to pursue "Quality by Design" for improving and maintaining quality control and quality assurance programs in our pharmaceutical development and manufacturing facilities, which is outlined in the FDA report entitled, "Pharmaceutical Quality for the 21st Century: A Risk-Based Approach."  The FDA periodically inspects our production facilities to determine our compliance with the FDA's manufacturing standards.  Typically, after completing its inspection, the FDA will issue a report, entitled a "Form 483," containing observations arising from an inspection.  The FDA's observations may be minor or severe in nature and the degree of severity is generally determined by the time necessary to remediate the cGMP violation, any consequences to the consumer of the products and whether the observation is subject to a Warning Letter from the FDA. By strictly complying with cGMPs and the various FDA guidelines, Good Laboratory Practices ("GLPs"), as well as adherence to our Standard Operating Procedures, we have never received a cGMP Warning Letter in more than 70 years of business.

8

Source: LANNETT CO INC, 10-K, August 28, 2017

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Contractual Obligations**

The following table represents annual contractual obligations as of June 30, 2017:

| (In thousands) | Total | Less than 1 year | 1-3 years | 3-5 years | More than 5 Years |
|---|---|---|---|---|---|
| Long-Term Debt | $ 982,991 | $ 60,117 | $ 134,005 | $ 257,714 | $ 531,155 |
| Operating Lease Obligations | 10,717 | 1,159 | 2,160 | 2,160 | 5,238 |
| Purchase Obligations | 95,821 | 72,571 | 23,250 | — | |
| Interest on Obligations | 259,206 | 60,608 | 109,202 | 77,881 | 11,515 |
| Total | $ 1,348,735 | $ 194,455 | $ 268,617 | $ 337,755 | $ 547,908 |

Long-term debt and interest on obligations amounts above primarily relate to the Company's Amended Senior Secured Credit Facility. Refer to Note 11 "Long-Term Debt" for additional information.

Interest on obligations was calculated based on interest rates in effect at June 30, 2017.

The purchase obligations above is primarily due to the JSP Distribution Agreement. If the minimum purchase requirement is not met, JSP has the right to terminate the contract within 60 days of Lannett's failure to meet the requirement. If JSP terminates the contract, Lannett does not pay any fee, but could lose its exclusive distribution rights in the United States. If Lannett's management believes that it is not in the Company's best interest to fulfill the minimum purchase requirements, it can also terminate the contract without any penalty. If either party were to terminate the purchase agreement, there would be a significant impact on the financial position, results of operations and operating cash flows of the Company. See Note 21 "Material Contracts with Suppliers" to our Consolidated Financial Statements for more information on the terms, conditions and financial impact of the JSP Distribution Agreement.

Operating lease obligations primarily relate to a 116,000 square foot leased warehouse in Seymour, Indiana as well as a 25 year lease with Forward Cody, which commenced on April 2015.

**Research and Development Arrangements**

In the normal course of business, the Company has entered into certain research and development and other arrangements. As part of these arrangements, the Company has agreed to certain contingent payments which generally become due and payable only upon the achievement of certain developmental, regulatory, commercial and/or other milestones. In addition, under certain arrangements, we may be required to make royalty payments based on a percentage of future sales, or other metric, for products currently in development in the event that the Company begins to market and sell the product. Due to the inherent uncertainty related to these developmental, regulatory, commercial and/or other milestones, it is unclear if the Company will ever be required to make such payments. As such, these contingencies are not reflected in the expected cash requirements for Contractual Obligations in the table above.

**Prospects for the Future**

Over the last several years, we have grown to be a formidable generic drug company. We have earned the respect of our customers by our continuous growth in product offerings and our extraordinary service as a reliable supplier. The Company's strong regulatory record and the ability to respond to our customers' needs make our Company a desirable supplier. In 2016, we won the prestigious Diana Award for Best Generic Manufacturer from the Healthcare Distribution Alliance.

The Company is strengthening and building momentum to grow within the generic pharmaceutical industry organically and through mergers and acquisitions. The acquisitions of Silarx and KUPI demonstrates our ability to grow through M&A.

One initiative at the core of the Company's long term strategy is our plan to vertically integrate our supply chain. Acquired in 2007, we continue leveraging Cody Labs. In July 2008, the DEA granted Cody Labs a license to directly import concentrated poppy straw for extraction into opioid-based active pharmaceutical ingredients ("APIs") such as Morphine Base, Hydromorphone, Hydrocodone and Oxycodone, for use in various dosage forms for pain management. The value of this license comes from the successful development of patentable processes. Cody Labs has filed and received numerous patents using their expertise in API development and manufacture. Our technical skills allow the Company to perform in a market with high barriers to entry and limited foreign and domestic competition.

Because of this vertical integration, the Company has direct control of those APIs manufactured by Cody. In this fashion we can avoid increased costs, add to the Company's overall margins and avoid supply chain interruptions associated with buying APIs from third-party manufacturers. The Company can also leverage this vertical integration not only for direct supply of opioid-based APIs, but also for the manufacture of non-opioid-based controlled drugs such as Cocaine HCl.

Source: LANNETT CO INC, 10-K, August 28, 2017

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

In January 2017, the Company announced a $50 million expansion to our Cody Labs' facilities.

The Company believes that demand for controlled substances and pain management drugs, having grown from $3 billion in 2005 to over $31 billion today, will continue based upon the "Baby Boomer" demographics. By concentrating additional resources in the development of opioid-based APIs and dosage forms, as well as drugs used to treat addiction, the Company is well-positioned to take advantage of this opportunity. The Company is currently vertically integrated on three products, with several others in various stages of development.

One product that the Company manufactures is a brand drug for use in nasal surgery. Our C-Topical® Solution brand of cocaine hydrochloride involves the successful patented synthetic process developed by Cody. This product is being manufactured and marketed under the product name C-Topical® Solution. This product is an analgesic topical solution, with vasoconstriction as a side effect, for use primarily by ear, nose and throat physicians during surgical procedures. This product represents the Company's first foray into the brand market. Currently, we have completed the Phase III study and our CRO is assembling the data that Lannett's regulatory department will use to file our New Drug Application. As the Company continues to invest in and focus on process and manufacturing optimization, Cody Labs will continue to be an important part of our future growth plan.

==Selling brand versus generic products requires a dedicated sales force to detail and educate physicians on the product.== The Company strongly believes that C-Topical®, once FDA has granted approval, will be an important contributor to total revenue, with higher than average profit margins as a result of vertical integration. The Company's strategic goal is to continue investing in controlled substance product development. Revenues from manufactured products derived from controlled substances carry higher-than-average gross margins.

In addition to focusing on the development and manufacture of opioid-based APIs and dosage forms, the Company has made a decision to develop products which require a paragraph four ("P-IV") certification when filing the ANDA. A P-IV certification is required when an ANDA is submitted for a product for which the innovator's patent has not yet expired. The certification must state whether the patent on the reference listed drug ("RLD") is being challenged on grounds of it being invalid, or if the patent is being circumvented. This path to product approval represents an opportunity for our Company, because we do not have to wait until a particular patent expires to potentially enter the market. Secondly, if our Company is the first-to-file a P-IV certification on a product and we successfully invalidate or circumvent the patent, the FDA may grant 180 days of market exclusivity. This allows us to be the sole competitor to the brand currently on the market for six months unless the innovator company sells an AG. During this market exclusivity period, we could capture a significant portion of the market from the brand company at reasonably higher prices than our older products.

The Company filed its first ANDA with a P-IV certification in Fiscal 2013. As of June 30, 2017, we have 9 paragraph IV certifications pending with the FDA. Three of the P-IV certifications are currently being challenged. In response to our P-IV certification with respect to the Zomig® nasal spray product, AstraZeneca AB, AstraZeneca UK Limited and Impax Laboratories, Inc. filed two patent infringement complaints against the Company in July 2014. In response to our P-IV certification with respect to Thalomid®, Celgene Corporation and Children's Medical Center Corporation filed a patent infringement lawsuit against the Company in January 2015. In response to our P-IV certification with respect to Suprep®, Braintree Laboratories, Inc. filed a patent infringement lawsuit against the Company in March 2017. Refer to Note 12 "Legal, Regulatory Matters and Contingencies" for further information on the current status of the aforementioned P-IV challenges.

The Company has a business development group focused on mergers, acquisitions and other strategic alliances. The Company is party to supply and development agreements with JSP, Summit Bioscience LLC, HEC Pharm Group, Pharma Pass II LLC and various other international and domestic companies. The Company is currently in negotiations of similar agreements with other companies and is actively seeking additional strategic partnerships, through which it will market and distribute products manufactured in-house or by third parties. The Company plans to continue evaluating potential merger and acquisition opportunities as well as product acquisitions that are a strategic fit and accretive to the business.

After we closed upon the KUPI acquisition, we established a very aggressive integration plan. Our integration plans are moving swiftly and we will be benefitting from the synergies created through integration.

The FDA inspected our overseas pharmacokinetic subsidiary Darmantest Laboratory as well as Firmplace, a joint-venture stability lab this fall. Both Darmantest and Firmplace passed inspection. These operations may result in lower costs for stability and bioequivalency studies in the future.

Source: LANNETT CO INC, 10-K, August 28, 2017

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Exhibit 7

# MARKETED UNAPROVED DRUGS ─ OVERVIEW AND FDA ENFORCEMENT POLICIES

by

**Kurt R. Karst**
**Hyman, Phelps & McNamara, P.C.**
**700 Thirteenth Street, N.W., Suite 1200**
**Washington, D.C.  20005**
**Telephone:   (202) 737-7544**
**Facsimile:  (202) 737-9329**
**krk@hpm.com**

**Paper for presentation at Washington Information Source, Co. Expert Briefing:**
**"FDA's Final Compliance Policy Guide for Marketed Unapproved Drugs ─ Is Agency**
**Enforcement at a Crossroads, or Stuck in a Traffic Circle?"**
**Washington, D.C.  ●  August 10, 2006.**

## INTRODUCTION

This paper describes the Food and Drug Administration's ("FDA's") regulations and policies concerning the marketing of unapproved prescription drugs, summarizes drug regulation under the Federal Food, Drug, and Cosmetic Act ("FDC Act"), describes the different "categories" of drugs that are currently marketed in the United States (which have been created as a result of several amendments to the FDC Act since 1938), and describes FDA's enforcement policies for prescription products categorized as unapproved drugs.

## SUMMARY

Legally marketed drugs are those drugs marketed in accordance with an approved New Drug Application ("NDA") (and generic copies of such drugs marketed under an approved Abbreviated NDA ["ANDA"]), and drugs that are exempt from the NDA requirement.  This latter category includes pre-1938 and pre-1962 "grandfathered" drugs, drugs subject to an ongoing Drug Efficacy Study Implementation ("DESI") proceeding, prescription drugs Generally Recognized As Safe and Effective ("GRASE"), and drugs marketed in accordance with a final or tentative Over-the-Counter ("OTC") drug monograph.

Illegally marketed drugs subject to FDA enforcement action include drugs marketed outside of an OTC drug final or tentative final monograph, drugs found to be effective under DESI but for which an NDA or ANDA has not been submitted, drugs subject to a completed DESI proceeding that found them to be not effective, drugs subject to the Prescription Drug Wrap-Up, new unapproved drugs, and drugs that do not meet the GRASE requirements or that differ in some respect from pre-1938 or pre-1962 "grandfathered" drugs.  Although FDA estimates that there are several thousand such drugs that are being marketed illegally, FDA has not taken enforcement action against many of them by exercising its enforcement discretion.  Nevertheless, FDA has articulated a risk-based enforcement approach that has been and will continue to be the basis for enforcement action.

## DEFINITION OF "DRUG" AND "NEW DRUG"

The FDC Act defines the term "drug" as:

(A)   articles recognized in the official United State Pharmacopeia, official Homeopathic Pharmacopeia of the United States, or official National Formulary, or any supplement to any of them; and

(B)   articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and

(C)   articles (other than food) intended to affect the structure or any function of the body of man or other animals; and

(D)   articles intended for use as a component of any articles specified in clause (A), (B), or (C)….[1]

Thus, whether a product is a "drug" generally depends on its "intended use."[2]

A product that is a "new drug" within the meaning of FDC Act § 201(p) may not be introduced into interstate commerce unless there is an approved marketing application (e.g., an NDA), or unless an exemption has been granted permitting the introduction of the drug into interstate commerce (e.g., an effective Investigational New Drug Application).[3] However, not all drugs are considered "new drugs" for which premarket approval is required.  A drug is not a "new drug" if: (1) it is GRASE under the conditions of use for which it is labeled; and (2) it has been used "to a material extent or for a material time under those conditions."[4]

## HISTORICAL DEVELOPMENT OF THE FDC ACT

***The 1938 Amendments.***  The original Federal Food and Drugs Act first brought drug regulation under federal law in 1906 by prohibiting the sale of adulterated or misbranded drugs.  However, the statute did not require that drugs be approved by FDA in order to be marketed.  In 1938, Congress passed the FDC Act, which added the requirement that "new drugs," that is, drugs not Generally Recognized As Safe ("GRAS"), be approved

---

[1]       FDC Act § 201(g)(1).

[2]       See generally 21 C.F.R. § 201.128 (defining the meaning of "intended use").  Usually (but not always) FDA looks to the immediate label and the other labeling of a product to determine its "intended use."  Occasionally, however, FDA will look beyond the labels and labeling to determine the "intended use" of a product.  On very unusual occasions, FDA may look to other sources to maintain that a particular product is "really" intended for use as a drug even though the product is promoted with, for example, cosmetic claims in its label, labeling, and advertising.

[3]       FDC Act § 505(a).

[4]       Id. at § 201(p).

Washington Information Source, Co. Expert Briefing:  "FDA's Final Compliance Policy Guide for Marketed
Unapproved Drugs ─ Is Agency Enforcement at a Crossroads, or Stuck in a Traffic Circle?"
Washington, D.C.  ●  August 10, 2006                                                          **Page 4**

for safety in an NDA.  The active ingredients in many currently marketed drugs were first
introduced, at least in some form, before June 25, 1938 (the date on which the FDC Act
was enacted).  Drugs on the market prior to that date are exempt from "new drug" status
under a "grandfather clause," and therefore, are exempt from the requirement of submitting
an NDA, provided the drug contains the same chemical composition, indications, and other
conditions for use as the "grandfathered drug."[5]

If a drug obtained approval between 1938 and 1962, FDA generally permitted
Identical, Related, or Similar ("IRS") drugs to the approved drug to be marketed without
independent approval.  Many manufacturers also introduced drugs onto the market between
1938 and 1962 based on their own conclusion that the products were GRAS, and thus
exempt from the statutory "new drug" definition, or based on a formal opinion from FDA
that the products were not "new drugs."

**The 1962 Drug Amendments and the Drug Efficacy Study Implementation
Program.**  In 1962, Congress amended the FDC Act to require that a "new drug" be
demonstrated to be effective, as well as safe, in order to obtain FDA approval.[6]  However,
under a "grandfather clause" included in the 1962 Drug Amendments, a drug is exempt
from the effectiveness requirement if its composition and labeling has not changed since
October 10, 1962 (the date on which the 1962 Drug Amendments were enacted), and if, on
the day before the 1962 Drug Amendments became effective, the drug was: (1) used or sold
commercially in the United States; (2) not a "new drug" as defined by the FDC Act at that
time; and (3) not covered by an effective application.[7]

The 1962 Drug Amendments also required FDA to conduct a retrospective
evaluation of the effectiveness of the drug products approved as safe between June 25,
1938 and October 10, 1962.  FDA engaged the National Academy of Science/National
Research Council ("NAS/NRC") to make an initial evaluation of the effectiveness of over
3,400 products that had been approved based only on safety.  The NAS/NRC conducted the
review, which was broken down into specific drug categories.  The NAS/NRC submitted
the results of the review to FDA, which then reviewed and reevaluated the NAS/NRC
findings and published its own findings in the <u>Federal Register</u>.

---

[5]  <u>Id.</u>

[6]  <u>See</u> The Drug Amendments of 1962, Pub. L. No. 87-781, 76 Stat. 780 (1962) ("1962 Drug
Amendments").

[7]  <u>See id.</u> at § 107(c)(4); <u>see also</u> <u>USV Pharm. Corp. v. Weinberger</u>, 412 U.S. 655, 662-66
(1973).

FDA's administrative implementation of the NAS/NRC reports was called the DESI program.  DESI covered the products specifically reviewed by the NAS/NRC, as well as the even larger number of IRS products that had entered the market without FDA approval.  If FDA's final determination classified a drug as effective for its labeled indications, then the Agency required sponsors of approved NDAs (referred to as "deemed approved" NDAs) to supplement their applications for continued marketing of the drug, and sponsors of IRS drugs to submit Abbreviated NDAs ("ANDAs") seeking approval.[8]  If FDA's final determination classified a drug as ineffective, then, because DESI products were covered by "deemed approved" NDAs, FDA was required to follow administrative hearing procedures in the FDC Act and regulations to withdraw the NDA.

Some currently marketed products are subject to completed DESI proceedings, but nevertheless lack approved marketing applications.  This includes a number of products IRS to DESI products for which approval was withdrawn due to a lack of substantial evidence of effectiveness.  This group also includes a number of products IRS to those DESI products for which the FDA made a final determination that the product is effective, but ANDAs for the IRS products have not been submitted and approved as required under the statute and FDA's long-standing enforcement policy.[9]  FDA considers all of these products to be unapproved and marketed illegally, but uses its enforcement discretion to take enforcement action against firms marketing those products that the Agency believes present a potential safety risk, lack evidence of effectiveness, or are deceptively promoted.[10]

Some products currently on the market are unapproved but are still undergoing DESI reviews in which a final determination regarding efficacy has not yet been made.  In addition to the products specifically reviewed by the NAS/NRC (i.e., those products with "deemed approved" NDAs), this group includes unapproved products IRS to those products specifically reviewed.[11]  In many of these proceedings, FDA has made an initial determination that the products lack substantial evidence of effectiveness, and the

---

[8]       The ANDA procedures developed by FDA were created in 1970 and apply to pre-1962 IRS drugs.  See 35 Fed. Reg. 6574 (Apr. 24, 1970).  Conventional ANDAs were created in 1984, when Congress, through the Hatch-Waxman Act, created FDC Act § 505(j).

[9]       See 21 C.F.R. § 310.6.

[10]      See FDA, Guidance for FDA Staff and Industry, Marketed Unapproved Drugs – Compliance Policy Guide, at 3 (June 2006) ("Unapproved Drugs Guidance"), available at http://www.fda.gov/cder/guidance/6911fnl.pdf.  The appendix to this guidance document provides an excellent overview of DESI.

[11]      See 21 C.F.R. § 310.6.

Case 3:18-cv-07603-WHO   Document 116-1   Filed 02/06/20   Page 92 of 104

Washington Information Source, Co. Expert Briefing: "FDA's Final Compliance Policy Guide for Marketed
Unapproved Drugs — Is Agency Enforcement at a Crossroads, or Stuck in a Traffic Circle?"
Washington, D.C.  ●  August 10, 2006                                                                    Page 6

manufacturers have requested a hearing on that finding.  Under a long-standing FDA
policy, products subject to an ongoing DESI proceeding may remain on the market during
the pendency of the proceeding.[12]

 *Prescription Drug Wrap-Up.*  As discussed above, many drugs came onto the
market before 1962 without FDA approvals.  Many of these products claimed to be
marketed prior to June 25, 1938 or IRS to such a drug, and therefore, there may be a
colorable claim to "grandfather" status.[13]  Drugs that did not have pre-1962 approvals or
were not IRS to drugs with pre-1962 approvals were not subject to DESI.  For a period of
time, FDA allowed these drugs to remain on the market and allowed new unapproved
drugs that were IRS to these pre-1962 drugs to enter the market without approval.

 Due to a tragedy involving an unapproved Vitamin E intravenous injection (E-
FEROL), and in response to Congressional concern about the thousands of unapproved
drugs in the marketplace, in 1984 FDA assessed the pre-1962 non-DESI marketed drug
products.  The program for addressing these marketed but unapproved drugs and certain
others like them became known as the "Prescription Drug Wrap-Up."[14]  FDA believes that
most of the Prescription Drug Wrap-Up drugs first entered the market before 1938, at least
in some form.  For the most part, FDA has evaluated neither the safety nor the effectiveness
of the drugs in the Prescription Drug Wrap-Up.  However, according to FDA's
interpretation, drugs that were subject to the Prescription Drug Wrap-Up are all marketed
illegally, unless a manufacturer of such a drug can establish that the drug is "grandfathered"
or otherwise not a "new drug."

 *New Unapproved Drugs.*  Some unapproved drugs were first marketed, or were
changed, after the 1962 Drug Amendments were enacted (i.e., drugs that were not covered
in the Prescription Drug Wrap-Up).  Still other drugs are the subject of a formal "new drug"
finding (e.g., timed-release drugs, and parenteral drugs in plastic containers).[15]  FDA has

---

[12] See Unapproved Drugs Guidance at 8.

[13] FDA's regulation specifying the content of a hearing request for a drug claimed to qualify
for the pre-1938 "grandfather" clause suggests that FDA regards small changes in
composition and labeling as relevant to such status.  See 21 C.F.R. § 314.200(e)(2).

[14] The Prescription Drug Wrap-Up is also sometimes referred to as "DESI-2."  FDA's
Prescription Drug Wrap-Up list is over 1,500 pages long, and identifies approximately
5,150 unapproved, marketed products.  FDA claims that most of the drugs included in the
list are pre-1938 and unapproved pre-1962 drugs (or drugs that are IRS to such a product),
but has acknowledged that the list is incomplete and may also include post-1962
unapproved drugs.

[15] See 21 C.F.R. § 310.502.

Washington Information Source, Co. Expert Briefing:  "FDA's Final Compliance Policy Guide for Marketed
Unapproved Drugs — Is Agency Enforcement at a Crossroads, or Stuck in a Traffic Circle?"
Washington, D.C.  ●  August 10, 2006                                                                                           Page 7

taken the position that drugs in this category are all marketed illegally and are subject to enforcement action, unless covered by an approved marketing application.[16]

    ***Scope of the "Grandfather Clauses" and the GRASE Exemption.***  The 1938 and 1962 "grandfather clauses" in the FDC Act have been construed very narrowly by FDA and the courts.  FDA believes that there are few, if any, marketed drugs that are actually entitled to "grandfather" status, because the drugs currently on the market likely differ from the previous versions in some respect, such as formulation, dosage form,  strength, method of manufacture, route of administration, indications, or intended patient population.  If a company claims that its product is "grandfathered," FDA considers it the firm's burden to prove that assertion.[17]  FDA has stated that it believes "it is not likely that any currently marketed prescription drug product is grandfathered or is otherwise not a *new drug*," but recognizes that "it is at least theoretically possible" that such a product exists.[18]

    As discussed above, a product may be determined to be GRASE and to have been used "to a material extent or for a material time" for its labeled conditions.[19]  Such products are not "new drugs," and thus may be marketed legally without an approved NDA.  As with the pre-1938 and pre-1962 "grandfather clauses," this exemption has been construed very narrowly by FDA and the courts.[20]

    ***Over-the-Counter Drugs.***  OTC drugs were originally included in DESI, but FDA eventually concluded that this was not an efficient use of resources.  In 1972, FDA implemented a process (i.e., the OTC Drug Review) of reviewing OTC drugs through rulemaking by therapeutic classes (e.g., antacids, antiperspirants, cold remedies).  The OTC Drug Review is intended to result in the publication of a final monograph for each therapeutic class.  The monographs set forth the permissible claims, labeling, and active ingredients for OTC drugs in each class.[21]  Drugs that are marketed in accordance with a final monograph are considered to be GRASE and do not require FDA approval of a

---

[16]    See Unapproved Drugs Guidance at 11.

[17]    See 21 C.F.R. § 314.200(e)(5).

[18]    Unapproved Drugs Guidance at 11 (italics in original).

[19]    FDC Act § 201(p).

[20]    See e.g., Weinberger v. Hynson, Westcott & Dunning, Inc., 412 U.S. 609 (1973); see also FDA Response, Docket No. 97N-0314 (April 26, 2001), *available at* http://www.fda.gov/ohrms/dockets/dockets/97n0314/pdn0002.pdf (finding that SYNTHROID -a levothyroxine sodium product- was not GRASE).

[21]    See e.g., 21 C.F.R. Part 333.

marketing application, because GRASE substances are exempt from the statutory definition of a "new drug."

Final monographs have been published for the majority of OTC drugs.  Tentative final monographs have been issued for virtually all the remaining categories of OTC drugs. FDA has also finalized a number of "negative monographs" that list therapeutic categories in which no OTC drugs can be marketed without approval through an NDA.[22]  FDA has also promulgated a list of active ingredients that cannot be used in certain unapproved OTC drugs because there are inadequate data to establish that they are GRASE.

FDA has taken the position that OTC drugs covered by ongoing OTC monograph proceedings may remain on the market, subject to current enforcement policies.[23]  FDA has extended these policies to products sold as prescription drugs with ingredients under the OTC Drug Review, deferring action until the monograph is final.[24]  OTC drugs that require approval because their ingredients or claims are not within the scope of the OTC Drug Review, or are not allowed under a final monograph or another final rule, are illegally marketed unless they are the subject of an approved marketing application.

## FDA'S ENFORCEMENT PRIORITIES

FDA has estimated that "in the United States today, perhaps as many as several thousand drug products are marketed illegally without required FDA approval."[25]  Despite the fact that many drugs are on the market without the appropriate FDA approval, the Agency has stated that it will follow a risk-based approach with regard to enforcement against such unapproved drug products.  Under this approach, FDA gives higher priority to enforcement action against unapproved drugs in the following categories:

(1) Drugs with potential safety risks;

---

[22]  See e.g., id. at § 310.530 (topically applied hormones).

[23]  See CPG Manual, Sec. 450.200 –General Provisions and Administrative Procedures for Recognition as Safe and Effective (CPG 7132b.15), *available at* http://www.fda.gov/ora/compliance_ref/cpg/cpgdrg/cpg450-200.html; CPG Manual Sec. 450.300 – General Provisions and Administrative Procedures for Recognition for Marketing Combination Products (CPG 7132b.16), *available at* http://www.fda.gov/ora/compliance_ref/cpg/cpgdrg/cpg450-300.html.

[24]  See 21 C.F.R. § 330.13.

[25]  Unapproved Drugs Guidance at 2.

Case 3:18-cv-07603-WHO   Document 116-1   Filed 02/06/20   Page 95 of 104

**Washington Information Source, Co. Expert Briefing:  "FDA's Final Compliance Policy Guide for Marketed Unapproved Drugs — Is Agency Enforcement at a Crossroads, or Stuck in a Traffic Circle?" Washington, D.C.  ●  August 10, 2006**                                                    **Page 9**

(2) Drugs that lack evidence of effectiveness;

(3) Drugs that present a "health fraud;"[26]

(4) Drugs that present direct challenges to the "new drug" approval and OTC drug monograph systems;

(5) Unapproved "new drugs" that are also violative of the FDC Act in other ways (e.g., Current Good Manufacturing Practice ["CGMP"] regulation violations); and

(6) Drugs that are reformulated to evade an FDA enforcement action (e.g., when a firm, in anticipation of FDA enforcement action, changes its unapproved drug product by, for example, adding an active ingredient, in an attempt to evade such enforcement action).[27]

There are several examples of recent FDA enforcement action against firms marketing unapproved drugs that fall into some of these categories.[28]

FDA's action that led to the decision in United States v. Sage Pharma., Inc., 210 F.3d 475 (5th Cir. 2000), is precedent of the Agency adding unapproved "new drug" charges after finding other FDC Act violations.  In Sage, the United States Court of Appeals for the Fifth Circuit agreed that FDA was permitted "to address the unapproved status of a particular drug outside the established priorities in the same enforcement proceeding as other violations of the [FDC Act.]."[29]  Sage Pharmaceuticals' CGMP

---

[26]  Id. at 3.  FDA defines health fraud to mean "[t]he deceptive promotion, advertisement, distribution or sale of articles . . . that are represented as being effective to diagnose, prevent, cure, treat, or mitigate disease (or other conditions), or provide a beneficial effect on health, but which have not been scientifically proven safe and effective for such purposes.  Such practices may be deliberate, or done without adequate knowledge or understanding of the article."  Id. at 3 (quoting FDA Compliance Policy Guide § 120.500).

[27]  Id. at 3-4.

[28]  Examples of FDA enforcement action on unapproved drug, in addition to those discussed below, are described on FDA's website at http://www.fda.gov/cder/drug/unapproved_drugs/enforcement.htm.

[29]  210 F.3d at 479-80; see also United States v. Pharmakon Laboratory, Inc., Case No. 8:03-CV-1663-T-26MSS (M.D. Fl. July 25, 2005), *available at* http://www.fda.gov/cder/drug/unapproved_drugs/PharmakonJuly_25_order.pdf.

Washington Information Source, Co. Expert Briefing: "FDA's Final Compliance Policy Guide for Marketed
Unapproved Drugs ─ Is Agency Enforcement at a Crossroads, or Stuck in a Traffic Circle?"
Washington, D.C. ● August 10, 2006                                                           Page 10

violations led to the initiation of enforcement action to which a "new drug" charge was added.

FDA's action on single-entity extended-release guaifenesin products is precedent of the Agency taking immediate enforcement action against firms marketing unapproved drugs once FDA approves an NDA for a similar product. In October 2002, FDA sent Warning Letters to 66 firms that marketed unapproved single-ingredient extended-release guaifenesin products claiming that the products were illegally marketed "new drugs."[30] FDA's action was initiated after it approved an NDA for MUCINEX (extended-release guaifenesin tablets) in July 2002. The approval of MUCINEX provided FDA with the impetus to immediately enforce the FDC Act. The Agency's Warning Letters noted the permissible OTC monograph use of single-ingredient immediate-release guaifenesin, and specifically cited 21 C.F.R. § 310.502(a)(14) (requiring approval of an NDA for timed-release drugs) as a basis for claiming that the firms were marketing unapproved new drugs.

Finally, in June 2006, FDA announced that the Agency plans to take enforcement action against companies marketing unapproved drug products containing carbinoxamine (either single-entity or combination products), because: "(1) Carbinoxamine is a drug with potential safety risks . . .; and (2) the agency has approved an application to market a carbinoxamine-containing product, and thus the continued marketing of unapproved carbinoxamine products is a direct challenge to the drug approval process."[31] FDA's planned enforcement action was timed to coincide with the announcement of the availability of the Agency's Unapproved Drugs Guidance, and after the Agency had approved two ANDAs in March and April 2003, submitted by Mikart, with an anticipated supplement to these applications concerning the products' use in children under two years (due to safety concerns).

FDA evaluates whether to initiate enforcement action on a case-by-case basis, consistent with the Agency's risk-based enforcement approach. FDA generally does not intend to give special or advance notice that an unapproved drug may be subject to enforcement action, unless such notice is necessary given specific circumstances, or because notice would be appropriate to protect the public health. However, marketed unapproved products that are subject to a completed DESI proceeding or a final OTC drug

---

[30]      See e.g., FDA, Warning Letter to Allscripts Healthcare Solutions, (Oct. 11, 2002), *available at* http://www.fda.gov/cder/warn/2002/GuaifenesinLetters2.pdf.

[31]      FDA, Notice; Carbinoxamine Products; Enforcement Action Dates, 71 Fed. Reg. 33,462, 33,464 (June 9, 2006).

monograph proceeding are often given a grace period to bring their products into compliance with the law.[32]

###

---

[32]     See Unapproved Drugs Guidance at 4-5.

# EXHIBIT 8

Lannett Company, Inc.
Philadelphia, PA 19136

## COCAINE HYDROCHLORIDE
Topical Solution

Rx only

NOT FOR INJECTION OR OPHTHALMIC USE.

### DESCRIPTION

Each mL contains:
Cocaine hydrochloride 40 mg or 100 mg As aqueous solution.
The topical solution contains the following inactive ingredients: citric acid, D&C Yellow No. 10, FD&C Green No. 3, sodium benzoate, and water.

**NOTE (for Glass Bottle):** External surface of unopened bottle may be sterilized by ethylene oxide only. Do not steam autoclave.
Cocaine hydrochloride USP is a crystalline, granular, or powder substance having a saline, slightly bitter taste that numbs tongue and lips. Cocaine hydrochloride is a local anesthetic.

### CLINICAL PHARMACOLOGY

Cocaine blocks the initiation or conduction of the nerve impulse following local application, thereby effecting local anesthetic action. Cocaine is absorbed from all sites of application, including mucous membranes and the gastrointestinal mucosa. Cocaine is degraded by plasma esterses, with the half-life in the plasma being approximately one hour.

### INDICATIONS AND USAGE

Cocaine hydrochloride topical solution is indicated for the introduction of local (topical) anesthesia of accessible mucous membranes of the oral, laryngeal and nasal cavities.

### CONTRAINDICATIONS

Cocaine hydrochloride is contraindicated in patients with a known history of hypersensitivity to the drug or to the components of the topical solution.

### WARNINGS

RESUSCITATIVE EQUIPMENT AND DRUGS SHOULD BE IMMEDIATELY AVAILABLE WHEN ANY LOCAL ANESTHETIC IS USED.
**Carcinogenesis, Mutagenesis**
Long-term studies to determine the carcinogenic and mutagenic potential of cocaine are not available.
**Pregnancy**
*Teratogenic Effects-Pregnancy Category C:* Animal reproduction studies have not been conducted with cocaine. It is also not known whether cocaine can cause fetal harm when administered to a pregnant woman or can affect reproduction capacity. Cocaine should be given to a pregnant woman only if needed.

### PRECAUTIONS

The safety and effectiveness of cocaine hydrochloride topical solution depends on proper dosage, correct technique, adequate precautions, and readiness for emergencies. Standard textbooks should be consulted for specific techniques and precautions for various anesthetic procedures.
The lowest dosage that results in effective anesthesia should be used to avoid high plasma levels and serious adverse effects. Debilitated, elderly patients, acutely ill patients, and children should be given reduced doses commensurate with their age and physical status.
Cocaine hydrochloride topical solution should be used with caution in patients with severely traumatized mucosa and sepsis in the region of the proposed application. Use with caution in persons with known drug sensitivities.

### ADVERSE REACTIONS

Adverse reactions may be due to high plasma levels as a result of excessive and rapid absorption of the drug. Reactions are systemic in nature and involve the central nervous system and/or the cardiovascular system. A small number of reactions may result from hypersensitivity, idiosyncrasy or diminished tolerance on the part of the patient.
CNS reactions are excitatory and/or depressant, and may be characterized by nervousness, restlessness and excitement. Tremors and eventually clonic-tonic convulsions may result. Emesis may occur. Central stimulation is followed by depression, with death resulting from respiratory failure.
Small doses of cocaine slow the heart rate, but after moderate doses, the rate is increased due to central sympathetic stimulation.
Cocaine is pyrogenic, augmenting heat production in stimulating muscular activity and causing vasoconstriction which decreases heat loss. Cocaine is known to interfere with the uptake of norepinephrine by adrenergic nerve terminals, producing sensitization to catecholamines, causing vasoconstriction and mydriasis.
Cocaine causes sloughing of the corneal epithelium, causing clouding, pitting, and occasionally ulceration of the cornea. The drug is not meant for ophthalmic use.

### OVERDOSAGE

The fatal dose of cocaine has been approximated at 1.2 g., although severe toxic effects have been reported from doses as low as 20 mg.
*Symptoms* – The symptoms of cocaine poisoning are referable to the CNS, namely the patient becomes excited, restless, garrulous, anxious and confused.
Enhanced reflexes, headache, rapid pulse, irregular respiration, chills, rise in body temperature, mydriasis, exophthalmos, nausea, vomiting and abdominal pain are noticed. In severe overdoses, delirium, Cheyne-Stokes respiration, convulsions, unconsciousness, and death from respiratory arrest result. Acute poisoning by cocaine is rapid in developing.

*Treatment* – The specific treatment of acute cocaine poisoning is the intravenous administration of a short-acting barbiturate or diazepam. Artificial respiration may be necessary. It is important to limit absorption of the drug. If entrance of the drug into circulation can be checked, and respiratory exchange maintained, the prognosis is favorable since cocaine is eliminated fairly rapidly.

## DOSAGE AND ADMINISTRATION

The dosage varies and depends upon the area to be anesthetized, vascularity of the tissues, individual tolerance, and the technique of anesthesia. The lowest dosage needed to provide effective anesthesia should be administered. Dosages should be reduced for children and for elderly and debilitated patients. Cocaine hydrochloride topical solution can be administered by means of cotton applicators or packs, instilled into a cavity, or as a spray.

## HOW SUPPLIED

**4% Cocaine Hydrochloride Topical Solution, clear, blue-green solution.**
NDC 0527-1728-74: Unit-of-Use **Glass Bottle** filled to contain 4 mL, one 4 mL bottle per carton.
NDC 0527-1728-73: **Multi-Dose Bottle** of 10 mL.

**10% Cocaine Hydrochloride Topical Solution, clear, blue-green solution.**
NDC 0527-1729-74: Unit-of-Use **Glass Bottle** filled to contain 4 mL, one 4 mL bottle per carton.
NDC 0527-1729-73: **Multi-Dose Bottle** of 10 mL.

DEA Order Form Required.

Store at 20° to 25°C (68° to 77°F). [See
USP Controlled Room Temperature].

Avoid freezing.

Keep out of reach of children.

Rev. 03/08

Manufactured
By
Cody Laboratories, Inc.
Cody, WY 82414
For
Lannett Company, Inc.
Philadelphia, PA 19136

Exhibit 9



Contacts: Robert Jaffe/Evan Pondel
PondelWilkinson Inc.
(310) 279-5980

### LANNETT ANNOUNCES LAUNCH OF TWO PRODUCTS

*-- Company Enters Pain Management Market with Topical Anesthetic --*

**Philadelphia, PA – December 11, 2008** – Lannett Company, Inc. (AMEX:LCI), a manufacturer of generic pharmaceuticals, today announced it has launched a certain topical anesthetic product used in a variety of hospital and outpatient settings.  Sales of the topical anesthetic product were $10 million in 2007, according to Wolters Kluwer.

The company also said it has launched Amantadine HCl brand equivalent to Symmetrel, a registered trademark of Endo Pharmaceuticals, Inc., which is the first product resulting from its joint venture with Banner Pharmacaps, Inc. Amantadine HCl is indicated for use as an anti-viral, anti-Parkinson and treatment of drug induced extrapyramidal symptoms.

"The launch of the topical anesthetic product enables Lannett to enhance its visibility as a provider of widely prescribed pain management products," said Arthur Bedrosian, president and chief executive officer of Lannett.  "This is the fourth launch of a product that stems directly from our acquisition of Cody Laboratories, an important milestone for the company as we plan on introducing other pain management products.

"Additionally, our joint venture with Banner Pharmacaps allows our company to augment our product offerings through a strategic alliance that we believe provides a competitive advantage," Bedrosian said.

**Lannett Company:**
Lannett Company, founded in 1942, develops, manufactures, packages, markets and distributes generic pharmaceutical products for a wide range of indications.  For more information, visit Lannett Company's website at www.lannett.com.

*This news release contains certain forward-looking statements, which express the current beliefs and expectations of management. Such statements are based on current expectations and involve a number of known and unknown risks and uncertainties that could cause Lannett's future results, performance or achievements to differ significantly from the results, performance or achievements expressed or implied by such forward-looking statements. Important factors that could cause or contribute to such differences include Lannett's ability to successfully introduce other pain management products, successfully develop products, the impact of competition from brand name companies that sell their own generic products or successfully extend the exclusivity period of their branded products, the availability of product liability coverage in the current insurance market, the impact of pharmaceutical industry regulation and pending legislation that could affect the pharmaceutical industry, the difficulty of predicting U.S. Food and Drug Administration and other regulatory authority approvals, acceptance and demand for new pharmaceutical products and new therapies, uncertainties regarding market acceptance of innovative products newly launches, currently being sold or in development, the impact of restructuring of clients, reliance on strategic*

*alliances, exposure to product liability claims, dependence on patent and other protections for innovative products, fluctuations in currency, exchange and interest rates, operating results and other factors that are discussed in Lannett's Form 10K for its fiscal year ended June 30, 2008 and its other filings with the U.S. Securities and Exchange Commission. Forward looking statements speak only as of t he date on which they are made, and the Company undertakes no obligation to update publicly or revise any forward-looking statement, whether as a result of new information, future developments or otherwise.*

# # #

Exhibit 10

Filed Under Seal